21

Filed 12 April 20 P1:41
Chris Daniel - District Clerk
Harris County
ED101J016840072
By: Wanda Chambers

CAUSE NO. 2011-67220

| | | |
|---|---|---|
| FUNimation ENTERTAINMENT, | § | IN THE DISTRICT COURT OF |
| Plaintiff | § | |
| | § | |
| v. | § | HARRIS COUNTY, TEXAS |
| | § | |
| A.D. VISION, INC., JOHN ROBERT | § | |
| LEDFORD II, AESIR HOLDINGS L.L.C. | § | |
| SXION 23, L.L.C., SERAPHIM | § | |
| STUDIOS, L.L.C., SENTAI FILMWORKS, | § | |
| L.L.C., SENTAI HOLDINGS, L.L.C., and | § | |
| UNIO MYSTICA HOLDINGS, L.L.C., | § | |
| f/k/a UNIOMYSTICA, L.L.C. d/b/a | § | |
| SWITCHBLADE PICTURES, | § | |
| Defendants. | § | 151ST JUDICIAL DISTRICT |

## PLAINTIFF'S MOTION TO DISMISS COUNTERCLAIM AND TO STRIKE AFFIRMATIVE DEFENSES, WITH SUPPORTING MEMORANDUM

TO THE HONORABLE COURT:

Plaintiff FUNimation Entertainment ("FUNimation") files this Motion to Dismiss and to Strike, respectively, the Counterclaim and Affirmative Defenses contained in:

- Paragraphs 4, 5, 14, 16 and 22-25 of the Original Answer and Counterclaim filed by Defendants AEsir Holdings, LLC, Sxion 23, LLC, Valkyrie Media Partners, LLC, Seraphim Studios, LLC, Sentai Filmworks, LLC, Sentai Holdings, LLC, and Unio Mystica Holdings, LLC, f/k/a Uniomystica, LLC, d/b/a Switchblade Pictures (collectively, the "Transferee Defendants"); and

- Paragraphs 2, 3, and 12 of the Original Answer filed by Defendants A.D. Vision, Inc. ("ADV") and John Robert Ledford II ("Ledford").

Plaintiff respectfully shows the Court as follows:

Certified Document Number: 51986648 - Page 1 of 11

# BACKGROUND

In 2008, another court in this judicial district held that ADV had breached a series of contracts with third party ARM Corporation ("ARM") by failing to make contractually required payments in excess of $11 million. (Exhibit 1 to the Affidavit of Lauren J. Harrison ("Harrison Aff.").)[1]  The Court issued a Writ of Sequestration allowing ARM to foreclose on collateral valued at over $3 million, leaving ADV in debt to it for approximately $7.3 million plus additional fees and interest. (*Id.*)  ARM subsequently sold the collateral and ADV's remaining debt to FUNimation. (Exh. 2 to Harrison Aff.)

In May 2009, FUNimation contacted ADV – specifically its CEO, defendant John Robert Ledford II ("Ledford") – seeking to collect the debt.  Mr. Ledford responded to FUNimation's inquiry by falsely informing FUNimation that ADV was about to file for bankruptcy protection and referring the inquiry to ADV's bankruptcy counsel. (Exh. 3 to Harrison Aff.)  In fact, however, Mr. Ledford and a small group of ADV employees hastily formed a number of shell corporations with the Texas Secretary of State office. (Exhs. 4-7 to Harrison Aff.)  Within days the ADV insiders transferred all of ADV's assets to the shell companies.  Each of the companies was formed and managed by ADV employees. (*Ibid.*)   ADV did not transfer the debt that it owed to FUNimation.  That debt remained the property of ADV.  ADV never did file for bankruptcy, but it appears that it no longer has sufficient assets to satisfy the debt.

ADV kept the transfers secret for months while its counsel delayed responding to FUNimation's repeated inquiries regarding the debt, and while FUNimation continued to believe the fiction regarding ADV's imminent bankruptcy filing. (Exhs. 8-9 to Harrison Aff.)  It was only FUNimation's repeated requests for information directed to ADV's attorney that finally

---

[1] This motion does not ask the Court to consider any evidence.  The materials filed with the Affidavit are intended only to substantiate the allegations set forth in the Background to the dispute.

Certified Document Number: 51986648 - Page 2 of 11

prompted ADV to disclose the transfers.   ADV's attorney advised FUNimation of the "sale" on August 31.  (Exh. 10 to Harrison Aff.)  On September 1, ADV issued a press release announcing that that on June 1 it had transferred all of its assets to the newly-created companies.  (Exh. 11 to Harrison Aff.)

This case asks whether the denuding of ADV, cloaked as it was in fraud, constituted a fraudulent transfer, and who can or will satisfy the debt as a result.

## SUMMARY OF ARGUMENTS

FUNimation seeks by this Motion to remove unnecessary issues from the case in order to streamline discovery and to narrow the issues for resolution:

- The Transferee Defendants' counterclaim for Declaratory Judgment is an impermissible "mirror image" claim.  *Texas Liquor Ctrl. Bd. v. Canyon Creek Land Corp.*, 456 S.W.2d 891, 895 (Tex. 1970).

- All Defendants' affirmative defenses of "lack of standing" are properly construed as challenges to FUNimation's capacity to sue, not its standing, and therefore are required to be presented in the form of verified denials supported by sworn affidavits on behalf of each defendant claiming the defense. TEX. R. CIV. P.  93 (1, 2); *Pledger v. Schoellkopf*, 762 S.W.2d 145, 146 (Tex. 1988).

- All Defendants' affirmative defenses of "lack of consideration" and "material breach," are improper third party challenges to the validity of the assignment between ARM and FUNimation.  A debtor may not assert such defenses to an assignment agreement to which it is not a party.  *Glass v. Carpenter*, 330 S.W.2d 530, 537 (Tex. App. – San Antonio 1959, writ ref'd n.r.e.).

- All Defendants' "affirmative defenses" based on the "economic loss rule" should be stricken.  None of the causes of action in this case is subject to the economic loss rule. Fraud and actions predicated on fraud are well-known exceptions to the economic loss rule. *Formosa Plastics Corp. v. Presidio Engineers & Contractors*, 960 S.W.2d 41 (Tex. 1998).

## DISCUSSION

### 1. *Texas Does Not Allow "Mirror Image" Declaratory Judgment Counterclaims*

A defendant may not file a counterclaim for declaratory judgment that duplicates issues raised in the plaintiff's affirmative case.  This "Mirror Image" rule is well-settled.  *See, e.g.,*

Certified Document Number: 51986648 - Page 3 of 11

*Sanchez v. Americredit Financial Svces., Inc.*, 308 S.W.3d 521, 525 (Tex. App. – Dallas 2010, no pet.) (finding declaratory judgment claim improper that merely restated the party's defenses); *SCTW Health Care Ctr., Inc. v. AAR Inc.*, No. 01-07-00762, 2009 WL3321399 (Tex. App. – Houston [1st Dist.] Oct. 15, 2009) (not designated for publication) (upholding trial court order striking a counterclaim that asked "whether and to what extent" the defendant was obliged to pay – an issue that "was already at play in the pleadings filed by the parties"); *Warrentech Corp. v. Steadfast Ins. Co.*, 210 S.W.3d 760, 770 (Tex. App. – Fort Worth 2006) (holding that the Declaratory Judgment Act is not available to resolve issues already pending before the court).

The reason for the Mirror Image rule is to prevent parties from manufacturing claims for attorneys' fees in their defense of a case. A proper claim under the Texas Declaratory Judgment Act entitles the prevailing party to reimbursement of its reasonable fees. Allowing defendants to bring declaratory judgment "counterclaims" that do nothing more than negate the plaintiff's claims would manufacture unlimited claims for fees on behalf of successful defendants, essentially rewriting the "American rule." *See John Chezik Buick Co. v. Friendly Chevrolet Co.*, 749 S.W.2d 591, 594-95 (Tex.App.—Dallas 1988, no writ) (holding that a declaratory judgment counterclaim presenting no new controversy and "brought solely to pave an avenue to attorney fees" is improper).

The counterclaim filed by the Transferee Defendants offends the Mirror Image rule. FUNimation has brought a breach of contract claim against the "Transferee Defendants." The claim is based upon the same contract that gave rise to ADV's debt (called "the ADV Agreements" in the Petition). FUNimation's Petition specifically contends in its Breach of Contract Cause of Action that the Transferee Defendants are liable to FUNimation under the ADV Agreements:

Certified Document Number: 51986648 - Page 4 of 11

> ADV's failure to make payments under the ADV Agreements constitutes a material breach and wrongful repudiation and breach of the ADV Agreements for which ADV is liable to FUNimation in damages.
>
> As transferee of substantially all of ADV's intellectual property licenses, ***the Transferee Defendants succeeded to ADV's contractual liability under the ADV Agreements. The Transferee Defendants are liable to FUNimation for the repudiation and breach of the ADV Agreements***.

(First Amended Original Petition ¶¶ 52-53 ("Breach of Contract") (emphasis added)). This claim is premised on the notion that when ADV transferred all of its business and holdings to the Transferee Defendants, it succeeded in transferring its contractual liability as well, notwithstanding its apparent effort to carve that out. FUNimation's Petition expressly contends that the Transferee Defendants are bound by the ADV Agreements just as ADV is bound.

The "Counter-Claim Seeking Declaratory Judgment" that the Transferee Defendants filed requests a declaration that they are *not* bound by the ADV Agreements. That is the mirror image of FUNimation's claim. Specifically, the Transferee Defendants seek a declaration that "(i) the contract which forms the basis of Plaintiff's complaint is not a valid agreement binding on the [Transferee] Defendants; (ii) Defendants owe no duties or obligations whatsoever to Plaintiff or any other entity under the alleged contract; and (iii) that Plaintiff's claims as to Defendants arising under the alleged contract are dismissed." (Original Answer of [Transferee Defendants] at ¶ 25.)

This "counter-claim" requests determination of the same issues that are already pending before the Court by virtue of FUNimation's case in chief. It simply re-states the Transferee Defendants' defense to the contract claims. The "counter-claim" asks the Court to determine whether the Transferee Defendants are liable under the ADV Agreements, which is precisely what FUNimation's case-in-chief asks. If the Transferee Defendants were to prevail on this "counter-claim," they would not obtain anything more than if they succeeded on their defenses to

Certified Document Number: 51986648 - Page 5 of 11

FUNimation's breach of contract claim. *See HECI Exploration Co. v. Clajon Gas Co.*, 843 S.W.2d 622, 639 (Tex. App. – Austin 1992, writ denied) (holding that declaratory judgment counterclaim is improper when it would secure the party asserting it no greater relief than that party would obtain if it succeeded in defending the case).

FUNimation accordingly requests that the Court dismiss the Counterclaim of the Transferee Defendants contained at paragraphs 22-25 of their Answer.

2. ***Defendants' "Standing" Defenses Are Improperly Denominated and Unverified Challenges to Capacity***

Standing and capacity to sue are distinct concepts. Defendants conflate them. "A plaintiff has standing when it is personally aggrieved, regardless of whether it is acting with legal authority; a party has capacity when it has the legal authority to act, regardless of whether it has a justiciable interest in the controversy." *Nootsie v. Williamson Cty. Appraisal Dist.*, 925 S.W.2d 659, 661 (Tex. 1996). A challenge to the plaintiff's capacity to sue, unlike a challenge to its standing, requires the filing of a "a pleading verified by affidavit." TEX. R. CIV. P. 93(2); *Pledger v. Schoellkopf*, 762 S.W.2d 145, 146 (Tex. 1988). A challenge to capacity to sue, also unlike a challenge to standing, is waived if not asserted by verified denial because it does not go to the subject matter jurisdiction of the court. *Nootsie*, 925 S.W.2d at 662.

In this case, Defendants question the validity of the Assignment Agreements whereby FUNimation gained the contractual right to collect ADV's debt.[2] It is clearly on this basis that Defendants challenge FUNimation's "standing." However, a defense that the Plaintiff does not own the claim sued upon raises an issue of capacity, not standing: "A challenge to ***who owns a claim*** raises the issue of capacity, not standing, and requires compliance with rule 93." *Prostok*

---

[2] As discussed *infra* in Section 3, Defendants are barred on other grounds from challenging the validity of the assignment, so any attempt to re-plead this defense as "capacity" will be futile.

Certified Document Number: 51986648 - Page 6 of 11

*v. Browning*, 112 S.W.3d 876, 921 (Tex. App. – Dallas [5th Dist.] 2003, *aff'd in part, rev'd in part*, 165 S.W.3d 336 (Tex. 2005) (emphasis added).  As the Court of Appeals for the Fourteenth District has held:

> For several reasons, we agree with the majority of courts that misidentification among affiliated corporations or successors-in-interest is an issue that must be raised by verified pleading.  First, treating it as a standing complaint risks substantial waste, as standing may be raised long after the trial is over.  Additionally, in many cases (including this one) deciding who should pay whom on a contract goes to the heart of the merits, while standing is generally a question of law determined by the court from the pleadings. See *Texas Natural Resource Conservation Com'n v. IT Davy*, 74 S.W.3d 849, 855 (Tex. 2002); *Texas Ass'n of Business v. Texas Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993).

*CHCA East Houston, LP v. Henderson*, 99 S.W.3d 630, 633 (Tex. App. Houston [14th Dist.] 2003, no pet.).

Each Defendant has interposed an affirmative defense based on lack of standing. Because Defendants are challenging FUNimation's ownership of its claims, which is an issue of capacity and not standing, the following affirmative defenses must be stricken for failure to comply with the requirement of verification imposed by TEX. R. CIV. P. 93(2):

- Paragraph 14 of the Original Answer of [Transferee Defendants].
- Paragraph 12 of [ADV's and Ledford's] Original Answer.

### 3. *Defendants May Not Challenge the Assignment Agreements for Lack of Consideration or by Claiming Material Breach Thereof*

Under Texas law, a party may not challenge the validity of an assignment agreement to which it is not privy.[3]  The law specifically forbids an obligor to challenge an assignee's rights on the ground that the assignment agreement is voidable for lack of consideration or some other defect:

---

[3] There is an exception, not applicable here, if the agreement is void on its face.  In that case the debtor must assert a denial of genuineness that is verified by sworn affidavit.  TEX. R. CIV. P. 93(8).

Certified Document Number: 51986648 - Page 7 of 11

> The law is settled that the obligors of a claim may defend the suit brought thereon on any ground which renders the assignment void, but may not defend on any ground which renders the assignment voidable only, because the only interest or right which an obligor of a claim has in the instrument of assignment is to insure himself that he will not have to pay the same claim twice.

*Tri-Cities Const., Inc. v. American Nat. Ins. Co.*, 532 S.W.2d 426, 430 (Tex. App. – Houston [1st Dist.] 1975).

Thus, an obligor may *not* defend a case on the ground that the assignment lacked consideration, lacked mutuality, lacked specificity, or was procured by fraud, undue influence or the misuse of a fiduciary relationship. Those are all defenses that are *unavailable* to the Defendants. *Id.*; *Glass v. Carpenter*, 330 S.W.2d 530, 537 (Tex. App. – San Antonio 1959, writ ref'd n.r.e.) (surveying law on this point). Indeed, it is worth noting that Texas does not even require that an assignment agreement be supported by consideration at all. An assignee "may enforce its rights against the obligor regardless of whether any consideration was exchanged for the assignment." *McLernon v. Dynegy, Inc.*, 347 S.W.3d 315, 327 (Tex. App. – Houston [14th Dist.] 2011). The affirmative defenses for lack of consideration are defective for the additional reason that they are not verified in accordance with TEX. R. CIV. P. 93(9). Repleading would be futile, however, because the defenses are barred.

The Court should strike the following affirmative defenses, each of which appears to challenge the validity of the Assignment Agreements on the ground that they lacked consideration or that FUNimation allegedly breached them:

- Paragraphs 5 and 16 of the Original Answer of [Transferee Defendants].

- Paragraph 3 of [ADV's and Ledford's] Original Answer.

Certified Document Number: 51986648 - Page 8 of 11

#### 4.  *The Economic Loss Rule Plays No Role in this Case*

FUNimation requests the Court to strike the "affirmative defenses"[4] in which Defendants rely upon the economic loss rule.   The economic loss rule is not relevant to this case. Eliminating the issue will provide the parties with certainty on how to develop evidence and expert witness testimony regarding the calculation of recoverable damages.

The economic loss rule in Texas precludes a party from obtaining on a negligence or products liability theory its purely economic losses arising from a breach of contract.  The import of the rule is that if a party suffers economic loss from the failure of a counterparty to fulfill its contractual obligations, that loss must be vindicated through a breach of contract claim.   The Texas Supreme Court recently had an opportunity to revisit the economic loss rule in *Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407 (Tex. 2011).   In that case, the Court observed, "[W]e have applied the economic loss rule only in cases involving defective products or failure to perform a contract."   *Id.* at 418.   The Court quoted and squarely rejected the formulation used by the Court of Appeals, which was "that you can never recover economic damages for a tort claim."   *Id.*

It is still the case, as it was before *Sharyland*, that a party may recover on a fraud-based theory for economic losses that arise under a contract.   *Formosa Plastics Corp. v. Presidio Engineers & Contractors*, 960 S.W.2d 41 (Tex. 1998).  It is also still the rule, as it was before *Sharyland*, that the economic loss rule does not limit damages that arise as a result of a party's independent breach of a statutory or common law duty.   *See Southwestern Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494-94 (Tex. 1991); *Motsenbocker v. Potts*, 863 S.W.2d 126, 138 (Tex. App. – Dallas 1993, no writ) (economic loss rule inapplicable to intentional torts).   And the

---

[4] The economic loss rule is not really an affirmative defense. *Tarrant Ct. Hosp. Dist. v. GE Auto Svces., Inc.*, 156 S.W.3d 885, 895 (Tex. App. – Fort Worth 2005).  FUNimation seeks to strike these defenses not for procedural

Certified Document Number: 51986648 - Page 9 of 11

economic loss rule says nothing about claims for equitable relief.

None of the claims that FUNimation has made implicates the economic loss rule. For the sake of providing essential guidance in the development of discovery, expert reports, expert testimony and the parties' theories on damages, the Court should strike the following "affirmative defenses":

- Paragraph 4 of the Original Answer of [Transferee Defendants].

- Paragraph 2 of [ADV's and Ledford's] Original Answer.

**CONCLUSION**

For the foregoing reasons, Plaintiff requests that the Court dismiss the counterclaim for declaratory judgment asserted by the Transferee Defendants and strike the affirmative defenses of lack of standing, lack of consideration, material breach and the economic loss doctrine. A proposed order is attached.

Respectfully submitted,

**JONES, WALKER, WAECHTER,
POITEVENT, CARRERE & DENEGRE**

By: _____

    LAUREN J. HARRISON
    State Bar No. 24025840
    First City Tower
    1001 Fannin, Suite 2450
    Houston, Texas   77046
    713.437.1800
    713.437.1810 (facsimile)
    Email: lharrison@joneswalker.com

**ATTORNEYS FOR PLAINTIFF**

infirmity, however, but to obtain guidance on the merits of the case.

Certified Document Number: 51986648 - Page 10 of 11

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was forwarded to all known counsel of record listed below via hand delivery, facsimile transmission, regular mail, certified mail-return receipt requested, and or electronic transmission in accordance with the Texas Rules of Civil Procedure on this the 20th day of April, 2012.

Mr. Kyle C. Herbert
Mr. Shane A. McClelland
SIMON, HERBERT, McCLELLAND
    & STILES, LLP
3411 Richmond Avenue, Suite 400
Houston, Texas   77046
*Attorneys for Defendants Aesir Holdings, L.L.C.,*
*Sxion 23, L.L.C., Valkyrie Media Partners, L.L.C.,*
*Seraphim Studios, L.L.C., Sentai Filmworks,*
*L.L.C., and Unio Mystica Holdings, L.L.C.*
*f/k/a UnioMystica, L.L.C. d/b/a*
*Switchblade Pictures*

**VIA CM-RRR 7196 9008 9111 1283 3274**
**and FACSIMILE TRANSMISSION**

Ms. Thi "Nina" Tran
Mr. T. Michael Ballases
HOOVER SLOVACEK, L.L.P.
5847 San Felipe, Suite 2200
Houston, Texas   77057
*Attorneys for Defendants*
*A.D. Vision, Inc. and John Robert Ledford II*

**VIA CM-RRR 7196 9008 9111 1283 3267**
**and FACSIMILE TRANSMISSION**

LAUREN J. HARRISON



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   June 1, 2012

Certified Document Number:        51986648 Total Pages:  11

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated
documents are valid. If there is a question regarding the validity of this document and or seal
please e-mail support@hcdistrictclerk.com**

12 April 20 P1:41
Chris Daniel - District Clerk
Harris County
ED101J016840072
By: Wanda Chambers

## CAUSE NO. 2011-67220

| | | |
|---|---|---|
| FUNimation ENTERTAINMENT, | § | IN THE DISTRICT COURT OF |
| Plaintiff | § | |
| | § | |
| v. | § | HARRIS COUNTY, TEXAS |
| | § | |
| A.D. VISION, INC., JOHN ROBERT | § | |
| LEDFORD II, AESIR HOLDINGS L.L.C. | § | |
| SXION 23, L.L.C., SERAPHIM | § | |
| STUDIOS, L.L.C., SENTAI FILMWORKS, | § | |
| L.L.C., SENTAI HOLDINGS, L.L.C., and | § | |
| UNIO MYSTICA HOLDINGS, L.L.C., | § | |
| f/k/a UNIOMYSTICA, L.L.C. d/b/a | § | |
| SWITCHBLADE PICTURES, | § | |
| Defendants. | § | 151ST JUDICIAL DISTRICT |

### AFFIDAVIT OF LAUREN J. HARRISON

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF HARRIS | § |

*BEFORE ME*, the undersigned authority, on this day personally appeared LAUREN J. HARRISON, who, after being by me first duly sworn, upon oath deposed and said the following:

My name is LAUREN J. HARRISON. I am over the age of eighteen (18), of sound mind, have never been convicted of a felony offense or a crime of moral turpitude, and am otherwise competent to give this affidavit. The facts contained herein are based on my personal knowledge and are true and correct.

1. Attached hereto as **Exhibit 1** is a true and correct copy of the Writ of Sequestration issued by the court in A.D. Vision, Inc. v. ARM Corporation, Cause No. 2008-23026, in the 234th Judicial District of Harris County, dated April 23, 2008 (Clerk's Document Number 38655042).

2. Attached hereto as **Exhibit 2** are certain of the assignment agreements between FUNimation and third party ARM Corporation. Other agreements not material to this Motion have been produced to Defendants but are not included here.

Certified Document Number: 51986649 - Page 1 of 2

{HD034707.1}

3.      Attached hereto as **Exhibit 3** is a true and correct copy of electronic correspondence from John Ledford directed to FUNimation providing contact information for A.D. Vision, Inc.'s ("ADV's") "BR [bankruptcy] attorney."

4.      Attached hereto as **Exhibit 4** is a Texas Secretary of State document reflecting the formation of corporate entity AEsir Holdings, LLC.

5.      Attached hereto as **Exhibit 5** is a Texas Secretary of State document reflecting the formation of corporate entity Seraphim Studios, LLC.

6.      Attached hereto as **Exhibit 6** is a Texas Secretary of State document reflecting the formation of corporate entity Sxion 23, LLC.

7.      Attached hereto as **Exhibit 7** is a Texas Secretary of State document reflecting the formation of corporate entity Valkyrie Media Partners, LLC.

8.      Attached hereto as **Exhibit 8** is a true and correct copy of correspondence from FUNimation to the attorney that John Ledford claimed was ADV's "BR [bankruptcy] attorney."

9.      Attached hereto as **Exhibit 9** is a true and correct copy of correspondence from FUNimation to the attorney that John Ledford claimed was ADV's "BR [bankruptcy] attorney."

10.     Attached hereto as **Exhibit 10** is a true and correct copy of correspondence from ADV's "BR [bankruptcy] attorney" to FUNimation.

11.     Attached hereto as **Exhibit 11** is a true and correct copy of a press release issued by ADV on September 1, 2009 and available at http://www.advfilms.com/.

Further affiant sayeth not.

_____
LAUREN J. HARRISON

SWORN TO AND SUBSCRIBED BEFORE ME by LAUREN J. HARRISON on the 20th day of April , 2012.



NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS

DEBRA C. HOLLOWAY
Notary Public, State of Texas
My Commission Expires
October 22, 2012

My commission expires: 10/22/2012

Certified Document Number: 51986649 - Page 2 of 2

{HD034707.1}



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   June 1, 2012

Certified Document Number:        51986649 Total Pages:  2

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated documents are valid. If there is a question regarding the validity of this document and or seal please e-mail support@hcdistrictclerk.com**

# Exhibit 1

Certified Document Number: 51986650 - Page 1 of 9

$75.00 COI

Receipt Number: 223248
Tracking Number: 72293466

THE STATE OF TEXAS

WRIT OF SEQUESTRATION

**CAUSE: 2008-23026**

**Plaintiff: A D VISION INC**

IN THE 234TH JUDICIAL DISTRICT COURT
OF HARRIS COUNTY, TEXAS

Defendant: ARM CORPORATION, JAPAN CONTENTS
INVESTMENTS LPS, SOJITZ CORPORATION, KOZO
MIZUSHIMA, NARIO HADA, SHINJI UEDA, AND KAZUO
OOTSUKI

WHEREAS, in a certain cause now pending in this the 234TH Judicial District Court of Harris County, Texas, in Cause No. 2008-23026, wherein A D VISION INC, Plaintiff, and ARM CORPORATION, JAPAN CONTENTS INVESTMENTS LPS, SOJITZ CORPORATION, KOZO MIZUSHIMA, NARIO HADA, SHINJI UEDA, AND KAZUO OOTSUKI , Defendant the said plaintiff has made application and given bond for a Writ of Sequestration. Therefore, the Sheriff or any Constable within the State of Texas is hereby commanded to take into his possession the following described personal (or real) property, valued in plaintiff's contract attached, GUYVER, COMIC PARTY REVOLUTION, JINKI: EXTEND, PANIPONI DASH, UTWAREUMONO, MOEYO KEN TV SERIES, COYOTE RAGTIME SHOW, UFO PRINCESS VALKYRIE PRINCESS BRIDE AND UFO PRINCESS VALKYRIE HAPPY PARTY, PARADISE, NERIMA DAIKON BROTHERS, AIR GEAR, SGT KERORO, LE CHEVALIER D'EON, GHOST TRAIN, SYNESTHESIA, KURAU PHANTOM MEMORY, 0091-1, SHINM ANGYO ONSHI, AH!MY GODDESS FLIGHTS OF FANCY, INNOCENT VENUS, PUMPKIN SCISSORS, RED GARDEN, WELCOME TO THE NHK, MAGIKANO, XENOSAGA, TOKYO MAJIN, PROJECT BLUE, VENUS VS VIRUS, YAMATONADESHIKO SHICHHENGE, AIR TV SERIES, 5 CENTIMETERS PER SECOND, DEVIL MAY CRY, KYOSHIRO TO TOWA NO SORA, KANON TV SERIES, MURDER PRINCESS, AIR THE MOVIE, MOONLIGHT MILE, KING OF BANDIT JING IN SEVENTH HEAVEN, AND ICE viz: MATERIAL if it be found in your County and keep the same subject to the further order of the Court, unless the same is replevied according to the provisions of law and the Texas Rules of Civil Procedure.

IN ACCORDANCE WITH THE CERTIFIED COPY OF THE ORDER OF THE COURT HERETO ATTACHED
**TO DEFENDANT: A D VISION INC BY SERVING ITS REGISTERED AGENT JOHN R LEDFORD II 5750 BINTIFF DRIVE SUITE 210 HOUSTON TEXAS 77036**
You are hereby notified that certain properties alleged to be owned by you have been sequestered. If you claim any rights in such property, you are advised:
**"YOU HAVE A RIGHT TO REGAIN POSSESSION OF THE PROPERTY BY FILING A REPLEVY BOND. YOU HAVE A RIGHT TO SEEK TO REGAIN POSSESSION OF THE PROPERTY BY FILING WITH THE COURT A MOTION TO DISOLVE THIS WRIT."**
HEREIN FAIL NOT, but have you this Writ with your return thereon showing how you have executed the same before this Court on the Monday, next after the expiration of 20 days from the date of service of this Writ of Sequestration.
GIVEN UNDER MY HAND, and seal of said Court at my office in Houston, Harris County, Texas, this the 23 day of APRIL, 2008.

Issued at the request of:
MATNEY, SCOTT
700 LOUISIANA ST STE 4200
HOUSTON, TEXAS 77002
Bar Number: 24010747

(SEAL)

THERESA CHANG District Clerk
Harris County, Texas
201 CAROLINE Houston Texas 77002
(PO Box 4651, Houston, Texas 77210)

By: _____
Deputy: CHAMBERS, WANDA

OFFICER'S AUTHORIZED PERSON RETURN

Came to hand on the _____ day of _____, 20_____, at _____ o'clock _____.M. and executed on the _____ day of _____, 20_____, at _____ o'clock _____.M. by _____ _____ in _____ County, Texas by delivering to each of the within named defendant's in person a true copy of this Writ, together with the accompanying copy of _____ at the following times and place to wit.

| NAME | DATE | TIME | PLACE | MILEAGE |
|------|------|------|-------|---------|
|      |      |      |       |         |
|      |      |      |       |         |
|      |      |      |       |         |
|      |      |      |       |         |

Total Fees Collected: $ _____

_____ Sheriff/Constable

_____ County, Texas

By: _____ Deputy

P:\CIVIL\SERVICES
EQUEST.DOC

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

Certified Document Number: 51986650 - Page 2 of 9

'08 APR 23 PH 3:09

PHIL CAMUS
CONSTABLE PRECINCT 5
HARRIS COUNTY, TEXAS

Certified Document Number: 51986650 - Page 3 of 9

CAUSE # 2008-23026

CAME TO HAND APRIL 23, 2008 AT 3:08 PM AND EXECUTED APRIL 28, 2008 AT 10:00 AM BY TAKING INTO OUR POSSESSION THE PROPERTY DESCRIBED IN THIS WRIT OF SEQUESTRATION FOUND IN HARRIS COUNTY, TEXAS AND LOCATED AT 5750 BINTLIFF SUITE 210 HOUSTON, HARRIS COUNTY, TEXAS.

AND KEEPING THE SAME SUBJECT TO THE FURTHER ORDER OF THE 234TH JUDICIAL COURT IN THE COUNTY OF HARRIS IN A CERTAIN CAUSE THEREIN PENDING, UNLESS THE SAME IS REPLEVIED ACCORDING TO THE PROVISIONS OF THE LAW AND THE TEXAS RULES OF CIVIL PROCEDURE.

ON APRIL 28, 2008 AT 10:00 AM DEPUTIES C.GOETZ, R. KUEHNLE, AND R. MALDONADO WENT TO AD VISION INC. LOCATED AT 5750 BINTLIFF SUITE 210, HOUSTON, HARRIS COUNTY, TEXAS.THE REGISTERED AGENT JOHN LEDFORD II WAS NOT AVAILABLE HE IS CURRENTLY IN JAPAN. WE WERE ASSISTED BY MR. JOEY GOUBEAUD (MANAGER) AND CHERE BENETT (H.R. MANAGER). THEY WERE GIVEN A COPY OF THIS WRIT AND ADVISED THAT THE ITEMS LISTED ON THIS WRIT WOULD BE TAKEN INTO OUR POSSESSION AND KEPT SUBJECT TO FUTHER ORDERS OF THE COURT. IT WAS NOT POSSIBLE TO SEIZE ALL ITEMS THIS DATE DUE TO MATERIAL THAT WAS ON ELECTRONIC EQUIPMENT AND WOULD TAKE APPROXIMATELY THIRTY NINE HOURS TO DOWNLOAD. SEVERAL TITLES LISTED ON THIS WRIT WERE NOT LOCATED THIS DATE. ON APRIL 30TH I WAS CONTACTED BY MR. JOEY GOUBEAUD AND ADVISED THAT THE MATERIAL THAT WAS ON THE ELECTRONIC EQUIPMENT HAD FINISHED DOWNLOADING AND COULD BE PICKED UP. AT APPROXIMATELY 2:30 PM THIS DATE I MET WITH MR. GOUBEAUD AND PICKED UP ONE IOMEGA HARD DRIVE AND DELIVERED IT TO GUARDIAN TRANSFER AND STORAGE TO BE STORED WITH THE OTHER MATERIALS. ON MAY 7TH I WAS CONTACTED BY MR. GOUBEAUD HE ADVISED THAT SEVERAL OTHER TITLES HAVE BEEN LOCATED AND COULD BE PICKED UP. AT 2:15 PM THIS DATE AGAIN I MET WITH MR. GOUBEAUD AND SEVERAL BOXES CONTAINING MORE TITLES THAT WERE NOT LOCATED INITALLY WERE FOUND. THESE ITEMS WERE ALSO TAKEN TO THE STORAGE FACILITY. THERE HAS BEEN NO ATTEMPT ON ANYONE'S BEHALF TO REPLEVY ON THE PROPERTY SEIZED UNDER THE WRIT. THE PLAINTIFF HAD FILED A BOND WITH THE COURT AND THE PROPERTY WAS RELEASED TO THE PLAINTIFF'S AGENT. THIS WRIT IS BEING RETURNED TO COURT EXECUTED.

SERVICE FEE: $ 150.00

TOTAL FEE: 150.00

PHIL CAMUS, CONSTABLE PCT. #5
HARRIS COUNTY, TEXAS

BY: _____,DEPUTY
DEPUTY CHRIS GOETZ  5W27



2008-23026

CAUSE NO. 2008-23026

| A.D. VISION, INC. | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | HARRIS COUNTY TEXAS |
| | § | |
| vs. | § | F I L E D |
| | § | Theresa Chang |
| ARM CORPORATION, JAPAN | § | District Clerk |
| CONTENTS INVESTMENT LPS, | § | APR 21 2008 |
| SOJITZ CORPORATION, KOZO | § | Time: _____ |
| MIZUSHIMA, NARIO HADA, SHINJI | § | Harris County, Texas |
| UEDA, AND KAZUO OOTSUKI | § | By _____ |
| | § | Deputy |
| Defendants. | § | 234th JUDICIAL DISTRICT |

## ORDER ON SEQUESTRATION

On this day, the Court heard ARM Corporation's ("ARM") Application for Writ of Sequestration. The hearing was conducted without notice to A.D. Vision ("ADV") as the Court finds from the application and evidence that:

### Findings

1.    Venue is proper in Harris County, Texas, because all or a substantial part of the events or omissions giving rise to the claims occurred in Harris County, Texas.

2.    This sequestration is not sought to injure or harass ADV, and ARM will probably lose its debt unless such sequestration is issued.

3.    ADV and ARM entered into various agreements to provide ADV with financing to acquire licenses to various audio-visual entertainment programs, including a Facility Agreement, Rescheduling Agreement and Security Agreement collectively (the "Agreements"). The Agreements provided ARM with a security interest in various personal property collateral

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

Certified Document Number: 51986650 - Page 4 of 9

including the following materials: master materials, artwork, promotional materials and other physical elements (including any intellectual property contained therein) necessary for the localization, production, marketing and other use of the content together with the material developed and or translated by ADV from the Material as further described in the Deliverable exhibits to each License, and include Japanese-language tape masters, English-language tape masters, digital master files, clips, stills, box art, ad spots, Japanese and English-language voice-over scripts, DLT masters, web site materials, promotional materials such as bonus materials, DVD extras and interviews, for the following titles:

Guyver
Comic Party Revolution
Jinki: Extend
Paniponi Dash!
Utwareumono
Moeyo Ken TV Servies
Coyote Ragtime Show
UFO Princess Valkyrie -- Princess Bride and UFO Princess Valkyrie -- Happy Party Paradise
Nerima Daikon Brothers
Air Gear
Sgt. Keroro
Le Chevalier D'Eon
Ghost Train
Synesthesia
Kurau Phantom Memory
0091-1
Shin Angyo Onshi
Ah! My Goddess -- Flights of Fancy
Innocent Venus
Pumpkin Scissors
Red Garden
Welcome to the NHK
Magikano
Xenosaga
Tokyo Majin
Project Blue
Venus vs. Virus
Yamatonadeshiko Shichhenge
AIR TV Series

Certified Document Number: 51986650 - Page 5 of 9

73059.000001 EMF_US 25619155v1

5 centimeters per Second
Devil May Cry
Kyoshiro to Towa no Sora
Kanon TV Series
Murder Princess
AIR the Movie
Moonlight Mile
King of Bandit Jing in Seventh Heaven
ICE

the ("Material").

4.     ADV has breached the Agreements by failing to make payments. ARM has

declared its right to repossession of the Material. The sum of $11,202,361.09, plus

reimbursement for Material and Facility Service fees, is due and owing as of April 18, 2008.

The collateral continues to deteriorate and is wasting as payments are not being made although

the Material is still in use.

5.     ARM is entitled to the issuance of a writ of sequestration.

6.     ARM is further entitled to the issuance of such writs pursuant to Section §24.011

of the Texas Government Code necessary to the enforcement of the Court's jurisdiction,

including, but not limited to, a writ commanding the executing officer to obtain from ADV all

documents concerning the agreement, lease, sale, location, identification, and maintenance of the

property necessary for the enforcement of the writ of sequestration.

It is, therefore, ORDERED that upon ARM'S posting of a bond in the amount of

$ _10,000.00_ *, payable to ADV, conditioned and approved as required by law, a

writ of sequestration effecting the orders of this Court be issued against ADV for the property

described above as the Material.

The bond shall remain sufficient for all purposes as a replevy bond pursuant to Rule 708

of the Texas Rules of Civil Procedure in the event ARM applies to the officer charged with

* This Court will expedite a hearing at Counter/Π's request, to increase bond if such is necessary or desired.

73059.000001 EMF_US 25619155v1

execution of the writ of sequestration pursuant to the terms of Rule 708 of the Texas Rules of Civil Procedure;

It is further ORDERED that the sequestering officer undertake all reasonable measures to enter upon any property where the property may be found, to remove any locks, barriers, or other obstacles by means of reasonable force, and to seize, secure, and sequester the property in compliance with this Order and applicable law;

It is further ORDERED that writ issue commanding the sequestering officer to obtain from all documents concerning the lease, sale, location, identification, maintenance of the property necessary for the enforcement of the writ of sequestration or an enforcement of the Court's jurisdiction pursuant to Section 24.011 of the Texas Government Code;

It is further ORDERED that the property be kept safe and preserved subject to further orders of this Court;

It is further ORDERED that ADV may replevy any of the property by posting a bond in the amount of $ ~~3,000~~ 3,025,000.⁰⁰/₁₀₀ , payable to ARM conditioned and improved as required by law; and

It is further ORDERED that, in the event ADV fails to replevy within ten (10) days of the date of service of the writ of sequestration, ARM may replevy any of the property sequestered without the necessity of further bond that was given for issuance of the writ of sequestration pursuant to the terms of Rule 708 of the Texas Rules of Civil Procedure.

SIGNED this _____April 21_____, 2008. @ 1115am

_____
PRESIDING JUDGE

73059.000001 EMF_US 25619155v1

APPROVED AS TO FORM AND ENTRY:

Scott Matney Attorneys for Defendant ARM Corporation
Hunton & Williams
SBN: 24010747
700 Louisiana, Suite 4200
Houston, Texas 77002
Ph: (713) 229-5700  Fax:  (713) 229-5750

73059.000001 EMF_US 25619155v1

**STATE OF TEXAS**
**COUNTY OF HARRIS**

Theresa Chang, District Clerk of Harris County,
Texas, do hereby certify that the foregoing is a
true and correct copy of the original record, now
in my lawful custody and possession, as appears on
record.

In my office and filed on _____
Witness my official hand and seal of office, the

THERESA CHANG, DISTRICT CLERK
Harris County, Texas

By _____ Deputy



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   June 1, 2012

Certified Document Number:      51986650 Total Pages:  9

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated
documents are valid. If there is a question regarding the validity of this document and or seal
please e-mail support@hcdistrictclerk.com**

# Exhibit 2

Certified Document Number: 51986651 - Page 1 of 49

EXECUTION VERSION

## ASSIGNMENT AGREEMENT

This Assignment Agreement (this "Agreement") is entered into as of this 25th day of June, 2008, by and between FUNimation Productions, Ltd., a Texas limited partnership ("Buyer"), and ARM Corporation, a Japanese corporation ("Seller").

### RECITALS

A.     Seller is a licensee under the license agreements more particularly described on Exhibit A attached hereto (collectively, the "License Agreements" and individually a "License Agreement"), and pursuant to the License Agreements, the licensors have furnished master materials, artwork, promotional materials and other physical elements (including any intellectual property rights contained therein or embodied thereby) necessary for the localization, production, marketing and other use of content under the License Agreements (collectively, the "Materials").

B.     A.D. Vision, Inc., a Texas corporation ("ADV"), joined in the execution of most of the License Agreements as a sub-licensee and distributor, and has used the Materials to develop and produce various localized and translated materials, artwork, promotional materials and other physical elements (including any intellectual property rights contained therein or embodied thereby) for purposes of the resale and distribution of licensed content in the United Sates, Canada and other English-speaking countries and other territories covered by the License Agreements (the "Developed Materials").

C.     ADV defaulted in its obligations under the License Agreements and under that certain Strategic Alliance and Content Acquisition Facility Agreement, dated as of May 18, 2006, between Seller and ADV (the "Strategic Alliance Agreement"), and Seller has exercised its rights under the Strategic Alliance Agreement to "step into the shoes" of ADV with respect to each License Agreement.

D.     In addition, under a separate security agreement between Seller and ADV, ADV pledged all of its interests in and to the License Agreements, the Materials and the Developed Materials (the "ARM Collateral"), together with other collateral described therein, to secure ADV's performance under the Strategic Alliance Agreement.  Based on defaults by ADV, Seller has exercised its rights to foreclose on and obtain rights and title to the ARM Collateral, and such foreclosure sale was completed on June 3, 2008.

E.     Pursuant to that certain Intercreditor Agreement dated as of April 14, 2008 (the "Intercreditor Agreement") between Whitney National Bank ("Whitney Bank") and Seller, the transfer to Seller of ADV's interests in the ARM Collateral has been made free and clear of any liens or security interests of Whitney Bank.

F.     Seller desires to sell all of its rights, titles, and interests in and to the License Agreements, the Materials and the Developed Materials to Buyer, on the terms and conditions hereinafter set forth.



73059.000001 EMF_US 25809768v5

Certified Document Number: 51986651 - Page 2 of 49

FUN 02590

G.      Buyer desires to acquire the License Agreements from Seller and obtain rights to the Materials and the Developed Materials, on the terms and conditions hereinafter set forth.

NOW, **THEREFORE**, in consideration of the recitals and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I.
## ASSIGNMENT OF ASSETS

Section 1.1    <u>Assignment of Assets</u>.    Subject to the terms and conditions of this Agreement, at the Closing (as hereinafter defined) Seller shall sell, convey, transfer and assign to Buyer, and Buyer shall acquire from Seller, the following assets of Seller (collectively, the "Assigned Assets"):

(a)      All of the rights, titles and interests of Seller (both as an original party and as a successor-in-interest to ADV) in and to and arising under each License Agreement that is designated as an "<u>Assigned Agreement</u>" in accordance with the terms of Section 1.5(b), including without limitation the rights to receive any reimbursements for costs and expenses incurred by Seller and/or ADV prior to the Closing, and the benefits of any royalty reductions or offsets based on amounts paid by Seller and/or ADV prior to the Closing; and

(b)      All of the rights, titles and interests of Seller (both as an original party to the Assigned Agreements and as a successor-in-interest to ADV) in and to all of the tangible copies of the Materials and the Developed Materials (including without limitation the materials described in <u>Exhibit B</u>) related to the Assigned Agreements, and any intellectual property rights owned by Seller or ADV related to or embodied in any such Materials or Developed Materials.

The Assigned Assets shall be conveyed by Seller to Buyer free and clear of all liabilities, obligations, liens and encumbrances, excepting only those liabilities and obligations constituting the Assumed Liabilities (as hereinafter defined).

Section 1.2    <u>Assignment Payments</u>.    In consideration for the sale and transfer of the Assigned Assets, Buyer agrees to assume Seller's obligation to make additional payments under each of the Assigned Agreements up to the amounts set forth under "Column B" for each Assigned Agreement in <u>Exhibit A</u> (the aggregate of such amounts is referred to as the "<u>Assignment Payments</u>"), and to assume, perform or discharge all of the liabilities and obligations of Seller under each Assigned Agreement to the extent arising from and after the Closing Date (collectively, including the Assignment Payments, the "<u>Assumed Liabilities</u>"). Seller will retain the obligation to make the payments under each of the Assigned Agreements set forth under "<u>Column A</u>" for such Assigned Agreement in <u>Exhibit A</u> (the aggregate of such amounts is referred to as the "<u>ARM Payments</u>"). Buyer agrees to pay the Assignment Payments to the respective licensors entitled to receive them within three (3) business days after the Closing and to provide to Seller evidence that such payments have been made. Seller agrees to pay the ARM Payments to the respective licensors for which Buyer assumes the obligation to pay the Assignment Payments within three (3) business days after the Closing and to provide to Buyer evidence that such payments have been made.



2

Certified Document Number: 51986651 - Page 3 of 49

Section 1.3    Excluded Assets.    The term "Assigned Assets" excludes any assets of Seller or ADV, tangible and intangible, that are not specifically enumerated in Section 1.1 (collectively referred to as "Excluded Assets").

Section 1.4    Retained Liabilities.    Except for the Assumed Liabilities, Buyer does not and shall not assume any obligations, commitments or liabilities of Seller or ADV (including accounts payable, accrued liabilities, and debt of Seller), whether known or unknown, contingent or matured, including without limitation any obligations under the Strategic Alliance Agreement or under any sublicense or distribution agreements that Seller or ADV may have entered into pursuant to any License Agreement. All of such obligations, commitments and liabilities that Buyer does not assume shall be hereinafter referred to as the "Excluded Liabilities." As between Seller and Buyer only, Seller shall retain the Excluded Liabilities, whether arising before or after the Closing Date, but Seller is not hereby assuming any obligations, commitments or liabilities of ADV.

Section 1.5    Assigned Agreements.

(a)    It is not the intent of Seller to assign any License Agreement that prohibits assignment by Seller under its terms without the consent of the applicable licensor. Seller shall use reasonable commercial efforts to obtain a consent and waiver from each licensor, which addresses, at a minimum, the following:  (i) a recognition that ADV's rights under the License Agreement have been assigned to Seller, (ii) a consent to Seller's assignment of the License Agreement to Buyer as contemplated hereby, (iii) a confirmation of the amount of any unpaid minimum guaranteed payments (or advance royalties) required thereunder (whether or not due); (iv) an agreement by the licensor not to assert any defaults by ADV under the License Agreement against Seller or Buyer, a waiver of all defaults by Seller under the License Agreement and, if required by licensor, any requirements to be imposed on Buyer to cure or remedy any such defaults; and (v) a confirmation of the extent that minimum guaranteed payments (or advance royalties) and production costs will be creditable against future royalties owed by Buyer. In connection with such consents, Buyer shall have a right to contact each licensor before the Closing Date after consultation with Seller to coordinate the form of the consent and to determine if any amendments to the relevant License are required or desirable to give full effect to the transactions contemplated hereby.

(b)    Prior to the scheduled Closing Date, Seller will provide Buyer with copies of any consents, waivers or amendments that Seller obtains from the licensors for review and approval. For purposes of this Agreement, an "Assigned Agreement" means only a License Agreement for which Seller has obtained a consent, waiver or amendment from the licensor to that agreement that is in a form and substance acceptable to Buyer in its reasonable discretion. Prior to the Closing, Seller and Buyer will mutually designate which License Agreements meet the foregoing requirements and will be "Assigned Agreements" hereunder as of the Closing Date.

Section 1.6    Post-Closing Assignments.    If all of the License Agreements are not designated as Assigned Agreements, then following the Closing, the following shall apply to the remaining License Agreements:

Certified Document Number: 51986651 - Page 4 of 49



3

(a)     For the first ninety (90) days following the Closing: Seller shall use reasonable commercial efforts to obtain a consent and waiver from each licensor of the remaining License Agreements covering the same points required under Section 1.5(a).  After consultation with Buyer, Seller may, in lieu of such consent, obtain an amendment to any such License Agreement to allow its assignment and transfer to Buyer or to allow its termination so that a replacement License Agreement can be effected in favor of Buyer.

(b)     If Seller obtains such consent, waiver or amendment within the first ninety (90) days following the Closing, it shall provide Buyer with a copy of such consent, waiver or amendment.  If such consent, waiver, or amendment is a form reasonably acceptable to Buyer, Buyer shall acquire such License Agreement, together with related Materials and Developed Materials on the following terms: (i) Seller will assign to Buyer all of Seller's rights in and to such License Agreement and related Materials and Developed Materials pursuant to the terms of the form of Assignment attached hereto as Exhibit C, (ii) Buyer shall assume any unpaid minimum guaranteed payments (or advance royalties) due under such License Agreement up to the amount indicated under Column B in Exhibit A for such License Agreement, and any other obligations of Seller under such License Agreement from and after the effective date of transfer of that agreement, in each case pursuant to the terms of the such Assignment, (iii) Seller shall deliver to Buyer those Materials and Developed Materials listed on Exhibit B related to the License Agreement so assigned to Buyer; and (iv) upon such assignment and assumption, such License Agreement shall be deemed to be an Assigned Agreement hereunder, such assumed payments and obligations shall be deemed to be part of the Assumed Liabilities, and such License Agreement and related Materials and Developed Materials shall be deemed to be part of the Assigned Assets, and as such will be subject to the same representations and warranties (except updated as of the date of such assignment), and the same covenants and indemnities, that covered the Assigned Assets that were assigned to, and the Assumed Liabilities that were assumed by, Buyer on the Closing Date.  Buyer shall pay the licensor the assumed amount of the unpaid minimum guaranteed payments (or advance royalties) due under such License Agreement up to the amount indicated under Column B in Exhibit A for such License Agreement within three (3) business days after Buyer receives from Seller such consent, waiver, or amendment in a form reasonably acceptable to Buyer and the assignment of such License Agreement from Seller.  Seller shall pay the licensor the amount indicated under Column A in Exhibit A for such License Agreement within three (3) business days after Buyer advises Seller that it is accepting such consent, waiver or amendment and such assignment and making the payment of the foregoing assumed amount.  In each case, each party will provide evidence to the other party that the payment to the licensor that such party is obligated to make has been made.

(c)     In order to provide Buyer with the full realization and value of every License Agreement, Seller agrees that it will, at the request of Buyer, take all reasonable actions (i) to assure that the rights of Seller under such License Agreement shall be preserved for the benefit of Buyer and (ii) to facilitate receipt of the consideration to be received by Seller in and under such License Agreement, which consideration shall be held for the benefit of, and shall be delivered to, Buyer at the subsequent closing; except that nothing herein shall require Seller to make any further payments to a licensor and Seller shall not be responsible for any termination of a remaining License Agreement by licensor if done by licensor pursuant to the terms of such agreement.



4

FUN 02593

(d)    If Seller is unable to obtain a consent, waiver, or amendment with respect to a License Agreement in a form reasonably acceptable to Buyer within the 90-day period referred to in Section 1.6(a), then Seller's obligations hereunder with respect to such License Agreement shall terminate, and Seller may terminate, transfer or otherwise dispose of such License Agreement and related Materials and Developed Materials as it deems appropriate, and Buyer shall have no interest in, nor any obligation or liability with respect to, such License Agreement.

## ARTICLE II.
## CLOSING

Section 2.1    <u>Actual Time and Place of Closing</u>.  Subject to the terms and conditions of this Agreement, the completion of the transaction contemplated hereby shall take place at the offices of Hunton & Williams LLP, Dallas, Texas, on June 27, 2008 or at such other mutually agreeable time within three days of the satisfaction or waiver of the conditions precedent to Closing set forth in Section 2.3, or within three days of the mutual waiver of the Conditions Precedent to Closing set forth in Section 2.3 (the "<u>Closing</u>").  The date on which the Closing shall take place shall herein be referred to as the "<u>Closing Date</u>."

Section 2.2    <u>Effective Time of Closing</u>.    All transactions contemplated by this Agreement shall be deemed to have occurred simultaneously at 12:01 a.m. Dallas, Texas time on the Closing Date.

Section 2.3    <u>Conditions Precedent to Closing</u>.

(a)    <u>Seller's Conditions</u>:  Each and every obligation of Seller to be performed on the Closing Date shall be subject to the satisfaction of, or written waiver by, Seller in its sole discretion prior to or at the Closing of each of the following express conditions precedent:

(i)    The representations and warranties of Buyer contained in Article V shall be true and correct as of the Closing with the same force and effect as though said representations and warranties had been made at and as of the Closing Date, and the covenants and agreements of Buyer to be performed on or before the Closing Date shall have been duly performed in all material respects in accordance with this Agreement; and

(ii)    No legal proceedings shall have been commenced by ADV challenging Seller's title to the License Agreements and to those Materials and Developed Materials listed on <u>Exhibit B</u>, arising as a result of the foreclosure sale by Seller.

(b)    <u>Buyer's Conditions</u>:  Each and every obligation of Buyer to be performed on the Closing Date shall be subject to the satisfaction of, or written waiver by, Buyer in its sole discretion prior to or at the Closing of each of the following express conditions precedent:

(i)    The representations and warranties of Seller in Article IV shall be true and correct as of the Closing Date with the same force and effect as though

5

Certified Document Number: 51986651 - Page 6 of 49



FUN 02594

said representations and warranties had been made at and as of the Closing Date, and the covenants and agreements of Seller to be performed on or before the Closing Date shall have been duly performed in accordance with this Agreement;

(ii)     Seller shall have obtained written indications of consent of licensors for all of the License Agreements listed in Part 1 of <u>Exhibit A</u> in form and substance reasonably acceptable to Buyer, pursuant to Section 1.5(b), and such consents shall be in full force and effect and shall not have been withdrawn or canceled;

(iii)    No legal proceedings shall have been commenced by ADV challenging Seller's title to the License Agreements and to those Materials and Developed Materials listed on <u>Exhibit B</u>, arising as a result of the foreclosure sale by Seller.

ARTICLE III.
DELIVERIES TO BE MADE AT CLOSING

Section 3.1    <u>Deliveries to be Made by Seller to Buyer</u>.  At the Closing, the following shall be delivered by Seller to Buyer:

(a)     A certificate of Seller, dated as of the Closing Date, duly executed on behalf of Seller by a senior officer of Seller, certifying that, to the Knowledge of Seller, each of the conditions described in Section 2.3(b) have been fully satisfied;

(b)     An assignment and assumption agreement executed by Seller covering the Assigned Agreements, in substantially the form attached hereto as <u>Exhibit C</u> (the "<u>Assignment</u>");

(c)     Those Materials and Developed Materials listed on <u>Exhibit B</u> related to the Assigned Agreements, free and clear of any liens, encumbrances and adverse claims;

(d)     A copy of all lists, records and files of Seller relating to the Assigned Assets;

(e)     Certified copies of the resolutions of the board of directors of Seller and its shareholder authorizing the execution, delivery and performance of this Agreement and of all documents contemplated herein;

(f)     A copy of the Intercreditor Agreement with the Whitney Bank, certifying that such agreement is in effect and has not been amended or rescinded; and

(g)     Such other documents as are reasonably necessary to convey the Assigned Assets, and all rights therein, to the Buyer.

Section 3.2    <u>Deliveries to be Made by Buyer to Seller</u>.  At the Closing, the following shall be delivered by Buyer to Seller:



6

Certified Document Number: 51986651 - Page 7 of 49

**FUN 02595**

(a)     A certificate of Buyer, dated as of the Closing Date, duly executed on behalf of Buyer by a senior officer of Buyer, certifying that, to such senior officer's knowledge, the conditions described in Section 2.3(a)(i) have been satisfied;

(b)     The Assignment executed by Buyer in favor of Seller, under which Buyer assumes the Assumed Liabilities;

(c)     Certified copies of the resolutions of Buyer's Board of Directors authorizing the execution, delivery and performance of this Agreement and of all documents contemplated herein; and

(d)     Such other documents as are reasonably necessary to consummate the transaction contemplated by this Agreement.

ARTICLE IV.
REPRESENTATIONS AND WARRANTIES OF SELLER

As of the date of this Agreement and the Closing Date, Seller represents and warrant to the Buyer that the statements contained in this Article IV are true and correct:

Section 4.1     <u>Organization of Seller</u>.  Seller is a corporation that is duly incorporated, validly existing and in good standing under the laws of Japan.  Seller has the corporate power and authority to execute and deliver this Agreement and carry out the transactions contemplated hereby.

Section 4.2     <u>Authority; Enforceability</u>.  The execution and delivery of this Agreement and the due consummation of the transactions contemplated hereby by Seller have been duly authorized by all necessary corporate action on behalf of Seller.  This Agreement constitutes the valid and binding agreements of Seller and is enforceable against Seller in accordance with its terms, subject to any applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting generally the enforcement of creditors' rights and principles of equity.

Section 4.3     <u>No Conflict by Seller</u>.  Except for any required consent of the licensors under the License Agreements or as set forth on <u>Schedule 4.3</u>, neither the execution or delivery of this Agreement by Seller nor the consummation of the transactions contemplated hereby by Seller (x) requires the consent of any federal, state or local authority or any third party or (y) will result in or constitute any of the following: (a) violation of the terms of the charter or bylaws of Seller; or (b) a violation of any provision of any applicable law or regulation, or of any writ or decree of any court or governmental instrumentality, applicable to Seller or to the Assigned Assets; or (c) with or without due notice or lapse of time or both, conflict with or result in a violation or breach of or a default (or give rise to any right of termination, cancellation or acceleration) under any agreement, indenture or other instrument by which Seller is bound; or (d) result in any third party having the right to exercise a Preference Right with respect to any part of the License Agreements, Materials or Developed Materials, or (e) the creation of any lien or encumbrance on or with respect to the License Agreements, Materials or Developed Materials. For purposes of the foregoing, "<u>Preference Right</u>" means any right or agreement that enables or may enable any person to purchase or acquire any asset or any interest therein or portion thereof

7



Certified Document Number: 51986651 - Page 8 of 49

**FUN 02596**

as a result of or in connection with the sale, assignment, encumbrance or other transfer (or the proposed sale, assignment, encumbrance or other transfer) of any asset or any interest therein or portion thereof or any change in control of the owner of such asset.

Section 4.4    Consents.    Except for any required consent of the licensors under the License Agreements, no consent, approval, authorization, or permit of, or filing with or notification to, any person is required for or in connection with (a) the execution and delivery of this Agreement by Seller, (ii) the consummation of the transactions contemplated hereby by Seller, or (iii) the performance of Seller's obligations contemplated hereby.

Section 4.5    Bankruptcy.    To the Knowledge of Seller, there are no bankruptcy or reorganization proceedings pending or threatened against ADV or any affiliate of ADV.

Section 4.6    Title to Assigned Assets.    Seller has, and from and after the Closing Date, Buyer will have, good and valid title to all of the Assigned Assets, free and clear of all liens, security interests, encumbrances, pledges and charges whatsoever except for express terms of the License Agreements and the terms of any consent from a licensor under a License Agreement and except as set forth on Schedule 4.6.

Section 4.7    License Agreements.    Except as set forth on Schedule 4.7 or in any consent delivered to Buyer pursuant to Section 1.5(b), each of the License Agreements is a valid and binding agreement of Seller and, to the best of Seller's knowledge, is a valid and binding agreement of the licensors that are a party thereto and in full force and effect and enforceable by Seller in accordance with their respective terms, and, with respect to each such License Agreement, Seller has not received a notice of default or breach by Seller or ADV of the provisions thereof or of termination thereof  and Seller has not been notified by any licensor under a License Agreement that it will take any such action as a result of the sale of the Assigned Assets to Buyer.   Seller has furnished to Buyer true and correct copies of all License Agreements, together with all written amendments thereto.

Section 4.8    Litigation.    Except as set forth in Schedule 4.8, Seller is not (a) engaged in or, to the best knowledge of Seller, threatened with, any claim, controversy, legal action, or other proceeding involving any of the License Agreements or the Strategic Alliance Agreement (as amended and supplemented), or involving Seller or its affiliates and ADV, whether or not before any court or administrative agency, and (b) in material violation of any law, judgment, order, decree, regulation or rule of any court or governmental authority applicable to it involving any of the License Agreements or the Strategic Alliance Agreement.

Section 4.9    Brokerage.    Except as set forth in Schedule 4.9, Seller has not made any agreement or taken any other action which might cause anyone to become entitled to a broker's fee or commission as a result of the transactions contemplated hereby.

ARTICLE V.
REPRESENTATIONS AND WARRANTIES OF BUYER

As of the date of this Agreement and the Closing Date, Buyer represents and warrants to Seller that the statements contained in this Article V are true and correct:

8

Certified Document Number: 5198665 - Page 9 of 49

Section 5.1    <u>Organization</u>.    Buyer is a limited partnership duly organized, validly existing and in good standing under the laws of the State of Texas.  Buyer has all requisite power and authority to execute and deliver this Agreement and carry out the transactions contemplated hereby.

Section 5.2    <u>Authority, Enforceability</u>,    The execution and delivery of this Agreement and the due consummation of the transactions contemplated hereby by Buyer have been duly authorized by all necessary action under Buyer's partnership agreement.  This Agreement constitutes the valid and binding agreement of Buyer enforceable against Buyer in accordance with its terms, subject to any applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting generally the enforcement of creditors' rights and principles of equity.

Section 5.3    <u>No Conflict by Buyer</u>.    Except as set forth on <u>Schedule 5.3</u>, neither the execution or delivery of this Agreement by Buyer nor the consummation of the transactions contemplated hereby by Buyer require the consent of any federal, state or local authority or any third party.  Neither the execution or delivery of this Agreement by Buyer nor the consummation of the transactions contemplated hereby by Buyer will result in or constitute any of the following: (a) a violation of the terms of the charter or partnership agreement of Buyer; or (b) a violation of any provision of any law or regulation, or of any writ or decree of any court or governmental instrumentality, applicable to Buyer.

Section 5.4    <u>Brokerage</u>.    Buyer has not made any agreement or taken any other action which might cause anyone to become entitled to a broker's or finder's fee or commission as a result of the transactions contemplated hereby.

Section 5.5    <u>Availability of Funds</u>.    At the Closing, Buyer will have available sufficient funds to pay the payment obligations of Seller owing to the licensors under the Assigned Agreements as listed on <u>Exhibit A</u> and thereafter to pay its debts, obligations and liabilities as they become due in the ordinary course of business.

ARTICLE VI.
OTHER COVENANTS

Section 6.1    <u>Exclusivity</u>.    From the date hereof through the termination of this Agreement or the Closing, as applicable (the "<u>Exclusivity Period</u>"), Seller and each of its equity holders, directors, officers, employees, agents, advisors and other authorized representatives, as applicable (collectively, the "<u>Seller's Representatives</u>"), shall not deal, directly or indirectly, with any person other than Buyer regarding the possible acquisition of or investment in any of the License Agreements or related Materials and Developed Materials (whether by way of merger, purchase of capital stock, purchase of assets, recapitalization or any similar type of transactions) (a "<u>Potential Transaction</u>"); and without the prior written consent of Buyer, Seller will not (a) solicit, initiate discussions or engage in negotiations with any person (whether such negotiations are initiated by Seller, Seller's Representatives or otherwise), other than Buyer, relating to any Potential Transaction, (b) provide information or documentation with respect to any of the License Agreements to any person, other than Buyer or Buyer's Representatives, or (c) enter into an agreement with any person, other than Buyer, relating to a Potential Transaction.

9

Certified Document Number: 51986651 - Page 10 of 49

If Seller or any Seller's Representative receives any unsolicited inquiry, offer or proposal relating to any of the above, Seller or such Seller's Representative shall immediately notify Buyer in writing thereof, including in such notice information as to the content and all material terms of such inquiry, offer or proposal. For the avoidance of doubt, ADV is not included within the definition of "Sellers Representatives".

Section 6.2    Mail.

(a)    All mail and other communications relating to the Assigned Assets and Assumed Liabilities received by Seller at any time after the Closing Date shall be immediately turned over to Buyer by Seller. All mail and other communications relating to the Excluded Assets or the Excluded Liabilities received by Buyer at any time after the Closing Date shall be immediately turned over to Seller by Buyer. Each party shall cooperate with the other, and take such actions as the other party reasonably requests, to assure that any remittances which are improperly sent to one party are redirected and delivered to the other in a timely manner.

(b)    Seller authorizes and empowers Buyer after the Closing Date to receive and open all mail and other communications received by Buyer, unless on its face such mail or other communication clearly relates only to the Excluded Assets or the Excluded Liabilities, and to act with respect to such communications in such manner as Buyer may elect if such communications relate to the Assigned Assets or the Assumed Liabilities, or, if such communications do not relate to the Assigned Assets or the Assumed Liabilities, to forward the same promptly to Seller.

(c)    Each Party shall promptly deliver to the other Party any cash, checks or other instruments of payment received by such Party after the Closing and to which the other Party is entitled pursuant to the terms of this Agreement.

Section 6.3    Confidentiality.  Each of the parties shall keep confidential (subject to applicable law and legal process) the terms and conditions of this transaction and any information which one party shall have obtained from the other (unless in the public domain); and in the event this Agreement is not consummated, each party shall promptly return to the other party all schedules, documents, or papers or other written information without retaining copies thereof, previously furnished to, or otherwise obtained by one party from the other as a result of this Agreement or in connection with the same. After the Closing and subject to applicable law and legal process, Buyer and Seller shall use their best efforts to keep confidential the terms of this transaction.

Section 6.4    Good Faith: Further Assurances and Cooperation.  The parties to this Agreement shall in good faith undertake to perform their respective obligations under this Agreement, to satisfy all conditions and to cause the transactions contemplated by this Agreement to be carried out promptly in accordance with the terms of this Agreement. Upon the execution of this Agreement and following the Closing, the parties hereto shall do such things as may be reasonably requested by the other parties hereto in order more effectively to consummate or document the transactions contemplated by this Agreement, including the execution and delivery to both parties and their respective successors of additional and further documents of transfer and assignment of any of the Assigned Assets. Acknowledging that the nature of the

10

Certified Document Number: 51986651 - Page 11 of 49

transactions contemplated hereby is such that continued cooperation between themselves before and after the Closing will be required, the parties hereto hereby agree to cooperate with the other to the extent reasonably necessary to enable the other to obtain such information and take such actions are required of them, and each party further agrees that, subject to applicable attorney-client privilege and obligations owed to third parties, Seller shall have reasonable access to the books and records transferred to Buyer, and the Buyer shall have reasonable access to the books and records retained by Seller.

Section 6.5   <u>Buyer's Rights to Assigned Agreements</u>.  From and after the Closing:

(a)    Buyer shall, in its sole discretion, carry out all of the ancillary functions related to the distribution of the audiovisual works that are licensed pursuant to the Assigned Agreements ("<u>Titles</u>"), including without limitation, localization, promotion, marketing, shipping and sub-licensing of the Titles subject to the terms of each Assigned Agreement and any required approval of the licensors under the Assigned Agreements (the "<u>Licensors</u>").

(b)    Buyer shall communicate with the Licensors directly with regard to the distribution activities including, but without limitation, quality assurance, promotion approval or any royalty reports.

(c)    Buyer shall have all of the rights and responsibilities under each Assigned Agreement that Seller and ADV had unless the Licensor agrees to change such agreement in writing.  With regard to the royalty reports and payments required by each Assigned Agreement, regardless of its terms, Buyer shall be responsible for the reports and payments, provided, however, that Buyer shall be entitled to the same right of recoupment of advances and dubbing and other production costs as enjoyed by ADV and/or Seller under each respective Assigned Agreement.

(d)    Buyer may localize and develop, at Buyer's expense, those Materials which were not developed by ADV.  Buyer shall obtain the approval for such developments from the Licensor as specified in the applicable Assigned Agreement.

Section 6.6   <u>Returns of ADV Products</u>.   The parties recognize that the products containing any of the Titles that were sold and shipped by ADV belong to ADV and the return from the retailers must be taken by ADV.  It is understood that Buyer is free from and has not accepted nor assumed any return obligation for ADV's products, and if the retailers ask Buyer to accept for return the products sold and shipped by ADV, Buyer may reject and decline such offer.   Prior to the Closing, subject to the restrictions and prohibitions in the Intercreditor Agreement, Seller shall make reasonable commercial efforts to require ADV to cease all further sales or shipments of products related to the Titles and will provide notice to any sublicensees or distributors of ADV who have digital distribution rights that ADV's rights under the License Agreements have terminated.

Section 6.7   <u>Dispute with Licensors</u>.   In case of disputes between Buyer and a Licensor, Buyer shall indemnify and hold harmless Seller from any liability or obligation related to such disputes with respect to the Assumed Liabilities, with the exception of disputes which are caused by Seller's breach of its obligations to Buyer, gross negligence or willful misconduct, and



11

Certified Document Number: 51986651 - Page 12 of 49

in such event Buyer shall inform Seller of the subject matter of such disputes in writing. Seller will cooperate with Buyer and such Licensor in order to attempt to resolve any disputes in a good faith manner.

ARTICLE VII.
INDEMNIFICATION

Section 7.1    Seller's Indemnification.    Seller shall indemnify and hold harmless Buyer and its affiliates, and their respective employees, officers, directors, agents and representatives from and against all charges, complaints, actions, suits, proceedings, hearings, investigations, claims, demands, judgments, orders, decrees, stipulations, injunctions, damages, dues, penalties, fines, amounts paid in settlement, liabilities, obligations, taxes, liens, losses, expenses and fees, including all attorney's, investigator's or consultant's fees and court costs (collectively, "Losses"), incurred or suffered by such indemnified person as a result of (i) any breach of the warranties, representations and covenants of Seller contained in this Agreement, (ii) any of the Excluded Liabilities, (iii) any disputes between Seller and ADV related to the Strategic Alliance Agreement or ADV's rights under any of the License Agreements, including without limitation the litigation described in Schedule 4.8, and (iv) any claims by ADV or Whitney Bank against Buyer related to Buyer's discussions with Seller with respect to the transactions hereunder or Buyer's execution of this Agreement or the consummation of the transactions contemplated hereunder.

Section 7.2    Buyer's Indemnification.    Buyer shall indemnify and hold harmless Seller and its affiliates, and their respective employees, officers, directors, agents and representatives against Losses incurred or suffered by such indemnified person as a result of (i) any breach of the warranties, representations and covenants of Buyer contained in this Agreement, and (ii) any of the Assumed Liabilities.

Section 7.3    Survival of Representations and Warranties; Limitations of Liability.

(a)    The representations and warranties contained herein or in any certificate or document delivered at the Closing are and will be deemed and construed to be continuing representations and warranties and will survive the Closing and continue in full force and effect thereafter for ninety (90) days after the Closing Date, except that the representations and warranties in Section 4.6 shall survive for the period of the applicable statute of limitations. If a notice of breach is given within any applicable time period, the indemnifying party shall be responsible for all Losses resulting from, arising out of, or related to such breach, including all Losses suffered after the date notice has been given.

(b)    Notwithstanding any provision of this Agreement to the contrary, Seller's cumulative aggregate liability for any and all breaches of representations or warranties hereunder and at any and all subsequent closings as contemplated by Section 1.6 shall not exceed the sum of (i) the Assignment Payments plus (ii) the additional payment obligations assumed by Buyer at such subsequent closings for any additional License Agreements assigned to Buyer at such subsequent closings.



12

Certified Document Number: 51986651 - Page 13 of 49

FUN 02601

Section 7.4   <u>Demands and Actions</u>.   The party from whom indemnity is sought ("<u>Indemnitor</u>") reserves the right to contest and defend by all appropriate legal or other proceedings any demand, assertion, claim, action or proceeding with respect to which it has been called upon to indemnify the person who seeks indemnity ("<u>Indemnitee</u>") under the provisions of this Agreement; provided, however, that:

(a)   Notice of the intention so to contest shall be delivered to Indemnitee within twenty (20) calendar days from the date of receipt by Indemnitor of notice of the assertion of such demand, assertion, claim, action or proceeding; and

(b)   Such contest shall be conducted by reputable attorneys employed by Indemnitor at Indemnitor's cost and expense, but Indemnitee shall have the right to participate in but not control such proceedings and to be represented by attorneys of its own choosing, at its own cost and expense.

Should Indemnitor so elect to assume and control the defense and settlement of any claim, Indemnitor will not be liable to Indemnitee for legal expenses subsequently incurred by Indemnitee in connection with the defense or settlement thereof.  If Indemnitor assumes such defense, Indemnitee shall have the right to participate in, but not control, the defense thereof and to employ counsel, at its own expense, separate from the counsel employed by Indemnitor.  If Indemnitor shall have assumed the defense of any claim, Indemnitee shall not admit any liability with respect to, or settle, compromise or discharge, such claim without Indemnitor's prior written consent.   If Indemnitor has not so assumed the defense of and Indemnitee shall settle, compromise or discharge any claim without Indemnitor's consent, such settlement, compromise or discharge shall not be conclusive as to the amount of Indemnitee's Losses, if any, with respect to such claim but may be used as evidence of such amount.

ARTICLE VIII.
TERMINATION

Section 8.1   Each of Buyer and Seller shall have the right to terminate this Agreement prior to the Closing Date pursuant to the following conditions:

(a)   If a party is in material breach of the this Agreement and fails to cure such breach within 10 business days of its written notice by the other party, the other party can terminate the this Agreement;

(b)   In the event that both parties recognize that the conditions precedent to Closing have not been satisfied by July 31, 2008, either party has a right to terminate this Agreement, provided that the failure to consummate the transactions contemplated hereby on or before such date did not result from the failure by the party seeking termination of this Agreement to fulfill any undertaking or commitment provided for herein on the part of such party that is required to be fulfilled on or prior to Closing; except that prior to a party's termination of this Agreement under this Section 8.1(b), the party seeking to terminate this Agreement shall deliver to the other party a written notice of its intent to termination, and then the other party has a right to offer a revised proposal to extend this Agreement within 10 days of its receipt of such notice.  If the parties cannot reach mutual agreement about the revised



13

Certified Document Number: 51986651 - Page 14 of 49

FUN 02602

proposal within 10 days after such notice of termination is delivered, then either party can terminate this Agreement immediately by providing written notice to the other party.

ARTICLE IX.
MISCELLANEOUS PROVISIONS

Section 9.1   <u>Notices.</u>   All notices, communications and deliveries under this Agreement shall be made in writing signed by the party making the same, and shall be deemed given on the date delivered if delivered via electronic transmission (but only if such transmission is acknowledged as being received by the intended recipient thereof) or if delivered in person or by special or overnight delivery, or on the fifth (5th) business day after mailed if mailed first-class certified or registered mail (with postage prepaid, return receipt requested) addressed as follows:

**To Buyer:**

> FUNimation Productions, Ltd.
> 1200 Lakeside Parkway, Building 1
> Flowermound, Texas 75028
> Attention: Gen Fukunaga, President
> Email: gen.fukunaga@funimation.com

with a copy to:

> FUNimation Productions, Ltd.
> 1200 Lakeside Parkway, Building 1
> Flowermound, Texas 75028
> Attention: Jake Hilton, Counsel
> Email: jake@funimation.com

and

> Vinson & Elkins LLP
> First City Tower
> 1001 Fannin Street  Suite 2500
> Houston, TX 77002-6760
> Attention: Edward T. Stockbridge
> Email: tstockbridge@velaw.com



14

Certified Document Number: 51986651 - Page 15 of 49

**FUN 02603**

**To Seller:**

> ARM Corporation
> 1-20, Akasaka 6-chome
> Minato-ku
> Tokyo, 107-8655, Japan
> Attention: Kozo Mizushima
> Email: mizushima.kozo@sojitz.com

with a copy to:

> Hunton & Williams LLP
> 1445 Ross Avenue, Suite 3700
> Dallas, Texas 75202
> Attention: Michelle Mendez, Esq.
> Email: mmendez@hunton.com

or to such other representative or such other address as the parties hereto may furnish to the other parties in writing. If notice is given pursuant to this Section 9.1 of a permitted successor or assign of a party to this Agreement, then notice shall be given as set forth above to such successor or assign of such party.

Section 9.2   Assignment. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto, and their respective legal or personal representatives, heirs, successors and assigns. No assignment or transfer of rights and obligations hereunder shall be made except with the prior written consent of the parties hereto.

Section 9.3   Captions; Definitions. The titles or captions of articles, sections or subsections contained in this Agreement are inserted only as a matter of convenience and for reference and in no way define, limit, extend or describe the scope of this Agreement or the intent of any provision hereof. The parties agree to all definitions in the statement of parties to this Agreement and in the other introductory language to this Agreement. For purposes of this Agreement, the term "Knowledge" shall be construed to mean both knowledge of which such party is actually possessed, and that knowledge which may be legitimately imputed to such party.

Section 9.4   Controlling Law; Waiver. This Agreement shall be construed and enforced in accordance with the laws of the State of Texas, without regard to its applicable conflict of laws provisions. This Agreement may not be altered or amended except in a writing signed by Seller and Buyer. The failure of any party hereto at any time to require performance of any provision hereof shall in no manner affect the right to enforce the same. No waiver by any party hereto of any condition, or of the breach of any term, provision, warranty, representation, agreement or covenant contained in this Agreement, whether by conduct or otherwise, in any one or more instances shall be deemed or construed as a further or continuing waiver of any such condition or breach or a waiver of any other condition or of the breach of any other term, provision, warranty, representation, agreement or covenant herein contained.



Certified Document Number: 51986651 - Page 16 of 49

FUN 02604

Section 9.5   <u>Exhibits and Schedules</u>.  All exhibits and schedules and attachments to exhibits and schedules and any other attachments to this Agreement are hereby incorporated into this Agreement and are hereby made a part of this Agreement as if set out in full in the first place that reference is made thereto.

Section 9.6   <u>Expenses</u>.  Each party shall be responsible for and bear all of its own costs and expenses (including any broker's, finder's, legal counsel, accounting and investment banking fees) incurred in connection with the transaction contemplated by this Agreement.

Section 9.7   <u>Counterparts; Entire Agreement</u>.  This Agreement may be executed by each party upon a separate copy, and in such case one counterpart of this Agreement shall consist of enough of such copies to reflect the signatures of all of the parties to this Agreement.  This Agreement shall become effective when one or more counterparts has been signed by each of the other parties to this Agreement.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, and it shall not be necessary in making proof of this Agreement or the terms of this Agreement to produce or account for more than one of such counterparts.  This Agreement together with all schedules and exhibits hereto and all other agreements and undertakings provided for hereunder shall constitute the entire agreement of the parties and there are no other written or oral understandings or agreements among the parties.

Section 9.8   <u>Severability</u>.  If any of the provisions of this Agreement shall be held invalid, illegal or unenforceable by the final determination of a court of competent jurisdiction and all appeals therefrom shall have failed or the time for such appeals shall have expired, such provision or provisions shall be deemed eliminated from this Agreement but the remaining provisions shall nevertheless be given full effect.  In the event this Agreement or any portion hereof is more restrictive than permitted by the law of the jurisdiction in which enforcement is sought, this Agreement or such portion shall be limited in that jurisdiction only to the extent required by the law of that jurisdiction.  If a court of competent jurisdiction shall determine that the terms of this Agreement are partially or wholly inoperative, unenforceable or invalid in a particular case for any reason, such court shall have the power to limit or otherwise to recast the terms of this Agreement in such case as to permit its enforcement to the greatest extent permitted by applicable law.

Section 9.9   <u>Construction</u>.  Each party and its counsel has reviewed this Agreement and the documents to be delivered in connection with this Agreement and has had the opportunity to negotiate the terms hereof and thereof and to suggest changes to the language herein and therein. Accordingly, the rules of construction to the effect that any ambiguities shall be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any of the documents delivered in connection with this Agreement.

Section 9.10   <u>No Third Party Beneficiaries</u>.  Except as otherwise provided in Article VII hereof, no provision in this Agreement shall create any third party beneficiary of any right or benefit arising hereunder.

Section 9.11   <u>Disclosure</u>.  Except as and to the extent required by law, without the prior written consent of Buyer, Seller shall not, directly or indirectly, make any public comment, statement or communication with respect to, or otherwise disclose or permit the disclosure of, to

16

Certified Document Number: 51986651 - Page 17 of 49

FUN 02605

the public or any third party any of the terms, conditions or other aspects of the this Agreement or the transaction contemplated hereby.

Section 9.12   Jurisdiction; Service of Process.   Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement may be brought against any of the parties, in the courts of the State of Texas sitting in Dallas, Texas, or, if it has or can acquire jurisdiction, in the United States District Court sitting in Dallas, Texas, and the Seller and Buyer each consents to the jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding and waives any objection to venue laid therein.   Seller and Buyer agree that service of process may be made by mailing a copy of the summons to them at their addresses set forth above or at such other addresses which they may subsequently specify to the other parties by written notice.

[SIGNATURE PAGE FOLLOWS]



Certified Document Number: 5198665I - Page 18 of 49

FUN 02606

EXECUTION VERSION

**IN WITNESS WHEREOF**, the parties have executed this Agreement on the date set forth above.

**BUYER:**

FUNIMATION PRODUCTIONS, LTD.
By its General Partner, Navarre CP LLC,
a Minnesota limited liability company

By: _____
Name: _____
Title: _____


**SELLER:**

ARM CORPORATION

By: _____
Name: _KOZO MAZUSHIMA_____
Title: _PRESIDENT_____

*[Signature Page to Assignment Agreement]*

Certified Document Number: 51986651 - Page 19 of 49

FUN 02607

# EXHIBIT A – PART 1

## LICENSE AGREEMENTS
## TO BE DELIVERED AT CLOSING

| | LICENSE AGREEMENT | AMOUNTS DUE TO LICENSOR | COLUMN A AMOUNTS TO BE PAID BY SELLER | COLUMN B AMOUNTS TO BE PAID BY BUYER |
|---|---|---|---|---|
| 1. | Multiple Rights License Agreement dated July 15, 2007 among CoMix Wave Films, Inc., Licensor and ARM, Inc., Initial Licensee and Payment Entity together with A.D. Vision, Inc. as Distributor for the audio-visual work entitled: *5 Centimeters per Second* | $50,000.00 | $2,941.00 | $47,059.00 |
| 2. | Deal Memo with an effective date of October 20, 2006 by and among Licensor, Kodansha Ltd., Licensee, ARM Corporation and Distributor, A.D. Vision, Inc. for the audio-visual work entitled: *Air Gear* | Zero | Zero | Zero |
| 3. | Multiple Rights License Agreement dated September 25, 2006 among Toshiba Entertainment, Inc. as Licensor and ARM Corporation together with A.D. Vision, Inc. for the audio-visual work entitled: *Coyote Ragtime Show* | Zero | Zero | Zero |
| 4. | Multiple Rights License Agreement dated August 1, 2007 among Showgate, inc. as Licensor, ARM Corporation together with A.D. Vision, Inc. for the audio-visual work entitled: *Devil May Cry* | $610,000.00 | $35,883.00 | $574,117.00 |
| 5. | Joint Production Agreement dated June 1, 2006 among Kadokawa Pictures USA, Inc., ARM Corporation and A.D. Vision, Inc. for the audio-visual work entitled: *Guyver* | Zero | Zero | Zero |
| 6. | License Agreement dated July 1, 2007 between Tokyo Broadcasting System, Inc. as Licensor and ARM Corporation as Licensee and Payment Entity and A.D. Vision, Inc. as Distributor for the audio-visual work entitled: *Kanon TV Series* | $75,000.00 | $4,412.00 | $70,588.00 |
| 7. | Programming License Agreement dated November 30, 2006 between Media Factory, Inc. as Licensor, ARM Corporation as Licensee and A.D. Vision, Inc. as Distributor for the audio-visual work entitled: *Kurau Phantom Memory* | $192,000.00 | $11,294.00 | $180,706.00 |

*Exhibit A – Page 1*

Certified Document Number: 51986651 - Page 20 of 49

FUN 02608

| | LICENSE AGREEMENT | AMOUNTS DUE TO LICENSOR | COLUMN A AMOUNTS TO BE PAID BY SELLER | COLUMN B AMOUNTS TO BE PAID BY BUYER |
|---|---|---|---|---|
| 8. | Deal Memo dated October 24, 2006 by and between Shochiku co., Ltd as Licensor and ARM Corporation as Licensee for the audio-visual work entitled: *Le Chevalier D'Eon* | Zero | Zero | Zero |
| 9. | Multiple Rights License Agreement dated June 20, 2007 among The Klockworx Co., Ltd. as Licensor together with ARM Corporation as Initial Licensee and Payment Entity and A.D. Vision, Inc. as Distributor for the audio-visual work entitled: *Moonlight Mile* | Zero | Zero | Zero |
| 10. | Deal Memo with an effective date of November 20, 2006, by and among Licensor, Lodansha Ltd., Licensee, and ARM for the audio-visual work entitled: *Ah! My Goddess Flights of Fancy* | Zero | Zero | Zero |
| 11. | Program License Agreement dated June 6, 2007 by and between TV Tokyo Medianet, Inc. as Licensor, ARM Corporation as Licensee and A.D. Vision, Inc. as Agent for Licensee for the audio-visual work entitled: *Yamatonadeshiko Shichihenge (The Wallflower)* | $300,000.00 | $17,647.00 | $282,353.00 |
| | **TOTAL:** | $1,227,000.00 | $72,177.00 | $1,154,823.00 |

*Exhibit A – Page 2*

Certified Document Number: 51986651 - Page 21 of 49

**FUN 02609**

## EXHIBIT A – PART 2

### LICENSE AGREEMENTS
### TO BE DELIVERED AFTER CLOSING

| LICENSE AGREEMENT | AMOUNTS DUE TO LICENSOR | COLUMN A AMOUNTS TO BE PAID BY SELLER | COLUMN B AMOUNTS TO BE PAID BY BUYER |
|---|---|---|---|
| 1. Television & Videogram License Agreement dated December 21, 2006 by and among Aniplex, Inc., ARM Corporation and AD Vision Inc. for the audio-visual work entitled: *0091-1* | Zero | Zero | Zero |
| 2. License Agreement dated May 1, 2007 by and among Tokyo Broadcasting System, Inc., as Licensor, ARM Corporation, as Licensee/Payment Entity, and A.D. Vision, Inc., as Distributor, for the audio-visual work entitled: *Air TV Series* | $90,000.00 | $5,294.00 | $84,706.00 |
| 3. Multiple Rights License Agreement dated June 30, 2007 among Toei Animation Inc. as Licensor together with ARM Corporation, as Initial Licensee and Payment Entity and A.D. Vision, Inc. as Distributor for the audio-visual work entitled: *Air The Movie* | Zero | Zero | Zero |
| 4. Multiple Rights License Agreement dated June 30, 2006 among Sojitz Corporation as Licensor and ARM, inc. as Initial Licensee and Payment Entity together with A.D. Vision, Inc. as Distributor for the audio-visual work entitled: *Comic Party Revolution* | Zero | Zero | Zero |
| 5. Deal Memo dated October 24, 2006 by and between Shochiku Co., Ltd. as Licensor and ARM Corporation as Licensee for the programs titled: *Ghost Train and Synesthesia* | Zero | Zero | Zero |

*Exhibit A – Page 3*

Certified Document Number: 51986651 - Page 22 of 49

FUN 02610

| | LICENSE AGREEMENT | AMOUNTS DUE TO LICENSOR | COLUMN A AMOUNTS TO BE PAID BY SELLER | COLUMN B AMOUNTS TO BE PAID BY BUYER |
|---|---|---|---|---|
| 6. | License Agreement dated September 1, 2007 among Bandai Visual Co., Ltd., ARM Corporation as Licensee and A.D. Vision, Inc. as Distributor for the audio-visual work entitled: *Ice* | Zero | Zero | Zero |
| 7. | License Agreement dated April 6, 2007 among Bandai Visual Co., Ltd., ARM Corporation as Licensee and A.D. Vision as Distributor the audio-visual work entitled: *Innocent Venus* | Zero | Zero | Zero |
| 8. | Multiple Rights License Agreement dated June 30, 2006 among Sojitz Corporation as Licensor and ARM, Inc. as Initial Licensee and Payment Entity together with A.D. Vision, Inc. as Distributor for the audio-visual work entitled: *Jinki: Extend* | Zero | Zero | Zero |
| 9. | Television & Videogram License Agreement dated May 1, 2007 by and among Aniplex, Inc., ARM Corporation and AD Vision, Inc. for the audio-visual work entitled: *King of the Bandit Jing In Seventh Heaven* | Zero | Zero | Zero |
| 10. | Multiple Rights License Agreement dated August 1, 2007 among Showgate, Inc. as Licensor, ARM Corporation and A.D. Vision, Inc. for the audio-visual work entitled: *Kyoshiro to Towa no Sora* | $30,000.00 | $1,764.00 | $28,236.00 |
| 11. | Multiple Rights License Agreement dated March 31, 2007 among GDH K. K. as Licensor and ARM Corporation as Initial Licensee and Payment Entity and A.D. Vision, Inc. as Distributor for the audio-visual work entitled: *Magikano* | $39,000.00 | $2,294.00 | $36,706.00 |
| 12. | Multiple Rights License Agreement dated September 25, 2006 among Toshiba Entertainment, Inc. as Licensor and ARM Corporation and A.D. Vision, Inc. for the audio-visual work entitled: *Moeyo Ken* | Zero | Zero | Zero |

*Exhibit A – Page 4*

**FUN 02611**

| | LICENSE AGREEMENT | AMOUNTS DUE TO LICENSOR | COLUMN A AMOUNTS TO BE PAID BY SELLER | COLUMN B AMOUNTS TO BE PAID BY BUYER |
|---|---|---|---|---|
| 13. | Multiple Rights License Agreement dated September 19, 2007 among Marvelous Entertainment, Inc. as Licensor together with ARM Corporation as Initial Licensee and Payment Entity and A.D. Vision, Inc. as Distributor for the audio-visual work entitled: *Murder Princess* | $120,000.00 | $7,059.00 | $112,941.00 |
| 14. | Television & Videogram License Agreement dated October 1, 2006 by and among Aniplex, Inc., ARM Corporation and AD Vision, Inc. for the audio-visual work entitled: *Nerima Daikon Brothers* | Zero | Zero | Zero |
| 15. | Multiple Rights License Agreement dated June 30, 2006 among King Record, Co. Ltd. as Licensor together with ARM Corporation as Initial Licensee and Payment Entity and A.D. Vision, Inc. as Distributor for the audio-visual work entitled: *Paniponi Dash!* | Zero | Zero | Zero |
| 16. | Multiple Rights License Agreement dated April 27, 2007 among Toshiba Entertainment, inc. as Licensor, ARM Corporation and A.D. Vision, Inc. for the audio-visual work entitled: *Project Blue* | $84,000.00 | $4,941.00 | $79,059.00 |
| 17. | Multiple Rights License Agreement dated March 31, 2007 among GDH K. K. as Licensor, ARM Corporation as Initial Licensee and Payment Entity and A. D. Vision, inc. as Distributor for the audio-visual work entitled: *Pumpkin Scissors* | $468,000.00 | $27,529.00 | $440,471.00 |
| 18. | Multiple Rights License Agreement dated March 31, 2007 among GDH K. K. as Licensor, ARM Corporation as Initial Licensee and Payment Entity and A.D. Vision, Inc. as Distributor for the audio-visual work entitled: *Red Garden* | $396,000.00 | $23,294.00 | $372,706.00 |

*Exhibit A – Page 5*

FUN 02612

| | LICENSE AGREEMENT | AMOUNTS DUE TO LICENSOR | COLUMN A AMOUNTS TO BE PAID BY SELLER | COLUMN B AMOUNTS TO BE PAID BY BUYER |
|---|---|---|---|---|
| 19. | Program License Agreement dated November 10, 2006 by and among TV Tokyo Medianet, Inc. as Licensor and ARM Corporation as Licensee and A. D. Vision as Agent for Licensee for the audio-visual work entitled: *Sgt. Keroro (Seasons 1 and 2)* | $622,000.00 | $36,588.00 | $585,412.00 |
| 20. | Multiple Rights License Agreement dated September 20, 2006 among Sojitz Corporation as Licensor and ARM, Inc. as Initial Licensee and Payment Entity and A. D. Vision, Inc. as Distributor for the audio-visual work entitled: *Shin Angyo Onshi* | $100,000.00 | $5,882.00 | $94,118.00 |
| 21. | Multiple Rights License Agreement dated April 27, 2007 among Toshiba Entertainment, Inc. as Licensor and ARM Corporation and A. D. Vision, Inc. for the audio-visual work entitled: *Tokyo Majin* | $390,000.00 | $22,941.00 | $367,059.00 |
| 22. | Multiple Rights License Agreement dated August 1, 2006 among Sojitz Corporation as Licensor and ARM., Inc. as Initial Licensee and Payment Entity together with A. D. Vision, Inc. as Distributor for the audio-visual work entitled: *Utawarerumono* | Zero | Zero | Zero |
| 23. | Multiple Rights License Agreement dated September 25, 2006 among Toshiba Entertainment, Inc. as Licensor, ARM Corporation together with A. D. Vision, Inc. for the programs titled: *UFO Princess Valkyrie - Princess Bride and UFO Princess Valkyrie - Happy Party Paradise* | Zero | Zero | Zero |
| 24. | License Agreement dated July 1, 2007 between Tokyo Broadcasting System, Inc. as Licensor and ARM Corporation as Licensee and Payment Entity and A.D. Vision, Inc. as Distributor for the audio-visual work entitled: *Venus vs. Virus TV Series* | $180,000.00 | $10,588.00 | $169,412.00 |

*Exhibit A – Page 6*

Certified Document Number: 51986651 - Page 25 of 49

FUN 02613

| | LICENSE AGREEMENT | AMOUNTS DUE TO LICENSOR | COLUMN A AMOUNTS TO BE PAID BY SELLER | COLUMN B AMOUNTS TO BE PAID BY BUYER |
|---|---|---|---|---|
| 25. | Multiple Rights License Agreement dated March 31, 2007 among GDH K. K. as Licensor and ARM Corporation as Initial Licensee and Payment Entity together with A. D. Vision, Inc. as Distributor for the audio-visual work entitled: *Welcome to the NHK* | $144,000.00 | $8,471.00 | $135,529.00 |
| 26. | Multiple Rights License Agreement dated April 4, 2007 among Toei Animation, Inc. as Licensor together with ARM Corporation as Initial Licensee and Payment Entity and A. D. Vision, Inc. as Distributor for the audio-visual work entitled: *Xenosaga* | $24,000.00 | $1,412.00 | $22,588.00 |
| | TOTAL: | $2,687,000.00 | $158,057.00 | $2,528,943.00 |

Certified Document Number: 51986651 - Page 26 of 49

*Exhibit A – Page 7*

FUN 02614

# EXHIBIT B

## DESCRIPTION OF MATERALS AND DEVELOPED MATERIALS

| Property | Digibeta | Audio |
|---|---|---|
| **009-1** | 1-12 Japanese Generic Master<br>1-12 DVD Master (ENG op & cl, JPN logo, 1+2 ENG, 3+4 JPN)<br>v1-v3 DVD Master<br>Ep. 1 ADVocates DVD Master<br>New Type ep.4 dub<br>Extras: on 5 tapes + 1 DVD Master tape | 1-12 + Extra Mission ME conformed 2.0<br>1-12 + E.M. + Safety 5.1 + 2.0<br>1-12 + E.M. 5.1 +2.0 VOX<br>1-12 + E.M. voice tracks<br>Ep. 1 ADVocates 5.1 + 2.0 + VOX |
| **5 Centimeters Per Second** | 3 extra tapes x 2 copies<br>Promo trailer<br>Subtitled Generic Master<br>Japanese Generic Master<br>HD Japanese Master + promo<br>DVD Master | Voice only<br>5.1 + 2.0 x 2<br>Music + FX splits JPN<br>5.1 voice only<br>NO JPN surround sound - do have stereo |
| **AIR GEAR** | 1-5 Japanese Generic Masters (TV version)<br>1-25 Japanese Generic Masters<br>1-25 + Special Trick (ep 26) Japanese Masters<br>1-25 + S.T. DVD Masters (ENG op + cl, ENG title cards, JPN logo, 1+2 ENG, 3+4 JPN)<br>v1-v6 DVD menus<br>Extra: music video for convention<br>Clean op + cl on Japanese masters | 1-26 Music + FX splits<br>1-25 Conformed 2.0<br>1-26 5.1 + 2.0 + Safety<br>1-26 5.1 + 2.0 VOX only<br>1-26 voice tracks<br>Op song karaoke JPN stereo master<br>1-2 5.1 + 2.0 bleeped<br>Main Menu mix 5.1 |
| **AIR MOVIE** | Japanese Generic Master<br>Japanese Master<br>DVD Master<br>Credits in Kanji<br>Logo in JPN | 5.1 FX<br>5.1 Music<br>5.1 JPN full<br>5.1 + 2.0 ENG<br>5.1 VOX only<br>Voice tracks<br>5.1 JPN conformed (maybe safety)  *Found in Air TV box |
| **AIR TV** | 1-13 (recap ep.), In Summer Japanese Masters<br>1-13 + In Summer Japanese Generic Masters<br>1-13 + In Summer DVD Masters (ENG op/cl, JPN logo, ENG/JPN title cards, 1+2 ENG, 3+4 JPN)<br>v1-v3 DVD menus<br>Newtype promo - ep1<br>Extras tape - clean op/cl, original commercials/tv spots | 1-13 + In Summer 5.1 +2.0 (+safety)<br>1-12 + In Summer Japanese 5.1 conformed<br>Ep.1 for Newtype 5.1 + 2.0<br>EP.13 M+E splits<br>1-12 + In Summer Japanese 5.1 audio master<br>1-12 + In Summer 5.1 music (confirmed & Master)<br>1-12 + In Summer 5.1 SFX (conformed & Master)<br>1-4, 13, In Summer voice tracks<br>Newtype Ep.1, 1-12 + In Summer 5.1 & 2.0 VOX only<br>**Is recap ep13 in JPN stereo only?** |

*Exhibit B – Page 1*

Certified Document Number: 51986651 - Page 27 of 49

**FUN 02615**

Certified Document Number: 51986651 - Page 28 of 49

| Property | Digibeta | Audio |
|---|---|---|
| **Blade of the Phantom Master** | Japanese generic Master<br>DVD Master (ENG op/cl, JPN logo, 1+2 ENG 3+4 JPN)<br>Production Sketches<br>Extras reel | DA98s:<br>Japanese 5.1 audio master<br>5.1 + 2.0 Master + Safety<br>Voice tracks<br>5.1 SFX<br>5.1 Music<br>5.1 + 2.0 VOX only<br>Japanese 5.1 conformed |
| **COMIC PARTY REVOLUTION** | 1-13 DVD Masters (JPN logo (english + kanji) op/cl clos ENG text, 1+2 ENG, 3+4 JPN)<br>1-13 Japanese Generic<br>1-3 DVD menus<br>Newtype Promo<br>1-8 Broadcast Master | 1-13 (x2) Stereo Master ENG<br>1-13 Voice tracks<br>Trailer audio<br>JPN audio on Digitapes |
| **Coyote Ragtime Show** | 1-12 DVD Master (ENG op/cl, JPN logo in ENG, 1+2 ENG, 3+4 JPN)<br>1-12 Japanese Generic Master (has clean op+cl)<br>v1-v3 DVD menus | DA98s:<br>1-12 5.0 music<br>1-12 Japanese 5.1 Audio Master<br>1-12 Japanese VOX 5.1<br>1-12 Japanese 5.1 SFX Master<br>1-12 5.1 + 2.0 VOX<br>1-12 voice tracks<br>1-12 5.1 + 2.0 + safety copies |
| **DEVIL MAY CRY** | 1-12 Japanese Master (HD-Cam SR)<br>1-10 Japanese generic master (eps 11+12 labeled 'downconvert')<br>1-10 DVD Master. (ENG opening, JPN logo in ENG, ENG titlecards, ENG closing, ENG 1+2, JPN 3+4) (eps 11+12 are labeled "furture" DVD Master)<br>v1-v2, v5-v6 Extras<br>clean op/cl on extras tapes | DA98s:<br>5-12 conformed Japanese 5.1 Master<br>1-12 Japanese 5.1 + 2.0<br>1-4, 9-12 5.1 + 2.0 VOX only<br>1-12 5.1 music<br>1-12 5.1 SFX<br>1-4 voice tracks<br>1-4, 9-12 5.1 + 2.0 + safety |
| **GHOST TRAIN** | Japanese Master HD CAM-SR<br>Japanese Generic Master (anamorphic + letterbox)<br>Subtitled anamorphic + letterbox masters<br>DVD Master (ENG + JPN op credits + logo, 1+2 ENG, 3+4 JPN)<br>DVD menus<br>DVD Extras: TV spots, 'Making Of', commentary (see DA88) | LCRS + 2.0 mix + safety<br>Commentary Master + safety<br>5.1 + 2.0 Master + safety<br>JPN 4.0 + 2.0 audio master<br>JPN stereo master<br>Music + FX splits<br>LCRS + 2.0 VOX mix<br>Voice tracks |
| **GUYVER: THE BIOBOOSTED ARMOR** | 1-12 DVD Master US vid logo, op+cl ENG (1+2 ENG, 3+4 JPN)<br>1-26 Japanese Generic + extras<br>1-26 Japanese Generic PAL<br>1-26 Japanese Master<br>+ UK DVD menus, 1-7 ENG DVD menus<br>Anime Network eps<br>Series Manga extra<br>German & UK DVD menus, 1-7 ENG DVD Menus | 1-26 music & FX splits (1,2 Jmix - 3,4 Dialogue - 5,6 Music - 7,8 FX)<br>1-26 5.1 + 2.0 Eng Master + safety<br>1-26 VOX only mix<br>1-26 voice tracks clean<br>Commentary 1, 13, 23, 26 safely & Master manga to anime comp audio 1-7<br>PAL German 1-26 5.1 + 2.0 & UK materials 1-26 5.1 + 2.0 |

*Exhibit B — Page 2*



**FUN 02616**

Certified Document Number: 51986651 - Page 29 of 49

| Property | Digibeta | Audio |
|---|---|---|
| ICE | Extras reel - large tape<br>ep 1-3 JPN Master | JPN 5.1 + 2.0 Master<br>Music 5.1 + 2.0<br>SFX 5.1 + 2.0<br>Conformed JPN 5.1 + 2.0 Master |
| Innocent Venus | 1-12 Japanese Masters<br>1-12 Japanese Generic Masters<br>1-12 DVD Masters (ENG op+cl, JPN logo & titlecards, 1+2 ENG, 3+4 JPN)<br>v1-v3 DVD menus<br>ep. 1 promo digi<br>DVD extras: cast interviews, TV commentary<br>Clean op+cl on Japanese Masters | 1-12 Music + FX Splits<br>1-12 5.1 + 2.0 + safety<br>1-12 voice tracks<br>1-12 5.1 + 2.0 VOX only<br>1-12 conformed 2.0 + safety<br>1-2 ADVocates 5.1 + 2.0 VOX<br>1-2 ADVocates 5.1 + 2.0 + safety |
| JINKI EXTEND | 1-13 Japanese Master (op+cl ENG credits, Logo ENG - JPN in ENG, 1+2 ENG, 3+4 JPN)<br>1-13 DVD Master<br>1-3 DVD menus<br>4 Broadcast _____ 1-13 eps<br>Closing certain eps - maybe 'On air closing' | 1-13 Music + FX splits (1,2 mix - 3,4 FX - 5,6 music - 7,8 dial)<br>1-13 5.1 + 2.0  Master ENG<br>1-13 Dialogue only<br>1-13 PAL music + FX (NO ENG) matches tracks above<br>1-13 VOX only 5.1 + 2.0 ENG<br>1-13 conformed 2.0 master + safety (sep music + effects stereo & full mix<br>Trailers DA88 |
| KANON | 1-24 Japanese Master (ep split at mid-point bumper)<br>1-24 Japanese Generic Master<br>1-16 DVD Master (Japanese logo in ENG, ENG op/cl, 1+2 ENG, 3+4 JPN) | 4-12 voice tracks (1 master, 2 safety)<br>13-16 stereo audio master |
| KING OF THE BANDIT JING IN SEVENTH HEAVEN | OVA 1-3 DVD Master (JPN logo, ENG title card, 1+2 ENG, 3+4 JPN)<br>OVA 1-3 Japanese Master<br>Production sketches for menus | OVA 1-3 Music + FX splits<br>OVA 1-3 5.1 + 2.0 (ENG)<br>OVA 1-3 5.1 + 2.0 VOX only |
| KURAU PHANTOM MEMORY | DVD Masters (ENG vid, 1+2 ENG, 3+4 JPN, ENG credits, ENG logo)<br>1-24 Japanese Master              -same-<br>1-24 Japanese Generic<br>1-6 DVD menus + extras<br>**textless & extras at end** | 2 copies ME 2.0 w/full JPN mix<br>2 copies 5.1 + 2.0 ENG mix<br>ENG dialogue only 1-24 |
| KYOSHIRO TO TOWA NO SORA (SHATTERED ANGELS) | 1-12 JPN Master w extras + clean op/cl + ME<br>1-4 DVD Masters (1+2 ENG, 3+4 JPN) | DA98s:<br>1-4 Stereo audio master (1,2 ENG mix - 3,4 VOX - 5,6 ME - 7,8 JPN mix) |
| LE CHEVALIER D'EON | 1-24 full HD Master HD Cam SR<br>all menus<br>1-24 Japanese Masters<br>1-24 Japanese Generic Masters<br>1-24 DVD Masters (JPN logo, ENG text, op/cl, 1+2 ENG, 3+4 JPN)<br>textless op/cl | 1-24 5.1 + 2.0 Japanese 5.1 audio<br>1-24 5.1 + 2.0 Master tape<br>v1-v6 next ep preview<br>Have various voice tracks + VOX tapes<br>Have 24 bit 'Do not use' JPN 5.1 + 2.0 tapes<br>1-20 Music + FX safety tape |

*Exhibit B – Page 3*



| Property | Digibeta | Audio |
|---|---|---|
| *MAGIKANO | 1-13 Japanese Masters + extras + clean op/cl<br>1-13 Japanese Generic Masters, extras, clean op/cl<br>1-13 DVD Masters (ENG op/cl, JPN logo & titlecard, 1+2 ENG, 3+4 JPN) | DA98s:<br>1-13 5.1 ME mix Master (ep13 mislabeled as 'In Summer')<br>1-13 +safety 5.1 + 2.0<br>1-13 5.1 + 2.0 VOX only<br>1-13 conformed 2.0<br>1-13 voice tracks |
| Moeyo Ken TV | 1-13 Japanese Generic Masters<br>1-13 DVD Masters (JPN log in English, ENG op/cl, 1+2 ENG, 3+4 JPN)<br>v1-v3 DVD Menus | DA98s:<br>1-13 stereo audio master (+ep.1, 8 commentaries)<br>trailer audio master<br>PAL: 1-4 5.1 + 2.0 + music + FX splits<br>1-13 Japanese audio dumpdown<br>1-13 voice tracks + safety<br>1, 8+13 audio commentaries - digi<br>Extras - round table discussion, clean op/cl, music video |
| MOONLIGHT MILE | PAL 1-8<br>HD 1-12 + clean op/cl<br>1-12 Japanese Generic<br>1-8 DVD Master | 1-8 Stereo audio master (1,2 ME mix)<br>1-8 5.1 + 2.0 music<br>1-8 5.1 + 2.0 SFX<br>1-12 5.1 + 2.0 ENG mix<br>1-12 5.1 + 2.0 VOX only<br>5-12 JPN 5.1 + 2.0 Master<br>1-4 voice tracks clean<br>PAL various |
| MURDER PRINCESS | 1-6 Japanese Masters<br>1-6 Japanese Generic Masters (w/ clean op/cl)<br>1-6 DVD Masters (JPN op/cl, No ENG dialogue) | Nothing |
| AH! MY GODDESS 2: FLIGHTS OF FANCY | 1-24 Japanese Master (combined M&E on master)<br>1-24 DVD Master (JPN logo + TC, ENG credits)<br>1-24 Japanese Generic<br>Clean op/cl<br>v1-v6 menus | 1-24 Stereo audio Master (ENG mix, die, ME)<br>Combined M&E on JPN video Master<br>1-20 Video tracks |
| NERIMA DAIKON BROTHERS | 1-12 Japanese Master (1+2 ENG, 3+4 JPN)<br>Newtype promo<br>1-12 Japanese Generic Master<br>1-3 menus<br>1-12 DVD Master (theme cong ENG, ENG credit, JPN logo)<br>1-3 Extras + Majiyaba PV<br>1-11 clean songs<br>3 additional tapes of extra - ADV agres | 1-12 Music FX<br>1-12 Master + safety conformed 2.0<br>1-12 5.1 + 2.0 ENG Master<br>1-12 Conformed JPN commentaries<br>1-12 5.1 + 2.0 VOX only<br>1-12 voice tracks<br>1-12 JPN audio stereo Master |
| PANIPONI DASH | 1-26 Japanese Masters<br>1-26 Japanese Generic Masters<br>1-26 DVD Master (JPN opening & logo, ENG closing, JPN titlecard, 1+2 ENG, 3+4 JPN)<br>Extras (chalkboard extras, In Class, clean closing, etc.)<br>1-12 Anime Network Masters & promos | 1-26 5.1 + 2.0 Master + safety<br>1-26 ENG & JPN pop-ups (and safety)<br>1-26 5.1 + 2.0 VOX only mix<br>1-26 voice tracks<br>PAL:<br>1-26 DVD Masters<br>1-26 ENG & JPN pop-up DA98s<br>1-26 ENG 5.1 + 2.0 Masters + safety DA98 |

*Exhibit B – Page 4*

FUN 02618

| Property | Digibeta | Audio |
|---|---|---|
| **PROJECT BLUE EARTH SOS** | 1-6 Japanese Masters (HD Cam-SR)<br>1-6 Japanese Generic Masters<br>1-6 DVD Master (ENG op/cl, JPN logo in ENG, 1+2 ENG, 3+4 JPN)<br>Extras on HD CAM-SR & downconvert (cast interviews, commercials)<br>**Only 6 actual eps. Eps are 45 min each, should they count as 2?** | 3-6 5.1 + 2.0  VOX only<br>1-6 5.1 ME + 2.0  full mix<br>1-6 5.1 + 2.0 Masters + safety<br>1-6 Japanese 5.1 + 2.0 (16 bit & 24 bit)<br>1-4 voice tracks |
| ***PUMPKIN SCISSORS** | 1-18 DVD Masters (ENG op/cl, Japanese logo in ENG, 1+2 ENG, 3+4 JPN)<br>1-24 Japanese Master (has extras - interviews, commercials, clean op/cl)<br>1-24 Japanese Generic Master | DA98s:<br>1-16 voice tracks<br>1-16 5.1 + 2.0 VOX only<br>1-16 5.1 + 2.0 + safety<br>1-24 conformed 2.0<br>1-24 ME splits (Masters) |
| ***RED GARDEN** | 1-22 Japanese Master<br>1-18 Japanese Generic Master<br>1-16 DVD Masters (ENG textless op/cl, ENG logo, 1+2 ENG, 3+4 JPN)  **v1-v4 only, v5 on preorder so it must exist**<br>**Have Japanese video and audio master for OVA - no English production yet** | 1-24 Music & FX splits (1,2 music - 3,4 FX - 5,6 ME - 7,8 dial<br>1-22 conformed J (1,2 mix - 3,4 ME - 5,6 music - 7,8 FX)<br>1-20 5.1 + 2.0 VOX only<br>1-20 5.1 + 2.0 full ENG<br>1-16 voice clean |
| **SYNESTHESIA** | HD CAM SR DVD Japanese Master<br>Original & clone of extras<br>2 tapes of extras<br>DVD menus<br>2 Japanese Generic Masters<br>DVD Master | 5.1 + 2.0 JPN (Conformed JPN)<br>2 four channel music + FX (conformed ME) ( surround on 1 ch)<br>Music FX splits (reel transfers)<br>+ LCRS + 2.0 (not conformed) (reel transfers)<br>voice tracks clean<br>surround + stereo |
| **SERGEANT FROG** | 1-51 Japanese Generic (1,2 J - 3,4 ME)<br>1-51 Textless video - rotoscoped without Kanji<br>NY CC Panel<br>2 Pilot tapes<br>2 Marketing pitch tapes<br>1 Merchandise footage | 1-51 Music & FX splits (1,2 mix - 3,4 DIA - 5,6 music - 7,8 FX)<br><br>ep 13 Stereo audio Master ENG |
| **TOKYO MAJIN** | 1-14 DVD Master (ENG op/cl, JPN & ENG logo, 1+2 ENG, 3+4 JPN)<br>1-23 Japanese Master (has clean op/cl)<br>1-6 Japanese Generic Master<br>Extras: Promo reels, promo only video | DA98s:<br>1-13 5.1 + 2.0<br>1-23 5.1 M+E<br>1-9 voice tracks<br>1-13 5.1 + 2.0 VOX only mix<br>1-9, 15-23 Japanese 5.1 master |

Certified Document Number: 51986651 - Page 31 of 49

*Exhibit B – Page 5*

**FUN 02619**

| Property | Digibeta | Audio |
|---|---|---|
| **UTAWAREUM ONO** | 1-26 Japanese Generic Masters<br>v1-v6 DVD menus<br>1-26 DVD Masters (ENG op/cl, JPN logo & titlecard, 1+2 ENG, 3+4 JPN)<br>German credits<br>'Promo Use' Ep.4 DVD Master | DA98s:<br>1-26 5.1 + 2.0 + safety<br>1-26 conformed 2.0 + safety<br>1-26 voice tracks<br>1-26 5.1 + 2.0 VOX only<br><br>PAL:<br>1-26 Japanese Generic Masters + extras<br>PAL DA88<br>1-26 German 5.1 + 2.0<br>PAL DA98<br>1-26 Music & FX splits<br>1-10 5.1 + 2.0 Master DA98s |
| **UFO PRINCESS VALKYRIE - HAPPY PART PARADISE OVA (s3 v1&2)** | 1-6 (season 3) & 1-2 (season 4) DVD Master<br>1-6, 1-2 Japanese Generic Master (extras at end /clean/, 1,2 J - 3,4 ME)<br>s3, 1-2, s4 DVD menus<br>Anime Encounters & Newtype promo | 1-6, 1-2 voice tracks clean<br>s4 (1-2) ME 2.0 only<br>1-6, 1-2 ENG Stereo master (1,2 ENG mix - 3,4 ENG dialogue - 5,6 ME - 7,8 Unducked ME)<br>**Only JPN mix on Digi?** |
| **VENUS VS VIRUS** | 1-12 Japanese Masters<br>1-6 Japanese Generic Masters<br>1-12 DVD Masters (ENG op/cl, JPN logo & titlecards, 1+2 ENG, 3+4 JPN)<br>ep.1 promo DVD Master<br>English End credit roll<br>Clean op/cl on Japanese Masters | 1-12 + Safety stereo audio masters (english only)<br>1-12 voice tracks |
| **THE WALLFLOWER** | 1-19 Japanese Generic Master<br>1-13 DVD Master (ENG op/cl, JPN logo + titlecard, 1+2 ENG, 3+4 JPN)  **Masters for 11-13 do not contain English audio**<br>Clean op/cl Japanese Master<br>German End Credits | 1-13 5.1 + 2.0 VOX only (DF)<br>1-9 voice tracks (NDF)<br>1-13 5.1 + 2.0 + safety (NDF) English<br>11-19 ME splits (DF)<br>1-10 conformed ME 2.0 NDF<br>1-19 ME<br><br>PAL:<br>1-18 Japanese Generic Masters<br>PAL DA98s<br>1-18 ME Slits + safety<br>1-17 German 5.1 + 2.0<br>Trailer - German 5.1 + 2.0 VOX<br>1-17 German VOX |
| **\*WELCOME TO THE NHK** | 1-24 Japanese Masters (1+2 Jmix, 3+4 ME mix)<br>1-20 Japanese Generic (1+2 Jmix, 3+4 ME mix)<br>1-20 DVD Master (JPN logo, JPN opening, ENG closing)<br>End credits 13-20 + Newtype tape (1+2 ENG, 3+4 JPN)<br>Clean op/cl, extras & promos  **Not sure about textless** | 1-24 Music & FX splits Masters (1+2 mix, 3+4 ME, 5+6 Stereo music, 7+8 Stereo FX)<br>1-24 Conformed 2.0 Master (1+2 Stereo Music, 3+4 Stereo FX, 5+6 ME Mix stereo, 7+8 J Mix stereo)<br>1-20 5.1 + 2.0 Master - English surround & stereo<br>1-20 5.1 + 2.0 Safety - English surround & stereo<br>1-18 5.1 + 2.0 VOX only mix - surround + stereo Master |

*Exhibit B – Page 6*

Certified Document Number: 51986651 - Page 32 of 49

FUN 02620

| Property | Digibeta | Audio |
|---|---|---|
| | | 1-20 voice clean master |
| XENOSAGA | 1-12 DVD Master (ENG op/cl & logo) (1+2 ENG, 3+4 JPN)<br>1-12 Japanese Master<br>1-12 Japanese Generic<br><br>Extras:<br>R2 DVD commercials, Newtype ep 'promo' super title<br>Clean op/cl on JPN Master | 1-12 5.1 + 2.0<br>1-12 Conformed ME 2.0 + safety<br>1-12 5.1 + 2.0 mix + safety<br>1-12 ME splits<br>1-12 voice tracks (clean) |

**<u>* Note: The foregoing Materials and Developed Materials listed for the Properties "Magikano", "Pumpkin Scissors", "Red Garden" and "Welcome to the NHK" are no longer in Seller's possession and control and were returned to ADV at the request and instruction of the licensor GDH K.K., and Seller will not be able to transfer possession thereof to Buyer at the Closing. Such listing is subject to Schedule 4.7.</u>**

Certified Document Number: 51986651 - Page 33 of 49

*Exhibit B – Page 7*



**FUN 02621**

## EXHIBIT C

## ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement"), dated as of the _____ day of _____, 2008, is made by and between ARM Corporation, a Japanese corporation (the "Assignor"), and FUNimation Productions, Ltd., a Texas limited partnership (the "Assignee").

WHEREAS, the Assignor is a party to the license agreements described on Annex A attached hereto (the "License Agreements");

WHEREAS, the Assignor and the Assignee have entered into that certain Assignment Agreement dated of even date herewith (the "Assignment Agreement");

WHEREAS, pursuant to the License Agreements, the Assignor received certain Materials (as defined in the Assignment Agreement) from the licensors of such Materials and, using such Materials, certain Developed Materials (as defined in the Assignment Agreement) were translated and localized;

WHEREAS, under the Assignment Agreement, the Assignor is required to assign to the Assignee all of the Assignor's rights, titles and interests in and to the License Agreements, the Materials and the Developed Materials, and the Assignee is required to assume certain payments obligations and all of the liabilities and obligations of the Assignor arising under the License Agreements from and after the date hereof;

WHEREAS, the parties hereto desire to execute and deliver this Agreement to effect the assignment and assumption required by the Assignment Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.      Assignment.  The Assignor, subject to the terms and conditions set forth herein, hereby transfers, sets over and assigns to the Assignee all of the rights, titles and interests of the Assignor in and to the License Agreements, the Materials, and the Developed Materials, free and clear of all liens, security interests, encumbrances, pledges and charges whatsoever except for express terms of the License Agreements and the terms of any consent from a licensor under a License Agreement and except as set forth on Schedule 4.6 of the Assignment Agreement.

2.      Assumption.  The Assignee hereby accepts the aforesaid assignment and hereby assumes and agrees to pay, perform or discharge all of the liabilities and obligations of Seller arising under or in connection with each License Agreement from and after the date hereof and the payment obligations of the Assignor owing to licensors under the License Agreements, as specified on Annex A hereto.  Except for such assumed liabilities and obligations, Assignee is not hereby assuming any obligations, commitments or liabilities of Assignor or A.D. Vision,

*Exhibit C – Page 1*

Certified Document Number: 51986651 - Page 34 of 49

**FUN 02622**

Inc., a Texas corporation ("ADV") (including accounts payable, accrued liabilities and debt of Assignor), whether known or unknown, contingent or matured, including without limitation any obligations under the Strategic Alliance and Content Acquisition Facility Agreement dated as of May 18, 2006, between Assignor and ADV, or under any sublicense or distribution agreements that Assignor or ADV may have entered into pursuant to any License Agreement.

3.      Successors and Assigns.  The terms and conditions of this Agreement shall be binding upon and shall inure to the benefit of the Assignor, the Assignee and their respective heirs, personal representatives, successors and assigns.

4.      Modification and Waiver.  This Agreement may not be amended, modified or waived except by a writing signed by the party against whom such amendment, modification or waiver is sought to be enforced.

5.      Governing Law.  This Agreement and all other instruments referred to herein shall be governed by, and shall be construed according to, the laws of the State of Texas.

6.      Counterparts.  This Agreement may be executed in as many counterparts as may be required by the parties.  It shall not be necessary that the signature on behalf of all parties hereto appear on each counterpart hereof, and it shall be sufficient that the signature on behalf of both parties hereto appear on one or more such counterparts.  All counterparts shall collectively constitute a single Agreement.  This Agreement shall not be effective until executed on behalf of all parties hereto.

7.      Further Assurances.  From time to time, at the Assignee's request, whether on or after the date hereof and without further consideration, the Assignor shall execute and deliver or cause to be executed and delivered such further instruments of assignment, conveyance and transfer as may be reasonably necessary to assign, convey and transfer the License Agreements, the Materials and the Developed Materials, and shall cooperate to obtain any consents or approvals as may be required or advisable from any other parties to the License Agreements.

8.      NO WARRANTY.  EXCEPT AS SPECIFICALLY SET FORTH IN THE ASSIGNMENT AGREEMENT, THE ASSIGNOR MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AS TO THE LICENSE AGREEMENTS ASSIGNED HEREUNDER.

[Signature Page Follows]

*Exhibit C – Page 2*



Certified Document Number: 51986651 - Page 35 of 49

**FUN 02623**

IN WITNESS WHEREOF, the Assignor and the Assignee have executed or caused this Agreement to be executed on their behalf by their duly authorized representatives as of the date set forth above.

ASSIGNOR:

ARM CORPORATION

By: _____

Name: _KAZO MIZUSHIMA_

Its: _PRESIDENT_

ASSIGNEE:

FUNIMATION PRODUCTIONS, LTD.

By its General Partner, Navarre CP LLC, a
    Minnesota limited liability company

By: _____

Name: _____

Its: _____

*Exhibit C – Page 3*

Certified Document Number: 51986651 - Page 36 of 49

**FUN 02624**

## SCHEDULE 4.3

### No Conflicts by Seller

1. See Schedule 4.7.

*Schedule 4.3*

Certified Document Number: 51986651 - Page 37 of 49

**FUN 02625**

## SCHEDULE 4.6

### Title to Assigned Assets

1. See Schedule 4.7.

2. Seller has been unable to repossess from ADV the following Materials and Developed Materials, is unable to determine whether any or all of such Materials and Developed Materials even exist, and, consequently, may be unable effectively to transfer, assign or deliver possession of such Materials and Developed Materials to Buyer:

| PROPERTY/release status | CATEGORY | DESCRIPTION | ADV Notes / Status |
|---|---|---|---|
| 5 cm per Second Released | Audio | If JPN 5.1 exists, is not included | never received |
| AIR TV | Script | missing 2 ova episodes & Ep 13 - eng script | on harddrive? But redelivered 6-4 |
| all released | Script | missing 2 ova episodes & Ep 13 - jpn script | |
| | Audio | missing Voice Tracks 5-13 +2 ova episodes | not created |
| Ah! My Goddess 2 | subtitles | missing subtitle files 21-24 | delivered 6-4 |
| | Audio | have no Music & FX Splits | on digi |
| | Audio | missing Voice Tracks 21-24 | not created |
| Comic Party Revolution | Video | missing textless opening and closings | on tape |
| Devil May Cry | Video | missing Japanese volume 3-4 JPN Extras | ADV: Not sure what this means |
| | | reinsert missing 5-8 5.1 and 2.0 Eng Audio | delivered 6-4 |
| | Audio | missing conformed JPN 5.1 1-4 | delivered 6-4 |
| | Audio | missing voice track 5-12 | not created |
| | Audio | missing 5.1 & 2.0 VOX only 5-12 | Providing |
| Kyoshiro to Towa no Sora (Shattered Angels) | Video | DVD Masters 5-12 | not created |
| released thru v2 | Audio | no Music & FX Splits 1-12 | never received |
| | Subtitles | sub exports in .doc format | Provided: only vol. 1-3 exist |
| Kanon | Video | missing DVD masters 21-24 | Not Created 17-20 delivered 6-4 .not created? |
| released thru v5 | Audio | missing Stereo audio masters *1-8, 9-11,*12, 17-24 | If on DVD master, not concerned |
| we think done recording | Audio | missing VOX *1-3,13-20 | 13-20 Not created |
| | Video Extras | missing clean opening and closing | on tape |

*Schedule 4.6 Page 1*

Certified Document Number: 51986651 - Page 38 of 49

FUN 02626

Certified Document Number: 51986651 - Page 39 of 49

| PROPERTY/release status | CATEGORY | DESCRIPTION | ADV Notes / Status |
|---|---|---|---|
| | | video | |
| | Video Extras | missing extras - a closer look (parts 1-8) | don't know what means |
| | Script | missing 21-24 | Not Created |
| **Le Chevalier D'Eon** all released | Audio | Missing 21-24 Music & FX Splits | |
| **Moeyo Ken TV** all released | Audio | missing 1-13 Music & FX splits (have pal, not NTSC) | |
| | Video | missing 1-13 Japanese Masters | returned |
| **Moonlight Mile** | Audio | missing stereo audio master 9-12 (12 m&e mix) | Does not exits (surround sound only) |
| released through v2 | Audio | missing 5.1 and 2.0 Music 9-12 | Not Created |
| now have full materials! | Audio | missing 5.1 and 2.0 SFX 9-12 | Not Created |
| | Audio | missing 5.1 and 2.0 JPN 1-4 | |
| | Audio | missing 5-12 Voice Tracks Clean | Not Created |
| | Video | missing DVD masters 9-12 | delivered 6-4 |
| | Script | missing Eng ADR Script 5-8 | delivered 6-4 |
| | Packaging | missing JPN R2 packaging | No Created - Only rec'd Key Art for Vols. 1-3 |
| **009-1** all released | Video | missing original Japanese Masters 1-12 & 'extra mission' | Returned |
| **Project Blue Earth SOS** | Audio | missing Voice Tracks 5-6 | Not Created |
| all released | Audio | missing 5.1 & 2.0 VOX eps 1-2 | Not Created |
| | Video | missing clean opening and closing | on HDcam SR tape |
| **Pumpkin Scissors** | Video | missing DVD masters 19-24 | PUMPKIN SCISSORS DID NOT ADDRESS |
| released thru v4 | Audio | missing Voice Tracks 17-24 | |
| we think done recording | Audio | missing ENG 5.1 & 2.0 Masters 17-24 | |
| | Audio | missing 5.1 VOX 17-24 | |
| **Red Garden** | Video | missing Japanese Generic Maters 18-24 | RED GARDEN DID NOT ADDRESS |
| released thru v5 | Video | missing DVD Digibeta Masters 17-24 | Did they get 23-24 from Japan? |
| | Audio | missing 5.1 & 2.0 21-24 masters | |
| | Audio | missing Voice Tracks Clean 17-24 | |
| | Audio | missing 23-24 conformed Japanese Master | |
| | Video | missing Japanese  Masters 23-24 | |
| | Script | missing script 23-24 | |
| | Trans | missing translations 23-24 | |
| | Subtitles | missing subtitles 23-24 | |

*Schedule 4.6 Page 2*

**FUN 02627**

| PROPERTY/release status | CATEGORY | DESCRIPTION | ADV Notes / Status |
|---|---|---|---|
| **Tokyo Majin** | Video | missing Japanese Master Digibetas 24-26 | never received |
| released thru v3 | Video | missing Japanese Generic 7-14 | not created |
| | Video | missing DVD Masters 15-26 | not created |
| | Audio | missing ENG 5.1 & 2.0 masters 14-26 | not created |
| | Audio | missing 5.1 M&E 24-26 | not created |
| | Audio | missing Voice Tracks 10-26 | not created |
| | Audio | missing Japanese 5.1 10-14, 24-26 | not created (10-14 Delivered 6-4) |
| | | | |
| **The Wallflower** | Scripts | missing all English ADR Scripts | not created |
| released thru v3 | Packaging | missing all JPN R2 Packaging (except inserts 1-8) | never received, only received inserts |
| | | | |
| **Welcome to the NHK** | Video | missing DVD masters 21-24 | WELCOME TO NHK |
| released thru v5 | Video | missing Japanese Generic 21-24 | DID NOT ADDRESS |
| | Audio | missing ENG 5.1 & 2.0 audio 21-24 | |
| | Audio | missing Voice Tracks 21-24 | |
| | Script | missing eng scripts 21-24 | |

**DEFINITIONS**

| | |
|---|---|
| Audio | Separated JPN music, dialogue and sound effects - usually 2.0 |
| Music & FX Splits | ADV's archive of 5.1 and 2.0 English Audio |
| ENG 5.1 & 2.0 | Japanese 5.1 and 2.0 on same tape |
| JPN 5.1 & 2.0 | dialogue only - adr backup |
| Voice Tracks | English dialogue 5.1 and 2.0 |
| 5.1 & 2.0 VOX | 5.1 Sound Effects only |
| 5.1 SFX (or FX) | 5.1 Music only |
| 5.1 Music | Conformed stereo elements if series is stereo only, will sometimes put English, Japanese, ENG Dialogue and ME on same tape |
| Conformed 2.0 (or JPN) | |
| Stereo Audio Masters | |
| Video | |

*Schedule 4.6  Page 3*



**FUN 02628**

| PROPERTY/release status | CATEGORY | DESCRIPTION | ADV Notes / Status |
|---|---|---|---|
| Japanese Master | | | |
| Japanese Generic Master | Have not noticed a difference between this and Japanese master. Typically Japanese stereo full mix on 1&2, and m&e on 3&4 | | |
| DVD Master | Video as appears on ADV DVD and English stereo full mix on 1&2, Japanese stereo full mix on 3&4. | | |
| DVD Menus | Video ADV Menus | | |
| Extra Feature | video used as extra feature on dvd | | |
| Clean OP/CL or Textless Songs | Textless or clean animation for opening and closing footage | | |

Certified Document Number: 51986651 - Page 41 of 49

*Schedule 4.6  Page 4*

**FUN 02629**

Certified Document Number: 51986651 - Page 42 of 49

## SCHEDULE 4.7

### License Agreements

1. Seller has received written notices that the following License Agreements are in default and have been terminated. In that connection, any Materials and Developed Materials relating to those License Agreements have been returned to ADV at the request and instruction of the licensor for such License Agreements. Seller is unable to transfer to Buyer title to or possession of such Materials and Developed Materials without the consent and cooperation of such licensor and without ADV relinquishing possession thereof. These License Agreements will need to be reinstated and the related defaults waived by the applicable licensors in order to permit the assignment of such License Agreements by Seller to Buyer:

    (a) Multiple Rights License Agreement dated March 31, 2007 among GDH K. K. as Licensor and ARM Corporation as Initial Licensee and Payment Entity and A.D. Vision, Inc. as Distributor for the audio-visual work entitled: Magikano.

    (b) Multiple Rights License Agreement dated March 31, 2007 among GDH K. K. as Licensor, ARM Corporation as Initial Licensee and Payment Entity and A. D. Vision, Inc. as Distributor for the audio-visual work entitled: Pumpkin Scissors

    (c) Multiple Rights License Agreement dated March 31, 2007 among GDH K. K. as Licensor and ARM Corporation as Initial Licensee and Payment Entity and A.D. Vision, Inc. as Distributor for the audio-visual work entitled: Red Garden

    (d) Multiple Rights License Agreement dated March 31, 2007 among GDH K. K. as Licensor and ARM Corporation as Initial Licensee and Payment Entity together with A. D. Vision, Inc. as Distributor for the audio-visual work entitled: Welcome to the NHK

2. Although the applicable licensors may not yet have asserted formal defaults under their License Agreements, Seller may be in breach of one or more its obligations under the License Agreements. It is advisable that, in connection with obtaining the necessary consents to the assignment of the License Agreements from Seller to Buyer, waivers of any prior breaches by ARM should be obtained from the applicable licensors in connection with the assignment of such License Agreements by Seller to Buyer:

3. To the best of Seller's knowledge, although the applicable licensors may not yet have asserted formal defaults under their License Agreements, ADV may be in breach of one or more of its obligations under the License Agreements. Because the rights of ADV under the License Agreements have been taken over or assigned to Seller, it is advisable that the agreements of the licensors be obtained to the effect that Seller and Buyer shall not be responsible for the prior defaults of ADV under such License Agreements.

4. None of the licensors for any of the License Agreements have formally consented to the foreclosure sale and transfer of ADV's rights under the License Agreements to Seller. Consents from the licensors should be obtained for the transfer of ADV's rights under the License Agreements to the Seller.

*Schedule 4.7*



**FUN 02630**

## SCHEDULE 4.8

### Litigation

1.  Seller is currently involved in litigation with ADV, under Cause No. 2008-23027; *A.D. Vision, Inc. v. ARM Corporation, Japan Contents Investment LPS, Sojitz Corporation, Kozo Mizushima, Nario Hada, Shinji Ueda, and Kazuo Ootsuki*; In the District Court of Harris County, Texas, 234th Judicial District ("Lawsuit").  ADV initiated the Lawsuit and sought a temporary restraining order to prevent Seller from conducting a disposition of collateral sale and asserted claims based on breach of contract, breach of fiduciary duty, improper notice of disposition of collateral, and alter ego/piercing the corporate veil theories.  ADV's application for temporary restraining order was denied by the court.  Seller filed an answer asserting counterclaims based on ADV's breaches of contract, as well as a constructive trust on proceeds ADV receives as a result of its breaches of contract.  Seller also sought, and obtained, a writ of sequestration concerning property covered by its agreements with ADV.  A Harris County Constable executed the writ of sequestration on ADV and secured property from ADV in accordance with the writ.  ADV failed to post a replevy bond within the time allotted, prompting the return of the sequestered property to Seller.  ADV has yet to obtain valid service on the remaining defendants.

*Schedule 4.8*

**FUN 02631**

## SCHEDULE 4.9

### Brokerage

1. None

*Schedule 4.9*

Certified Document Number: 51986651 - Page 44 of 49



**FUN 02632**

## SCHEDULE 5.3

### No Conflicts by Buyer

1. None

Certified Document Number: 51986651 - Page 45 of 49

FUN 02633

## FIRST AMENDMENT TO
## ASSIGNMENT AGREEMENT

This First Amendment to Assignment Agreement (this "First Amendment") is entered into this 25th day of June, 2008 (the "Effective Date"), by and between FUNimation Production, Ltd., a Texas limited partnership ("Buyer"), and ARM Corporation, a Japanese corporation ("Seller").

### RECITALS

A.     Buyer and Seller have entered into an Assignment Agreement dated of even date herewith (the "Assignment Agreement") relating to the sale and assignment by Seller to Buyer of certain License Agreements, Materials and Developed Materials.

B.     In connection with Seller's efforts to obtain the necessary consents from the various licensors to the sale and assignment of the License Agreements, Materials and Developed Materials, certain licensors have required additional fees, reimbursements or other payments (the "Settlement Fees") to them.

C.     The parties desire to amend the Assignment Agreement to require Buyer to make payments of up to US$36,399.00 in Settlement Fees to certain licensors in order to obtain their required consents, and in consideration of such payments by Buyer, Seller has agreed to assign to Buyer a portion of the account receivable owed by A.D. Vision, Inc. ("ADV") pursuant to that certain Strategic Alliance and Content Acquisition Facility Agreement dated as of May 18, 2006 between ADV and Seller (as amended, the "Strategic Alliance Agreement").

NOW, THEREFORE, in consideration of the recitals and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.     Additional Payment.     In addition to the Assignment Payments and Assumed Liabilities to be paid or assumed by Buyer under the Assignment Agreement, Buyer agrees to pay up to US$36,399.00 in aggregate Settlement Fees in such amounts and to such licensors as may be designated by Seller. Such payments shall be made by Buyer within three business days after Buyer receives an assignment of the existing License Agreements from Seller for such licensors or in connection with the Buyer's receipt of new replacement license agreements from such licensors.

2.     Sale of Account Receivable.

(a)     At the Closing, in consideration of Seller's agreement to pay certain licensors up to US$36,399.00 under Section 1 above, Seller shall sell and convey to Buyer $4 million of the ADV Receivable (the "Assigned Receivable"). In connection with such sale and transfer, at the Closing, Seller will deliver to Buyer a bill of sale and assignment covering the Assigned Receivable, a UCC-1 covering such interest, and such other documents as Buyer may reasonably request. Such assignment shall be made



Certified Document Number: 51986651 - Page 46 of 49

**FUN 02634**

without any representations or warranties other than title. For purposes of the foregoing, "ADV Receivable" means any and all amounts due and owing to Seller by ADV under the Strategic Alliance Agreement.

(b)     Buyer acknowledges that Seller's rights to enforce its rights with respect to the ADV Receivable are subject to that certain Intercreditor Agreement dated as of April 14, 2008 (the "Intercreditor Agreement"), between Seller and Whitney National Bank.

(c)     Buyer also acknowledges that there is pending litigation between Seller and ADV related to the Strategic Alliance Agreement and other matters, as described in Schedule 4.8 of the Assignment Agreement. In connection with that litigation, Seller may forgive or release ADV from obligations with respect to the ADV Receivable up to the amount of the ADV Receivable retained by Seller; however, Seller agrees that it will not make any settlement or waiver of the ADV Receivable in any manner that would materially adversely affect the collectability of the Assigned Receivable by Buyer without Buyer's prior written consent. If and when such litigation is settled or resolved, Seller shall provide Buyer with written notice of such settlement or resolution. If Seller's share of the ADV Receivable has not been fully released, forgiven or discharged, then Seller will give written notice to Buyer of such settlement or resolution, together with all relevant documents related to the such settlement or resolution, and Buyer will have the option to purchase any remaining portion of the ADV Receivable held by Seller within sixty (60) days of its receipt of such notice for a price of one percent (1.0%) of the outstanding amount of such remaining portion of the ADV Receivable. If Buyer exercises its option to purchase such remaining portion of the ADV Receivable, it will assign its interest on the same terms as the Assigned Receivable described herein.

(d)     In the event that ADV makes any cash payments on the ADV Receivable (including either the Assigned Receivable or the portion of the ADV Receivable retained by Seller), Buyer will be entitled to receive the first $4,000,000 in cumulative amount of such cash payments and Seller shall be entitled to receive any such cash payments from ADV thereafter. Notwithstanding that Buyer has priority on collection of such cash payments, Seller may offset, release and forgive its portion of the ADV Receivable without restriction except as provided in subsection 2(c) above.

(e)     Seller agrees to remit all payments it receives from ADV or any other person with respect to the Assigned Receivable directly to Buyer (or to an assignee of Buyer) without any withholding or deduction therefrom, and Seller agrees that it shall hold any amounts received by it to which Buyer is entitled under this Agreement in trust and agrees that it shall have no right, title or interest whatsoever in such amounts.

(f)     Neither party shall be liable for any expenses related to the collection of the ADV Receivable or Assigned Receivable that are incurred by the other party unless expressly agreed in advance.

2

Certified Document Number: 5198651 - Page 47 of 49

**FUN 02635**

(g)     Notwithstanding any provision in this First Amendment, Buyer is not assuming any obligations of Seller of whatever nature, whether presently existing or arising or asserted hereafter, under the Strategic Alliance Agreement, the Intercreditor Agreement or any other agreement or otherwise, and is not subject to any provisions or restrictions therein.

3.     <u>Definitions</u>.   Capitalized terms used herein but not otherwise defined herein will have the same meanings assigned to them by the Assignment Agreement.

4.     <u>Counterparts</u>.   This First Amendment may be executed in separate counterparts, each of which shall be an original and all of which when taken together shall constitute one and the same instrument.   Further, this First Amendment may be executed and delivered by Seller and Buyer by facsimile signature and through the use of telecopied or emailed PDF copies of the executed signature page, and such execution and delivery of this First Amendment shall be deemed effective for all purposes as though this First Amendment was executed and delivered in "blue ink" original counterparts.

5.     <u>Entire Agreement</u>.  The Assignment Agreement, as amended hereby, shall be and remain in full force and effect and is hereby ratified and confirmed by Seller and Buyer.   To the extent any of the terms and provisions of the Assignment Agreement are inconsistent with the terms and provisions of this First Amendment, the terms and provisions of this First Amendment shall govern and control.

6.     <u>No Waiver</u>.  Neither this First Amendment nor any provision hereof may be waived, modified, amended, discharged or terminated except by an instrument in writing signed by the Party against which the enforcement of such waiver, modification, amendment, discharge or termination is sought, and then only to the extent set forth in such instrument.

[SIGNATURE PAGE FOLLOWS]

3

**FUN 02636**

**IN WITNESS WHEREOF**, the parties have executed this First Amendment on the date set forth above.

**BUYER:**

FUNIMATION PRODUCTIONS, LTD.
By its General Partner, Navarre CP LLC,
a Minnesota limited liability company

By: _____
Name: Gen Fukunaga
Title: President

**SELLER:**

ARM CORPORATION

By: _____
Name: Fozo Matsushima
Title: PRESIDENT

*[Signature Page to First Amendment]*

Certified Document Number: 51986651 - Page 49 of 49

**FUN 02637**



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   June 1, 2012

Certified Document Number:       51986651 Total Pages:  49

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated documents are valid. If there is a question regarding the validity of this document and or seal please e-mail support@hcdistrictclerk.com**

# Exhibit 3

Certified Document Number: 51986652 - Page 1 of 2

| | |
|---|---|
| **From:** | Gen Fukunaga |
| **Sent:** | Wednesday, May 27, 2009 4:46 PM (GMT) |
| **To:** | Jake Hilton |
| **Subject:** | FW: ADV BR Atty |

I will talk to you about this when I get a chance

Gen Fukunaga
*President and CEO*
*FUNimation Entertainment*
*1200 Lakeside Parkway, Bldg 1*
*Flower Mound, TX 75028*

**From:** John Ledford [mailto:ledford@advfilms.com]
**Sent:** Wednesday, May 27, 2009 10:56 AM
**To:** Gen Fukunaga
**Subject:** ADV BR Atty

Hi Gen,

Here's our BR atty .


Ed Rothberg

WEYCER, KAPLAN, PULASKI & ZUBER, P.C.

713 961 9045

Certified Document Number: 51986652 - Page 2 of 2

**FUN 01708**



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   June 1, 2012

Certified Document Number:       51986652 Total Pages:  2

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated documents are valid. If there is a question regarding the validity of this document and or seal please e-mail support@hcdistrictclerk.com**

# Exhibit 4

Certified Document Number: 51986653 - Page 1 of 3

Secretary of State
P.O. Box 13697
Austin, TX 78711-3697
FAX: 512/463-5709

Filing Fee: $300



**Certificate of Formation
Limited Liability Company**

**Filed in the Office of the
Secretary of State of Texas
Filing #: 801127884 05/28/2009
Document #: 259704470002
Image Generated Electronically
for Web Filing**

## Article 1 - Entity Name and Type

The filing entity being formed is a limited liability company. The name of the entity is:

### AEsir Holdings, LLC

The name of the entity must contain the words "Limited Liability Company" or "Limited Company," or an accepted abbreviation of such terms. The name must not be the same as, deceptively similar to or similar to that of an existing corporate, limited liability company, or limited partnership name on file with the secretary of state. A preliminary check for "name availability" is recommended.

## Article 2 – Registered Agent and Registered Office

☑A. The initial registered agent is an organization (cannot be company named above) by the name of:

**Net Master Hosting, LLC**

**OR**

☐B. The initial registered agent is an individual resident of the state whose name is set forth below:

C. The business address of the registered agent and the registered office address is:

**Street Address:
5644 Westheimer
Ste. 412  Houston  TX  77056**

## Article 3 - Governing Authority

☐A. The limited liability company is to be managed by managers.

**OR**

☑B. The limited liability company will not have managers. Management of the company is reserved to the members.

The names and addresses of the governing persons are set forth below:

Managing Member 1: (Business Name)  **Net Master Hosting, LLC**

Address:  **5644 Westheimer   Ste. 412  Houston  TX, USA  77056**

## Article 4 - Purpose

The purpose for which the company is organized is for the transaction of any and all lawful business for which limited liability companies may be organized under the Texas Business Organizations Code.

Certified Document Number: 198 3 - Page 2 of 3

## Supplemental Provisions / Information

[The attached addendum, if any, is incorporated herein by reference.]

## Organizer

The name and address of the organizer are set forth below.

**Net Master Hosting, LLC**          **5644 Westheimer Ste. 412 Houston, TX 77056**

## Effectiveness of Filing

☑A. This document becomes effective when the document is filed by the secretary of state.

**OR**

☐B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its signing. The delayed effective date is:

## Execution

The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument.

**Mark Williams, Director, Net Master Hosting, LLC**

Signature of Organizer

**FILING OFFICE COPY**

Certified Document Number: 51986653 - Page 3 of 3



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   June 1, 2012

Certified Document Number:        51986653 Total Pages:  3

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated documents are valid. If there is a question regarding the validity of this document and or seal please e-mail support@hcdistrictclerk.com**

# Exhibit 5

Certified Document Number: 51986654 - Page 1 of 2

05/28/2009   11:09   TOWN & COUNTRY BUS. SERVICES → 15124635709PPP9804          NO.867   P002

**FILED**
In the Office of the
Secretary of State of Texas

MAY 2 8 2009

**Corporations Section**

## CERTIFICATE OF FORMATION OF

# Seraphim Studios, LLC

This Certificate of Formation for a limited liability company is adopted by the undersigned organizer under the Texas Business Organizations Code:

### ARTICLE 1

The name of the limited liability company, referred to in this Certificate as the "Company," is:

Seraphim Studios, LLC

### ARTICLE 2

The period of duration of the Company is perpetual.

### ARTICLE 3

The purpose for which the Company is organized is to transact any or all lawful business for which limited liability companies may be organized under the Texas Business Organizations Code.

### ARTICLE 4

The address of the Company's initial registered office is 908 Town & Country Blvd., Suite 120, Houston, Texas 77024. The Company's initial registered agent at that address is Griffin D. Vance IV.

### ARTICLE 5

The Company will not have managers. The names and addresses of the initial members are:

Matt Greenfield: 9692 Westheimer Rd., #164, Houston, Texas 77063

Janice Williams: 14027 Memorial Drive #318, Houston, Texas 77079-8826

### ARTICLE 6

The Company's organizer is:

Griffin D. Vance IV, attorney-at-law, whose address is 908 Town & Country Blvd., Suite 120, Houston, Texas 77024.

This Certificate of Formation is executed on behalf of the Company on this 28th day of May 2009 and is made so as to be effective immediately upon filing with the Secretary of State, Texas.

By: Griffin D. Vance IV

Griffin D. Vance IV
Law Office of Griffin D. Vance PC
908 Town & Country Blvd., Suite 120
Houston, Texas 77024



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   June 1, 2012

Certified Document Number:        51986654 Total Pages:  2

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated
documents are valid. If there is a question regarding the validity of this document and or seal
please e-mail support@hcdistrictclerk.com**

# Exhibit 6

Certified Document Number: 51986655 - Page 1 of 2

05/20/2009    15:19    TOWN & COUNTRY BUS. SERVICES → 15124635709PPP9804    FILED 841    D002

In the Office of the
Secretary of State of Texas

## CERTIFICATE OF FORMATION OF

# Sxion 23, LLC

MAY 2 0 2009

**Corporations Section**

This Certificate of Formation for a limited liability company is adopted by the undersigned organizer under the Texas Business Organizations Code:

### ARTICLE 1

The name of the limited liability company, referred to in this Certificate as the "Company," is:

Sxion 23, LLC

### ARTICLE 2

The period of duration of the Company is perpetual.

### ARTICLE 3

The purpose for which the Company is organized is to transact any or all lawful business for which limited liability companies may be organized under the Texas Business Organizations Code.

### ARTICLE 4

The address of the Company's initial registered office is 908 Town & Country Blvd., Suite 120, Houston, Texas 77024. The Company's initial registered agent at that address is Griffin D. Vance IV.

### ARTICLE 5

The Company will not have managers. The names and addresses of the initial members are:

Matt Greenfield: 9692 Westheimer Rd., #164, Houston, Texas 77063

Janice Williams: 14027 Memorial Drive #318, Houston, Texas 77079-6826

### ARTICLE 6

The Company's organizer is:

Griffin D. Vance IV, attorney-at-law, whose address is 908 Town & Country Blvd., Suite 120, Houston, Texas 77024.

This Certificate of Formation is executed on behalf of the Company on this 20th day of _May_ 2009 and is made so as to be effective immediately upon filing with the Secretary of State, Texas.

By: Griffin D. Vance IV

Griffin D. Vance IV
Law Office of Griffin D. Vance PC
908 Town & Country Blvd., Suite 120
Houston, Texas 77024



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   June 1, 2012

Certified Document Number:        51986655 Total Pages:  2

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated
documents are valid. If there is a question regarding the validity of this document and or seal
please e-mail support@hcdistrictclerk.com**

# Exhibit 7

Certified Document Number: 51986656 - Page 1 of 2

05/28/2009   11:09   TOWN & COUNTRY BUS. SERVICES → 15124635709PPP9804   NO.867   0004

**FILED**
In the Office of the
Secretary of State of Texas

## CERTIFICATE OF FORMATION OF

MAY 28 2009

# Valkyrie Media Partners, LLC Corporations Section

This Certificate of Formation for a limited liability company is adopted by the undersigned organizer under the Texas Business Organizations Code:

### ARTICLE 1

The name of the limited liability company, referred to in this Certificate as the "Company," is:

Valkyrie Media Partners, LLC

### ARTICLE 2

The period of duration of the Company is perpetual.

### ARTICLE 3

The purpose for which the Company is organized is to transact any or all lawful business for which limited liability companies may be organized under the Texas Business Organizations Code.

### ARTICLE 4

The address of the Company's initial registered office is 908 Town & Country Blvd., Suite 120, Houston, Texas 77024. The Company's initial registered agent at that address is Griffin D. Vance IV.

### ARTICLE 5

The Company will not have managers. The names and addresses of the initial members are:

Matt Greenfield: 9692 Westheimer Rd., #164, Houston, Texas 77063

Janice Williams: 14027 Memorial Drive #318, Houston, Texas 77079-6826

Net Master Hosting, LLC: 5644 Westheimer Rd., Suite 412, Houston, Texas 77056

### ARTICLE 6

The Company's organizer is:

Griffin D. Vance IV, attorney-at-law, whose address is 908 Town & Country Blvd., Suite 120, Houston, Texas 77024.

This Certificate of Formation is executed on behalf of the Company on this 28th day of May, 2009 and is made so as to be effective immediately upon filing with the Secretary of State, Texas.

By: Griffin D. Vance IV

Griffin D. Vance IV
Law Office of Griffin D. Vance PC
908 Town & Country Blvd., Suite 120
Houston, Texas 77024



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   June 1, 2012

Certified Document Number:        51986656 Total Pages:  2

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated
documents are valid. If there is a question regarding the validity of this document and or seal
please e-mail support@hcdistrictclerk.com**

Filed 12 April 20 P1:41
Chris Daniel - District Cler
Harris County
ED101J016840072
By: Wanda Chambers

## CAUSE NO. 2011-67220

| | | |
|---|---|---|
| FUNimation ENTERTAINMENT,<br>Plaintiff | §<br>§<br>§ | IN THE DISTRICT COURT OF |
| v. | §<br>§ | HARRIS COUNTY, TEXAS |
| A.D. VISION, INC., JOHN ROBERT<br>LEDFORD II, AESIR HOLDINGS L.L.C.<br>SXION 23, L.L.C., SERAPHIM<br>STUDIOS, L.L.C., SENTAI FILMWORKS,<br>L.L.C., SENTAI HOLDINGS, L.L.C., and<br>UNIO MYSTICA HOLDINGS, L.L.C.,<br>f/k/a UNIOMYSTICA, L.L.C. d/b/a<br>SWITCHBLADE PICTURES,<br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | 151ST JUDICIAL DISTRICT |

## PLAINTIFF'S MOTION TO DISMISS COUNTERCLAIM AND TO STRIKE AFFIRMATIVE DEFENSES, WITH SUPPORTING MEMORANDUM

TO THE HONORABLE COURT:

Plaintiff FUNimation Entertainment ("FUNimation") files this Motion to Dismiss and to Strike, respectively, the Counterclaim and Affirmative Defenses contained in:

- Paragraphs 4, 5, 14, 16 and 22-25 of the Original Answer and Counterclaim filed by Defendants AEsir Holdings, LLC, Sxion 23, LLC, Valkyrie Media Partners, LLC, Seraphim Studios, LLC, Sentai Filmworks, LLC, Sentai Holdings, LLC, and Unio Mystica Holdings, LLC, f/k/a Uniomystica, LLC, d/b/a Switchblade Pictures (collectively, the "Transferee Defendants"); and

- Paragraphs 2, 3, and 12 of the Original Answer filed by Defendants A.D. Vision, Inc. ("ADV") and John Robert Ledford II ("Ledford").

Plaintiff respectfully shows the Court as follows:

Certified Document Number: 51986648 - Page 1 of 11

## BACKGROUND

In 2008, another court in this judicial district held that ADV had breached a series of contracts with third party ARM Corporation ("ARM") by failing to make contractually required payments in excess of $11 million. (Exhibit 1 to the Affidavit of Lauren J. Harrison ("Harrison Aff.").)[1]  The Court issued a Writ of Sequestration allowing ARM to foreclose on collateral valued at over $3 million, leaving ADV in debt to it for approximately $7.3 million plus additional fees and interest.  (*Id.*)  ARM subsequently sold the collateral and ADV's remaining debt to FUNimation.  (Exh. 2 to Harrison Aff.)

In May 2009, FUNimation contacted ADV – specifically its CEO, defendant John Robert Ledford II ("Ledford") – seeking to collect the debt.  Mr. Ledford responded to FUNimation's inquiry by falsely informing FUNimation that ADV was about to file for bankruptcy protection and referring the inquiry to ADV's bankruptcy counsel.  (Exh. 3 to Harrison Aff.)  In fact, however, Mr. Ledford and a small group of ADV employees hastily formed a number of shell corporations with the Texas Secretary of State office.  (Exhs. 4-7 to Harrison Aff.)  Within days the ADV insiders transferred all of ADV's assets to the shell companies.  Each of the companies was formed and managed by ADV employees. (*Ibid.*)   ADV did not transfer the debt that it owed to FUNimation.  That debt remained the property of ADV.  ADV never did file for bankruptcy, but it appears that it no longer has sufficient assets to satisfy the debt.

ADV kept the transfers secret for months while its counsel delayed responding to FUNimation's repeated inquiries regarding the debt, and while FUNimation continued to believe the fiction regarding ADV's imminent bankruptcy filing. (Exhs. 8-9 to Harrison Aff.)  It was only FUNimation's repeated requests for information directed to ADV's attorney that finally

---

[1] This motion does not ask the Court to consider any evidence.  The materials filed with the Affidavit are intended only to substantiate the allegations set forth in the Background to the dispute.

Certified Document Number: 51986648 - Page 2 of 11

prompted ADV to disclose the transfers.   ADV's attorney advised FUNimation of the "sale" on August 31.  (Exh. 10 to Harrison Aff.)  On September 1, ADV issued a press release announcing that that on June 1 it had transferred all of its assets to the newly-created companies.  (Exh. 11 to Harrison Aff.)

This case asks whether the denuding of ADV, cloaked as it was in fraud, constituted a fraudulent transfer, and who can or will satisfy the debt as a result.

## SUMMARY OF ARGUMENTS

FUNimation seeks by this Motion to remove unnecessary issues from the case in order to streamline discovery and to narrow the issues for resolution:

- The Transferee Defendants' counterclaim for Declaratory Judgment is an impermissible "mirror image" claim.  *Texas Liquor Ctrl. Bd. v. Canyon Creek Land Corp.*, 456 S.W.2d 891, 895 (Tex. 1970).

- All Defendants' affirmative defenses of "lack of standing" are properly construed as challenges to FUNimation's capacity to sue, not its standing, and therefore are required to be presented in the form of verified denials supported by sworn affidavits on behalf of each defendant claiming the defense.  TEX. R. CIV. P.  93 (1, 2); *Pledger v. Schoellkopf*, 762 S.W.2d 145, 146 (Tex. 1988).

- All Defendants' affirmative defenses of "lack of consideration" and "material breach," are improper third party challenges to the validity of the assignment between ARM and FUNimation.  A debtor may not assert such defenses to an assignment agreement to which it is not a party.  *Glass v. Carpenter*, 330 S.W.2d 530, 537 (Tex. App. – San Antonio 1959, writ ref'd n.r.e.).

- All Defendants' "affirmative defenses" based on the "economic loss rule" should be stricken.  None of the causes of action in this case is subject to the economic loss rule.  Fraud and actions predicated on fraud are well-known exceptions to the economic loss rule.  *Formosa Plastics Corp. v. Presidio Engineers & Contractors*, 960 S.W.2d 41 (Tex. 1998).

## DISCUSSION

### 1. *Texas Does Not Allow "Mirror Image" Declaratory Judgment Counterclaims*

A defendant may not file a counterclaim for declaratory judgment that duplicates issues raised in the plaintiff's affirmative case.  This "Mirror Image" rule is well-settled.  *See, e.g.,*

Certified Document Number: 51986648 - Page 3 of 11

*Sanchez v. Americredit Financial Svces., Inc.*, 308 S.W.3d 521, 525 (Tex. App. – Dallas 2010, no pet.) (finding declaratory judgment claim improper that merely restated the party's defenses); *SCTW Health Care Ctr., Inc. v. AAR Inc.*, No. 01-07-00762, 2009 WL3321399 (Tex. App. – Houston [1st Dist.] Oct. 15, 2009) (not designated for publication) (upholding trial court order striking a counterclaim that asked "whether and to what extent" the defendant was obliged to pay – an issue that "was already at play in the pleadings filed by the parties"); *Warrentech Corp. v. Steadfast Ins. Co.*, 210 S.W.3d 760, 770 (Tex. App. – Fort Worth 2006) (holding that the Declaratory Judgment Act is not available to resolve issues already pending before the court).

The reason for the Mirror Image rule is to prevent parties from manufacturing claims for attorneys' fees in their defense of a case. A proper claim under the Texas Declaratory Judgment Act entitles the prevailing party to reimbursement of its reasonable fees. Allowing defendants to bring declaratory judgment "counterclaims" that do nothing more than negate the plaintiff's claims would manufacture unlimited claims for fees on behalf of successful defendants, essentially rewriting the "American rule." *See John Chezik Buick Co. v. Friendly Chevrolet Co.*, 749 S.W.2d 591, 594-95 (Tex.App.—Dallas 1988, no writ) (holding that a declaratory judgment counterclaim presenting no new controversy and "brought solely to pave an avenue to attorney fees" is improper).

The counterclaim filed by the Transferee Defendants offends the Mirror Image rule. FUNimation has brought a breach of contract claim against the "Transferee Defendants." The claim is based upon the same contract that gave rise to ADV's debt (called "the ADV Agreements" in the Petition). FUNimation's Petition specifically contends in its Breach of Contract Cause of Action that the Transferee Defendants are liable to FUNimation under the ADV Agreements:

Certified Document Number: 51986648 - Page 4 of 11

> ADV's failure to make payments under the ADV Agreements constitutes a material breach and wrongful repudiation and breach of the ADV Agreements for which ADV is liable to FUNimation in damages.
>
> As transferee of substantially all of ADV's intellectual property licenses, *the Transferee Defendants succeeded to ADV's contractual liability under the ADV Agreements. The Transferee Defendants are liable to FUNimation for the repudiation and breach of the ADV Agreements*.

(First Amended Original Petition ¶¶ 52-53 ("Breach of Contract") (emphasis added)).  This claim is premised on the notion that when ADV transferred all of its business and holdings to the Transferee Defendants, it succeeded in transferring its contractual liability as well, notwithstanding its apparent effort to carve that out.  FUNimation's Petition expressly contends that the Transferee Defendants are bound by the ADV Agreements just as ADV is bound.

The "Counter-Claim Seeking Declaratory Judgment" that the Transferee Defendants filed requests a declaration that they are *not* bound by the ADV Agreements.  That is the mirror image of FUNimation's claim.  Specifically, the Transferee Defendants seek a declaration that "(i) the contract which forms the basis of Plaintiff's complaint is not a valid agreement binding on the [Transferee] Defendants; (ii) Defendants owe no duties or obligations whatsoever to Plaintiff or any other entity under the alleged contract; and (iii) that Plaintiff's claims as to Defendants arising under the alleged contract are dismissed."  (Original Answer of [Transferee Defendants] at ¶ 25.)

This "counter-claim" requests determination of the same issues that are already pending before the Court by virtue of FUNimation's case in chief.  It simply re-states the Transferee Defendants' defense to the contract claims.  The "counter-claim" asks the Court to determine whether the Transferee Defendants are liable under the ADV Agreements, which is precisely what FUNimation's case-in-chief asks.  If the Transferee Defendants were to prevail on this "counter-claim," they would not obtain anything more than if they succeeded on their defenses to

Certified Document Number: 51986648 - Page 5 of 11

FUNimation's breach of contract claim. *See HECI Exploration Co. v. Clajon Gas Co.*, 843 S.W.2d 622, 639 (Tex. App. – Austin 1992, writ denied) (holding that declaratory judgment counterclaim is improper when it would secure the party asserting it no greater relief than that party would obtain if it succeeded in defending the case).

FUNimation accordingly requests that the Court dismiss the Counterclaim of the Transferee Defendants contained at paragraphs 22-25 of their Answer.

### 2. *Defendants' "Standing" Defenses Are Improperly Denominated and Unverified Challenges to Capacity*

Standing and capacity to sue are distinct concepts. Defendants conflate them. "A plaintiff has standing when it is personally aggrieved, regardless of whether it is acting with legal authority; a party has capacity when it has the legal authority to act, regardless of whether it has a justiciable interest in the controversy." *Nootsie v. Williamson Cty. Appraisal Dist.*, 925 S.W.2d 659, 661 (Tex. 1996). A challenge to the plaintiff's capacity to sue, unlike a challenge to its standing, requires the filing of a "a pleading verified by affidavit." TEX. R. CIV. P. 93(2); *Pledger v. Schoellkopf*, 762 S.W.2d 145, 146 (Tex. 1988). A challenge to capacity to sue, also unlike a challenge to standing, is waived if not asserted by verified denial because it does not go to the subject matter jurisdiction of the court. *Nootsie*, 925 S.W.2d at 662.

In this case, Defendants question the validity of the Assignment Agreements whereby FUNimation gained the contractual right to collect ADV's debt.[2] It is clearly on this basis that Defendants challenge FUNimation's "standing." However, a defense that the Plaintiff does not own the claim sued upon raises an issue of capacity, not standing: "A challenge to *who owns a claim* raises the issue of capacity, not standing, and requires compliance with rule 93." *Prostok*

---

[2] As discussed *infra* in Section 3, Defendants are barred on other grounds from challenging the validity of the assignment, so any attempt to re-plead this defense as "capacity" will be futile.

Certified Document Number: 51986648 - Page 6 of 11

*v. Browning*, 112 S.W.3d 876, 921 (Tex. App. – Dallas [5th Dist.] 2003, *aff'd in part, rev'd in part*, 165 S.W.3d 336 (Tex. 2005) (emphasis added).  As the Court of Appeals for the Fourteenth District has held:

> For several reasons, we agree with the majority of courts that misidentification among affiliated corporations or successors-in-interest is an issue that must be raised by verified pleading.  First, treating it as a standing complaint risks substantial waste, as standing may be raised long after the trial is over. Additionally, in many cases (including this one) deciding who should pay whom on a contract goes to the heart of the merits, while standing is generally a question of law determined by the court from the pleadings. See *Texas Natural Resource Conservation Com'n v. IT Davy*, 74 S.W.3d 849, 855 (Tex. 2002); *Texas Ass'n of Business v. Texas Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993).

*CHCA East Houston, LP v. Henderson*, 99 S.W.3d 630, 633 (Tex. App. Houston [14th Dist.] 2003, no pet.).

Each Defendant has interposed an affirmative defense based on lack of standing. Because Defendants are challenging FUNimation's ownership of its claims, which is an issue of capacity and not standing, the following affirmative defenses must be stricken for failure to comply with the requirement of verification imposed by TEX. R. CIV. P. 93(2):

- Paragraph 14 of the Original Answer of [Transferee Defendants].

- Paragraph 12 of [ADV's and Ledford's] Original Answer.

### 3. *Defendants May Not Challenge the Assignment Agreements for Lack of Consideration or by Claiming Material Breach Thereof*

Under Texas law, a party may not challenge the validity of an assignment agreement to which it is not privy.[3]  The law specifically forbids an obligor to challenge an assignee's rights on the ground that the assignment agreement is voidable for lack of consideration or some other defect:

---

[3] There is an exception, not applicable here, if the agreement is void on its face.  In that case the debtor must assert a denial of genuineness that is verified by sworn affidavit.  TEX. R. CIV. P. 93(8).

Certified Document Number: 51986648 - Page 7 of 11

> The law is settled that the obligors of a claim may defend the suit brought thereon on any ground which renders the assignment void, but may not defend on any ground which renders the assignment voidable only, because the only interest or right which an obligor of a claim has in the instrument of assignment is to insure himself that he will not have to pay the same claim twice.

*Tri-Cities Const., Inc. v. American Nat. Ins. Co.*, 532 S.W.2d 426, 430 (Tex. App. – Houston [1[st]

Dist.] 1975).

Thus, an obligor may *not* defend a case on the ground that the assignment lacked consideration, lacked mutuality, lacked specificity, or was procured by fraud, undue influence or the misuse of a fiduciary relationship.   Those are all defenses that are *unavailable* to the Defendants. *Id.*; *Glass v. Carpenter*, 330 S.W.2d 530, 537 (Tex. App. – San Antonio 1959, writ ref'd n.r.e.) (surveying law on this point).   Indeed, it is worth noting that Texas does not even require that an assignment agreement be supported by consideration at all.   An assignee "may enforce its rights against the obligor regardless of whether any consideration was exchanged for the assignment." *McLernon v. Dynegy, Inc.*, 347 S.W.3d 315, 327 (Tex. App. – Houston [14[th]

Dist.] 2011).   The affirmative defenses for lack of consideration are defective for the additional reason that they are not verified in accordance with TEX. R. CIV. P. 93(9).   Repleading would be futile, however, because the defenses are barred.

The Court should strike the following affirmative defenses, each of which appears to challenge the validity of the Assignment Agreements on the ground that they lacked consideration or that FUNimation allegedly breached them:

- Paragraphs 5 and 16 of the Original Answer of [Transferee Defendants].

- Paragraph 3 of [ADV's and Ledford's] Original Answer.

Certified Document Number: 51986648 - Page 8 of 11

### 4.  The Economic Loss Rule Plays No Role in this Case

FUNimation requests the Court to strike the "affirmative defenses"[4] in which Defendants rely upon the economic loss rule.  The economic loss rule is not relevant to this case. Eliminating the issue will provide the parties with certainty on how to develop evidence and expert witness testimony regarding the calculation of recoverable damages.

The economic loss rule in Texas precludes a party from obtaining on a negligence or products liability theory its purely economic losses arising from a breach of contract.  The import of the rule is that if a party suffers economic loss from the failure of a counterparty to fulfill its contractual obligations, that loss must be vindicated through a breach of contract claim.  The Texas Supreme Court recently had an opportunity to revisit the economic loss rule in *Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407 (Tex. 2011).  In that case, the Court observed, "[W]e have applied the economic loss rule only in cases involving defective products or failure to perform a contract." *Id.* at 418.  The Court quoted and squarely rejected the formulation used by the Court of Appeals, which was "that you can never recover economic damages for a tort claim." *Id.*

It is still the case, as it was before *Sharyland*, that a party may recover on a fraud-based theory for economic losses that arise under a contract. *Formosa Plastics Corp. v. Presidio Engineers & Contractors*, 960 S.W.2d 41 (Tex. 1998).  It is also still the rule, as it was before *Sharyland*, that the economic loss rule does not limit damages that arise as a result of a party's independent breach of a statutory or common law duty. *See Southwestern Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494-94 (Tex. 1991); *Motsenbocker v. Potts*, 863 S.W.2d 126, 138 (Tex. App. – Dallas 1993, no writ) (economic loss rule inapplicable to intentional torts).  And the

---

[4] The economic loss rule is not really an affirmative defense. *Tarrant Ct. Hosp. Dist. v. GE Auto Svces., Inc.*, 156 S.W.3d 885, 895 (Tex. App. – Fort Worth 2005).  FUNimation seeks to strike these defenses not for procedural

Certified Document Number: 51986648 - Page 9 of 11

economic loss rule says nothing about claims for equitable relief.

None of the claims that FUNimation has made implicates the economic loss rule.  For the sake of providing essential guidance in the development of discovery, expert reports, expert testimony and the parties' theories on damages, the Court should strike the following "affirmative defenses":

- Paragraph 4 of the Original Answer of [Transferee Defendants].

- Paragraph 2 of [ADV's and Ledford's] Original Answer.

## CONCLUSION

For the foregoing reasons, Plaintiff requests that the Court dismiss the counterclaim for declaratory judgment asserted by the Transferee Defendants and strike the affirmative defenses of lack of standing, lack of consideration, material breach and the economic loss doctrine.  A proposed order is attached.

Respectfully submitted,

**JONES, WALKER, WAECHTER,
POITEVENT, CARRERE & DENEGRE**

By: _____
LAUREN J. HARRISON
State Bar No. 24025840
First City Tower
1001 Fannin, Suite 2450
Houston, Texas   77046
713.437.1800
713.437.1810 (facsimile)
Email: lharrison@joneswalker.com

**ATTORNEYS FOR PLAINTIFF**

infirmity, however, but to obtain guidance on the merits of the case.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was forwarded to all known counsel of record listed below via hand delivery, facsimile transmission, regular mail, certified mail-return receipt requested, and or electronic transmission in accordance with the Texas Rules of Civil Procedure on this the 20th day of April, 2012.

Mr. Kyle C. Herbert
Mr. Shane A. McClelland
SIMON, HERBERT, McCLELLAND
    & STILES, LLP
3411 Richmond Avenue, Suite 400
Houston, Texas   77046
*Attorneys for Defendants Aesir Holdings, L.L.C.,*
*Sxion 23, L.L.C., Valkyrie Media Partners, L.L.C.,*
*Seraphim Studios, L.L.C., Sentai Filmworks,*
*L.L.C., and Unio Mystica Holdings, L.L.C.*
*f/k/a UnioMystica, L.L.C. d/b/a*
*Switchblade Pictures*

**VIA CM-RRR 7196 9008 9111 1283 3274**
**and FACSIMILE TRANSMISSION**

Ms. Thi "Nina" Tran
Mr. T. Michael Ballases
HOOVER SLOVACEK, L.L.P.
5847 San Felipe, Suite 2200
Houston, Texas   77057
*Attorneys for Defendants*
*A.D. Vision, Inc. and John Robert Ledford II*

**VIA CM-RRR 7196 9008 9111 1283 3267**
**and FACSIMILE TRANSMISSION**

LAUREN J. HARRISON



I, Chris Daniel, District Clerk of Harris County, Texas certify that this is a true and correct copy of the original record filed and or recorded in my office, electronically or hard copy, as it appears on this date.
Witness my official hand and seal of office this June 1, 2012

Certified Document Number:        51986648 Total Pages: 11

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated documents are valid. If there is a question regarding the validity of this document and or seal please e-mail support@hcdistrictclerk.com**

# Exhibit 8

Certified Document Number: 51986657 - Page 1 of 4

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

A. Signature

X _Tiffany Shelby_   ☐ Agent   ☐ Addressee

B. Received by ( Printed Name )   C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:   ☐ No

1. Article Addressed to:

Mr Ed Rothberg
Weycer, Kaplan, Pulaski & Zuber
11 Greenway Plaza
Ste #1400
Houston, Tx 77046

3. Service Type
☑ Certified Mail   ☐ Express Mail
☐ Registered   ☐ Return Receipt for Merchandise
☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
(Transfer from service label)
7007  1490  0003  5594  2464

PS Form 3811, February 2004        Domestic Return Receipt        102595-02-M-1540

Certified Document Number: 51986657 - Page 2 of 4

FUN 02768

**U.S. Postal Service**™
**CERTIFIED MAIL**™ **RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

**OFFICIAL USE**

| | |
|---|---|
| Postage | $ 44 |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ 4.90 |

Postmark
Here

Sent To Ed Rotherberg
Street, Apt. No.; or PO Box No. 11 Greenway Plaza Ste 1400
City, State, ZIP+4 Houston Tx 77046

7007 1490 0003 5594 2664

PS Form 3800, August 2006          See Reverse for Instructions

Certified Document Number: 51986657 - Page 3 of 4

FUN 02770



**A NAVARRE CORPORATION COMPANY**

June 29, 2009

Mr. Ed Rothberg
Weycer, Kaplan, Pulaski, & Zuber, P.C.
11 Greenway Plaza
Suite 1400
Houston, Texas 77046

Re: A.D. Vision, Inc.

Dear Mr. Rothberg

We understand from Mr. John Ledford that you represent A.D. Vision, Inc. ("ADV").
FUNimation Entertainment ("FUNimation") is a secured creditor of ADV.  In response to
FUNimation's efforts to collect on its debt, Mr. Ledford advised us that we should
address our inquiries to you.

Accordingly, FUNimation hereby demands immediate payment from ADV in the amount
of FOUR MILLION UNITED STATES DOLLARS ($4,000,000).  We would like to
discuss payment arrangements or other settlement terms at your earliest opportunity.
You may reach me at the address noted below, by email at jake.hilton@funimation.com,
or by phone at 972.537.0835.

The foregoing is without waiver of any of FUNimation's rights or remedies, all of which
are hereby reserved.

Sincerely,

Jake M Hilton
Corporate Counsel
FUNimation Entertainment

Cc: Gen Fukunaga

**FUN 02772**

Certified Document Number: 51986657 - Page 4 of 4





I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   June 1, 2012

Certified Document Number:        51986657 Total Pages:  4

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated
documents are valid. If there is a question regarding the validity of this document and or seal
please e-mail support@hcdistrictclerk.com**

# Exhibit 9

Certified Document Number: 51986662 - Page 1 of 4



**A NAVARRE CORPORATION COMPANY**

---

August 17, 2009

VIA UPS # 1286E 22W03 4458 3491

Mr. Ed Rothberg
Weycer, Kaplan, Pulaski, & Zuber, P.C.
11 Greenway Plaza
Suite 1400
Houston, Texas 77046

Re:  A.D. Vision, Inc.

Dear Mr. Rothberg:

As noted in our previous letter dated June 29, 2009, a copy of which is enclosed, we understand from Mr. John Ledford that you represent A.D. Vision, Inc. ("ADV").  FUNimation Entertainment ("FUNimation") is a secured creditor of ADV.  In response to FUNimation's efforts to collect on its debt, Mr. Ledford advised us that we should address our inquiries to you.

As we also stated in our previous communication, FUNimation hereby demands immediate payment from ADV in the amount of FOUR MILLION UNITED STATES DOLLARS ($4,000,000).  In our view, continued non-responsiveness to these communications will indicate an unwillingness on the part of ADV to resolve this matter amicably and in good faith.  Accordingly, if FUNimation does not receive a response within fourteen (14) days of the date of this letter, we will be forced to consider taking further action to collect the amounts due FUNimation.

The foregoing is without waiver of any of FUNimation's rights or remedies, all of which are hereby reserved. You may reach me at the address noted below, by email at jake.hilton@funimation.com, or by phone at 972.537.0835.

Sincerely,

Jake M Hilton
Corporate Counsel
FUNimation Entertainment

Cc:  Gen Fukunaga

**FUN 02773**

Certified Document Number: 51986662 - Page 2 of 4





A NAVARRE CORPORATION COMPANY

June 29, 2009

Mr. Ed Rothberg
Weycer, Kaplan, Pulaski, & Zuber, P.C.
11 Greenway Plaza
Suite 1400
Houston, Texas 77046



Re: A.D. Vision, Inc.

Dear Mr. Rothberg

We understand from Mr. John Ledford that you represent A.D. Vision, Inc. ("ADV").
FUNimation Entertainment ("FUNimation") is a secured creditor of ADV. In response to
FUNimation's efforts to collect on its debt, Mr. Ledford advised us that we should
address our inquiries to you.

Accordingly, FUNimation hereby demands immediate payment from ADV in the amount
of FOUR MILLION UNITED STATES DOLLARS ($4,000,000). We would like to
discuss payment arrangements or other settlement terms at your earliest opportunity.
You may reach me at the address noted below, by email at jake.hilton@funimation.com,
or by phone at 972.537.0835.

The foregoing is without waiver of any of FUNimation's rights or remedies, all of which
are hereby reserved.

Sincerely,

Jake M Hilton
Corporate Counsel
FUNimation Entertainment

Cc: Gen Fukunaga

**FUN 02774**

Certified Document Number: 51986662 - Page 3 of 4

PERRY MILLER
(972) 335-7300          1 LBS          1 OF 1
FUNIMATION PRODUCTIONS, LTD.
1200 LAKESIDE PARKWAY
FLOWER MOUND  TX 75028

SHIP TO:
    MR. ED ROTHBERG
    (999) 999-9999
    WEYCER, KAPLAN, PUILASKI & ZUBER, P
    SUITE 1400
    11 GREENWAY PLAZA
    HOUSTON  TX 77046

 

TX 774 9-04

UPS GROUND

TRACKING #: 1Z 86E 22W 03 4458 3491



BILLING: P/P

UOW   7.0.17 UPS Thermal 2 93.0A 07/2009

International Shipping Notice - Carriage hereunder may be subject to the rules relating to liability and other terms and/or conditions established by the Convention for the Unification of Certain Rules Relating to International Carriage by Air (the "Warsaw Convention") and/or the Convention on the Contract for the International Carriage of Goods by Road (the "CMR Convention"). These commodities, technology or software were exported from the U.S. in accordance with the Export Administration Regulations. Diversion contrary to U.S. law prohibited. For shipping places, call 1-800-782-7892.
United Parcel Service, Louisville, KY

Certified Document Number: 51986662 - Page 4 of 4

FUN 02775



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   June 1, 2012

Certified Document Number:        51986662 Total Pages:  4

Chris Daniel, DISTRICT CLERK

HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated documents are valid. If there is a question regarding the validity of this document and or seal please e-mail support@hcdistrictclerk.com**

# Exhibit 10

Certified Document Number: 51986663 - Page 1 of 2

## WEYCER, KAPLAN, PULASKI & ZUBER, P.C.
### ATTORNEYS AT LAW

EDWARD L. ROTHBERG
SHAREHOLDER

BOARD CERTIFIED · BUSINESS BANKRUPTCY LAW
TEXAS BOARD OF LEGAL SPECIALIZATION

EMAIL: EROTHBERG@WKPZ.COM
WRITER'S DIRECT DIAL (713) 341-1159
WRITER'S DIRECT FAX: (866) 217-4443

ELEVEN GREENWAY PLAZA
SUITE 1400
HOUSTON, TEXAS 77046
TELEPHONE: (713) 961-9045
FACSIMILE: (713) 961-5341

DALLAS/FORT WORTH OFFICE:
3030 MATLOCK ROAD, SUITE 201
ARLINGTON, TEXAS 76015
TELEPHONE: (817) 795-5046
FACSIMILE: (800) 556-1869

August 31, 2009

Jake Hilton
Corporate Counsel
Funimation Entertainment
1200 Lakeside Parkway, Bldg 1
Flower Mound, TX 75208

Re:   A.D. Vision, Inc. ("ADV")

Dear Mr. Hilton:

This is in response to your letter dated August 17, 2009, seeking to collect a "secured" debt from ADV in the amount of $4 million. First, I must advise you that this firm no longer represents ADV. Second, I must advise you that Funimation never was a secured creditor of ADV. Funimation purchased this debt from ARM. Prior to that purchase, ARM foreclosed its lien and repossessed all of the collateral. Since the collateral was taken by ARM, there is no security for the debt. If Funimation purchased the debt based on a representation from ARM that there was collateral, then, Funimation may have a claim against ARM. Last, ADV's assets have been sold in connection with a transaction necessary to satisfy the debt of Whitney Bank. Thus, ADV is out of business and does not have the ability to make any payment on this debt.

Very truly yours,

Edward L. Rothberg.

{ADV002\00001\0553986.DOC;1\ELR}

**FUN 02781**



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   June 1, 2012

Certified Document Number:        51986663 Total Pages:  2

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated documents are valid. If there is a question regarding the validity of this document and or seal please e-mail support@hcdistrictclerk.com**

# Exhibit 11

Certified Document Number: 51986665 - Page 1 of 2



**FOR IMMEDIATE RELEASE**

# A.D.VISION, INC. CONCLUDES SERIES OF ASSET TRANSACTIONS

**HOUSTON, September 1, 2009** — A.D. VISION, INC. ("ADV" or the "Company") announced today that June 1, 2009, the Company concluded a series of transactions that are expected to result in seamless delivery of home video products and television programming to customers.

Through an asset purchase agreement, AEsir Holdings, LLC ("Aesir") acquired a subordinated interest in selected programming from ADV's film library together with other intellectual property subject to all liens and security interests of the Company's senior secured lender. The transaction requires Aesir to assume specific obligations and scheduled liabilities of the Company under legacy license agreements associated with the acquired programming.

Concurrently, the Company concluded an asset purchase agreement with SXION 23, LLC, doing business as "Section23 Films," a home video distribution company, under which it assumes account servicing and distribution operations in connection with the library acquired by Aesir, subject to all liens and security interest of the Company's senior secured lender.

John Ledford, ADV's President and CEO, states "We believe the actions we initiated and completed provided the same or more value to the Company's secured lender and its programming licensors while giving other key stakeholders such as employees and customers some potential value or the reasonable probability of realizing value."

In a separate transaction, Valkyrie Media Partners, LLC ("Valkyrie") acquired a 100% equity position in Anime Network, Inc. ("ANI"), formerly ADV's television unit, pursuant to a stock purchase agreement between ADV and Valkyrie. That transaction includes an assumption by Valkyrie of specific liens and security interests of the Company's senior secured lender.

In another separate transaction, Seraphim Studios, LLC acquired Amusement Park Media, the production unit of A.D. Vision, Inc.

Further announcements are expected from the respective acquiring entities over the coming days.

### ###



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   June 1, 2012

Certified Document Number:        51986665 Total Pages:  2

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated
documents are valid. If there is a question regarding the validity of this document and or seal
please e-mail support@hcdistrictclerk.com**