**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| **FUNimation ENTERTAINMENT,** *Plaintiff* **v.** **A.D. VISION, INC., JOHN ROBERT LEDFORD II, AESIR HOLDINGS L.L.C., SXION 23 L.L.C., SERAPHIM STUDIOS, L.L.C., VALKYRIE MEDIA PARTNERS, L.L.C., SENTAI FILMWORKS, L.L.C., SENTAI HOLDINGS, L.L.C., and UNIO MYSTICA HOLDINGS, L.L.C., f/k/a UNIOMYSTICA, L.L.C. d/b/a SWITCHBLADE PICTURES,** *Defendants.* **A.D. VISION, INC.** *Third-party Plaintiff,* **v.** **FUNIMATION PRODUCTIONS, LTD., ANIMEONLINE, LTD., FUNIMATION GP, LLC, FUNIMATION LP, LLC, FUNIMATION HOLDINGS, LLC, ANIME HOLDINGS, LLC, and GEN FUKUNAGA,** *Third-party Defendants.* | **C.A. NO.: 4:12-cv-01736** **JURY DEMAND** |

**COUNTER- AND CROSS-CLAIM DEFENDANTS'**
**REPLY IN SUPPORT OF THEIR AMENDED MOTION TO DISMISS**

Respectfully submitted,

LAUREN J. HARRISON
Attorney-in-Charge
State Bar No. 24025840
Fed. Id. No. 30232
1001 Fannin Street, Suite 2450
Houston, Texas  77046
Telephone: 713/437-1800
Facsimile: 713/437-1810
Email: lharrison@joneswalker.com

**OF COUNSEL:**
JONES WALKER LLP

***Attorneys For Plaintiff,***
***Funimation Entertainment And Third-Party***
***Defendants Funimation Productions, Ltd.,***
***Animeonline, Ltd., Funimation GP, LLC,***
***Funimation LP, LLC, Funimation Holdings, LLC,***
***Anime Holdings, LLC, And Gen Fukunaga***

**TABLE OF CONTENTS**

PAGES

TABLE OF CONTENTS.................................................................................................I

TABLE OF AUTHORITIES .........................................................................................II

THE COURT'S QUESTIONS ...................................................................................... 1

    A. DISMISSAL OF THE ARM-ADV LAWSUIT WITHOUT PREJUDICE DOES NOT AFFECT PRECLUSION............................................................................................................ 1

    B. THE PRIOR PROCEEDINGS WERE NOT EX PARTE. ................................................ 3

    C. DISMISSAL DOES NOT ALTER APPLICATION OF NOERR-PENNINGTON. ............................. 3

    D. DENIAL OF ADV'S MOTION TO DISMISS....................................................... 4

    E. FUNIMATION'S ACQUISITION OF FORECLOSED PROPERTY IS NOT ACTIONABLE. ............... 4

REPLY TO ADV'S BRIEF ........................................................................................... 5

    A. ADV LACKS ARTICLE III STANDING. ........................................................... 5

    B. THE COUNTER COMPLAINT FAILS TO STATE A CLAIM.................................... 7

        1. Federal Antitrust Claims/Texas Free Enterprise Act Claims.................................7

            a. Antitrust Injury.................................................................................7

            b. Illegal Exclusionary Conduct.................................................10

            c. Harm to Competition within a Relevant Market........................................14

            d. For a Sherman Act Section 1 claim, proof of a conspiracy. ...........................16

            e. For a Sherman Act Section 2 Monopolization claim, a plausible allegation that the defendant has monopoly power........................................17

CONCLUSION........................................................................................................ 18

CERTIFICATE OF SERVICE ................................................................................. 19

## <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>                                                                                                          <u>PAGES</u>

*Apani Southwest v. Coca-Cola Enterprises,*
    300 F.3d 620 (5th Cir. 2002)...............................................................................15

*Apani Sw., Inc. v. Coca-Cola Enter's, Inc.,*
    300 F.3d 620 (5th Cir. 2002)...............................................................................18

*Atl. Richfield Co. v. USA Petroleum Co.,*
    495 U.S. 328 (1990).............................................................................................7

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007)..........................................................4, 7, 8, 9, 13, 14, 15, 17

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,*
    509 U.S. 209 (1993)...........................................................................................11

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
    429 U.S. 477 (1977).............................................................................................8

*Conwood Co, LP v. United States Tobacco Co.,*
    290 F.3d 768 (6th Cir. 2002)...............................................................................13

*D.C. Court of Appeals v. Feldman,*
    460 U.S. 462 (1983).............................................................................................2

*Dimmitt Agri Indus., Inc. v. CPC Int'l, Inc.,*
    679 F.2d 516 (5th Cir. 1982)...............................................................................18

*Doctor's Hospital of Jefferson, Inc. v. Southeast Medical Alliance, Inc.,*
    123 F.3d 301 (5th Cir. 1997).................................................................................8

*Dooley v. Crab Boat Owners Ass'n,*
    290 F.3d 768 (6th Cir. 2002)...............................................................................13

*Duffy & McGovern Accommodation Servs. v. QCI Marine Offshore, Inc.,*
    448 F.3d 825 (5th Cir. 2006).................................................................................1

*Gresham Park Cmty Org. v. Howell,*
    652 F.2d 1227 (5th Cir. 1981)...........................................................................1, 2

*Jebaco, Inc. v. Harrah's Operating Co., Inc.,*
    587 F.3d 314 (5th Cir. 2009).................................................................................9

*Mower v. Boyer,*
    811 S.W.2d 560 (Tex. 1991).................................................................................1

*Nicsand, Inc. v. 3M Co.,*
    507 F.3d 442 (6th Cir. 2007).................................................................................8

*Norris v. Hearst Trust*,
  500 F.3d 454 (5th Cir. 2007)..................................................................................1, 2, 10

*Pieper v. Am. Arbitration Ass'n*,
  336 F.3d 458 (6th Cir. 2003)..............................................................................................2

*Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*,
  508 U.S. 49 (1993)..............................................................................................................3

*PSKS, Inc. v. Leegin Creative Leather Products*,
  615 F.3d 412 (5th Cir. 2010)............................................................................................14

*Rio Grande Royalty Co. v. Energy Transfer Partners*,
  786 F. Supp.2d 1190 (S.D. Tex. 2009).............................................................................11

*Rooker v. Fidelity Trust Co*,
  263 U.S. 413 (1923)............................................................................................................2

*Royal Ins. Co. of Am. v. Quinn-L Capital Corp.*,
  960 F.2d 1286 n.11 (5th Cir. 1992).....................................................................................1

*Seidenstein, M.D. v. Nat'l Medical Enterprises, Inc.*,
  769 F.2d 1100 (5th Cir. 1985)......................................................................................14, 15

*Spectrum Sports, Inc. v. McQuillan*,
  506 U.S. 447 (1993)..........................................................................................................18

*Stearns Airport Equip Co., Inc. v. FMC Corp.*,
  170 F.3d 518 (5th Cir. 1999)............................................................................................11

*Steel Co. v. Citizens for Better Env't.*,
  523 US 83 (1998).................................................................................................................5

*Taylor Publishing Co. v. Jostens, Inc.*,
  216 F.3d 465 (5th Cir. 2000).......................................................................................11, 12

*U.S. Bancorp Mortgage Co. v. Bonner Mall P'ship*,
  513 U.S. 18 (1994)..............................................................................................................1

*United States v. Grinnell Corp.*,
  384 U.S. 563 (1966)..........................................................................................................17

*United States v. Microsoft Corp.*,
  87 F.Supp.2d 30 (D.D.C. 2000)........................................................................................11

*Verizon Commc'n, Inc. v. Law Offices of Curtis Trinko, L.L.P.*,
  540 U.S. 398 (2004)..........................................................................................................11

**RULES**                                                                                                                          **PAGES**

FED. R. EVID. 408 .................................................................................................................................12


**OTHER AUTHORITIES**                                                                                                    **PAGES**

3A Areeda & Turner, ANTITRUST LAW ¶ 782(a), at 272 (2002)...............................................................13

3A Areeda & Turner, ANTITRUST LAW ¶ 782m, at 269...........................................................................12

Steven Salop, "Exclusionary Conduct, Effect on Consumers, and the Flawed Profit-Sacrifice Standard," 73
    ANTITRUST L. J. 311 (2006)...........................................................................................................10, 11

Thomas D. Rowe, Jr. and Edward L. Baskauskas, '*Inextricably Intertwined' Explicable at Last?* Rooker-Feldman
    *Analysis after the Supreme Court's* Exxon Mobil *Decision*, FED. CT. L. REV. 1 (May 2006) ..................................2

Counter- and Cross-Claim Defendants (collectively "FUNimation") file this Reply in Support of their Amended Motion to Dismiss (dkt. no. 26) in accordance with this Court's Order for Expedited Response (dkt. no. 43).  This Reply responds to three questions posed by the Court and to the Response brief (dkt. no. 34) filed by Counter- and Cross-Claim Plaintiffs (collectively, "ADV").

## THE COURT'S QUESTIONS

### A.   DISMISSAL OF THE ARM-ADV LAWSUIT WITHOUT PREJUDICE DOES NOT AFFECT PRECLUSION.

The fact that the ARM-ADV lawsuit was dismissed without prejudice should not affect the analysis because the rulings issued in connection with sequestration may be given the same preclusive effect as a final judgment, regardless of the disposition of the remainder of the case. This Court accords to the ruling the same preclusive effect that a Texas court would[1] (it also may accord the ruling greater preclusive effect than Texas would, but not less[2]).  The rule in Texas is that an interlocutory order may be given preclusive effect so long as the ruling is "adequately deliberated and firm."[3]   Federal common law in this circuit applies collateral estoppel when a ruling is no longer subject to revision by the trial court.[4]

The most closely analogous case that Counter Defendants could find is *Norris v. Hearst Trust*,[5] which applied Texas law holding that once a court has decided an issue, the plaintiff may not nonsuit and then relitigate the same issue in a subsequent proceeding.

---

[1]   *Duffy & McGovern Accommodation Servs. v. QCI Marine Offshore, Inc.*, 448 F.3d 825, 828 (5th Cir. 2006).

[2]   *Gresham Park Cmty Org. v. Howell*, 652 F.2d 1227, 1242-43 (5th Cir. 1981).

[3]   *Mower v. Boyer*, 811 S.W.2d 560, 562 (Tex. 1991); *see also U.S. Bancorp Mortgage Co. v. Bonner Mall P'ship*, 513 U.S. 18, 26 (1994) (holding that it would be improper to vacate a judgment at the request of parties who later settled the case, because the judgment constituted precedent on which other parties should be able to rely).

[4]   *Royal Ins. Co. of Am. v. Quinn-L Capital Corp.*, 960 F.2d 1286, 1295 n.11 (5th Cir. 1992) (holding that partial summary judgment order is subject to preclusive effect because it finally decided the issues in the case, even though it had not yet been incorporated into a final judgment).

[5]   500 F.3d 454, 461-62 (5th Cir. 2007).

The state court orders concerning ADV's breach, ARM's right to foreclose, and the appropriateness of the collateral disposition are detailed, firm and final. They are not subject to revision by the trial court and are no longer appealable. ADV could have sought relief (through replevin or the appellate courts) but did not. As in *Norris*, ADV's voluntary dismissal does not relieve it of the effect of the prior ruling and as in *Norris*, ADV may not relitigate the same issue that the prior court decided. Equity also favors this result. The collateral was long ago sold. It would impose a great injustice on the parties who have relied on the finality of those proceedings to reopen them now, many years later.

In addition, relitigating the issue decided by the state court would offend the *Rooker-Feldman* doctrine. This doctrine prohibits federal courts from exercising appellate jurisdiction over state court judgments.[6] Although FUNimation could find no Fifth Circuit case holding that this doctrine applies to interlocutory state court orders, the majority of circuits and commentators agree that it does.[7] The doctrine's purpose is to prevent parties who lose in state court from seeking what in substance would be appellate relief in a new proceeding in federal court.[8] Revisiting the state court's foreclosure rulings would be the same as giving ADV the appeal that it waived in 2008.

The rules regarding preclusive effect should not be confused with the rules governing interlocutory appeals.[9] The rules are distinct because different principles apply. Allowing

---

[6]    *Rooker v. Fidelity Trust Co,* 263 U.S. 413, 415-16 (1923); *D.C. Court of Appeals v. Feldman*, 460 U.S. 462, 476 (1983).

[7]    *See, e.g., Pieper v. Am. Arbitration Ass'n*, 336 F.3d 458, 462-63 (6th Cir. 2003) (surveying case law and holding that the *Rooker-Feldman* doctrine applies to interlocutory orders)*, cert. denied,* 540 U.S. 1182 (2004); Thomas D. Rowe, Jr. and Edward L. Baskauskas, *'Inextricably Intertwined' Explicable at Last?* Rooker-Feldman *Analysis after the Supreme Court's* Exxon Mobil *Decision*, FED. CT. L. REV. (May 2006) (recommending that the doctrine apply to interlocutory orders).

[8]    *Pieper,* 336 F.3d at 460-65.

[9]    *Gresham Park,* 652 F.2d at 1242-43.

appeal of a nonfinal order is inefficient; according preclusive effect to an interlocutory ruling that can no longer be revised is efficient.

Finally, it is worth noting that this Court does not *need* to give preclusive effect to the state court orders in order to grant the Motion to Dismiss because the claims as pled are facially deficient. The state court orders show, among other things, why it would be futile to amend.

**B.    THE PRIOR PROCEEDINGS WERE <u>NOT</u> EX PARTE.**

It is incredibly disingenuous for ADV to argue that the state court proceedings were "*ex parte.*" ARM's Application for Writ of Sequestration was served on ADV's counsel.[10] The court held a hearing on the Application without notice to ADV and issued its initial Order *ex parte*, but ADV then filed a Motion seeking review (which the Court rejected) and participated in all the ensuing proceedings, culminating with the issuance of the Writ (which was not *ex parte*) and the court's directive relating to the foreclosure sale.[11] The *ex parte* argument should have no effect here.

**C.    DISMISSAL DOES NOT ALTER APPLICATION OF NOERR-PENNINGTON.**

Regardless of whether this Court grants preclusive effect to the interlocutory rulings of the prior court, the *Noerr-Pennington* doctrine applies to bar claims that are premised on the prior proceeding. *Noerr-Pennington* prohibits courts from basing antitrust liability on any "objectionably reasonable" request for judicial relief; it does not concern itself with the result of that petition or with the parties' subjective motivations.[12] Thus, even if the Court decided to revisit the state court's rulings with respect to the foreclosure, that would not mean that the Court could premise liability on any party's participation in that proceeding. ADV's antitrust claims are premised in large part on what it calls the "sham" foreclosure. *Noerr-Pennington* immunity

---

[10]    Ex. 11 (dkt. no. 13) at p.18.

[11]    *See* Exs. 12-18 (dkt. no. 13).

[12]    *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 57-62 (1993).

comes into play because the foreclosure was part of a litigation in which ARM validly (and successfully) sought to enforce its contractual rights. Even if this Court were to disagree with the trial court regarding whether foreclosure was proper (and properly conducted), it could not allow ADV to obtain relief based upon a foreclosure that occurred as part of an objectively reasonable litigation. That ARM's participation in the trial court litigation was objectively reasonable can hardly be disputed. After all, ADV – not ARM – filed the lawsuit that raised the very issues that were litigated.

**D.  DENIAL OF ADV'S MOTION TO DISMISS.**

This does not affect the arguments made in this Motion. ADV's Motion to Dismiss challenged FUNimation's standing. It posited that the assignment of the receivable from ARM to FUNimation was flawed in such a way that FUNimation would lack standing to sue for the receivable. This Court found no merit to ADV's arguments and appears to have agreed with FUNimation's argument (premised on black letter law in Texas) that a third party to an assignment agreement lacks standing to challenge it – in other words, that ADV lacks standing to challenge the validity of the ARM-FUNimation assignment. Those arguments should not come into play here. FUNimation's motion is a straightforward attack on the sufficiency of the pleadings to establish a plausible claim for relief under *Twombly* and *Iqbal*. FUNimation further argues that leave to amend would be futile because each of the claims is either time-barred, precluded, or both.

**E.  FUNIMATION'S ACQUISITION OF FORECLOSED PROPERTY IS NOT ACTIONABLE.**

ADV's allegation that FUNimation has acquired anime titles formerly belonging to ADV, even taken as true, should have no legal significance. First, this allegation does not appear anywhere in ADV's Counter Complaint. The Counter Complaint includes no factual allegations relating to any specific title acquisitions by FUNimation at any time. FUNimation *admits* that in

2008 it acquired approximately 30 anime titles that ADV had already lost in the foreclosure proceeding. The fact that FUNimation acquired a number – but not remotely all – of the titles formerly belonging to ADV does not come close to stating an antitrust claim. The acquisition of property – whether or not from a competitor – is not actionable under the antitrust laws. FUNimation purchased property that its competitor had already lost in a foreclosure proceeding. As an anime distributor, FUNimation had a legitimate business motive to obtain those anime properties. So long as the acquisition made business sense for FUNimation (and ADV admits that it did; it alleges – wrongly – that the titles were sold "for a fraction of their total value"), these acquisitions raise absolutely no antitrust issue. In fact, it might have raised antitrust concerns if FUNimation had *not* acted on the opportunity!

## REPLY TO ADV'S BRIEF

### A.  ADV LACKS ARTICLE III STANDING.

Although FUNimation did not frame its challenge as one to subject matter jurisdiction, it is a problem presented in the Motion to Dismiss (dkt. no. 26 at p.21), and ADV's response does nothing to solve it. Truly, there is no redressable controversy presented in the Counter Complaint.

> The "irreducible constitutional minimum of standing" contains three requirements. First and foremost, there must be alleged (and ultimately proved) an "injury in fact"—a harm suffered by the plaintiff that is "concrete" and "actual or imminent, not conjectural or hypothetical." Second, there must be causation—a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant. And third, there must be redressability—a likelihood that the requested relief will redress the alleged injury. This triad of injury in fact, causation, and redressability constitutes the core of Article III's case-or-controversy requirement, and the party invoking federal jurisdiction bears the burden of establishing its existence.[13]

ADV's only injury was losing the right to the anime titles on which ARM foreclosed.

---

[13]    *Steel Co. v. Citizens for Better Env't.*, 523 US 83, 103 (1998) (internal citations omitted).

This loss was the direct result of ADV's breach of its agreements with ARM and the rulings against it in the foreclosure litigation (which, again, even if overruled by this Court are still entitled to *Noerr-Pennington* immunity).  ADV would have suffered this same loss regardless of whether FUNimation *or any other party* purchased the anime titles.

ADV suggests that FUNimation somehow goaded ARM into the foreclosure, but that baseless allegation cannot support a claim.  Even taking it as true, there is nothing wrongful in encouraging a party to do something that it is allowed to do – to exercise its contractual rights.  There is no cause of action for "tortious encouragement to abide by contractual terms."

There also is neither an allegation nor any plausible basis to believe that ARM would *not* have declared ADV in default and foreclosed on the property absent the suggested encouragement from FUNimation.  ADV was in debt to ARM for *$12 million dollars*.  Of course ARM would take whatever legal action was required to try to collect on that debt.  ARM's legally protected  decision to exercise its contractual rights is the sole and superseding cause of whatever harm ADV may have suffered.  Whatever loss ADV might have suffered by virtue of having those titles foreclosed upon and sold to FUNimation, that injury is not "fairly traceable" to any conduct of FUNimation.

ADV's allegations relating to FUNimation's supposed role in the termination of its relationship with ARM are not just irrelevant and implausible; they are demonstrably false.  ADV contends that FUNimation and ARM were in discussions as of December 2007 (something that FUNimation does not deny, although it disputes ADV's allegations regarding the scope, nature, timing, legality and effect of these discussions).  But: **ARM first held ADV in default in September 2007**.[14]  The parties reached terms that were intended to allow ADV to cure, which

---

[14]    Ex. 1 at ¶¶ 7-17 and Ex. 4 (dkt. no. 13).

ADV failed to do.  ARM then reasserted default in December 2007.  Thus, even if ADV could craft a claim that FUNimation somehow persuaded ARM to enforce rights that it had, ADV has not actually pled this.  In coming up with its baseless allegation, ADV apparently forgot that it had already been held in default months before it claims FUNimation discussed this with ARM.

Without a causal connection between ADV's alleged injury and any wrongful act by FUNimation, ADV cannot establish the cause-in-fact necessary for constitutional standing.

**B.   THE COUNTER COMPLAINT FAILS TO STATE A CLAIM.**

FUNimation will attempt not to reargue all the points made in the Motion to Dismiss. Below is a summary of points, with additional discussion provided as necessary to respond to the Court's questions and to ADV's responsive pleading.

### 1.   Federal Antitrust Claims/Texas Free Enterprise Act Claims.

An antitrust claim cannot survive scrutiny under *Twombly* and *Iqbal* unless EVERY ONE OF THE FOLLOWING IS PLAUSIBLY PLED.  ADV has not adequately pled any of them, much less all.  In considering ADV's arguments, it is worth noting that **ADV's brief *does not cite a single antitrust case that was decided after Iqbal (2009)***:

#### a.   *Antitrust Injury.*

Without antitrust injury, a party may not bring any claim under the antitrust laws.  An antitrust injury is one that not only flows causally from the defendant's conduct (Article III standing, above) but that "is attributable to an anti-competitive aspect of the practice under scrutiny."[15]  An example of an antitrust injury would be an inability to obtain supplies because a rival has tied up the market with illegal exclusive or tying agreements.  Under *Twombly*, a complaint must contain "enough factual matter (taken as true) to suggest [that an antitrust injury

---

[15]   *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990).

occurred].”[16]

The case on which ADV relies is on the one hand unhelpful in that it was decided a decade before *Twombly*, yet it provides an excellent explanation for why antitrust injury does not lie in this case. ADV cites *Doctor's Hospital of Jefferson, Inc. v. Southeast Medical Alliance, Inc.,* [17] for the notion that FUNimation's challenge to antitrust injury is an impermissible invitation for the Court to decide the merits. (Response, dkt. no. 34 at p.14.) On the contrary, FUNimation asks this Court to follow clear and binding precedent to hold that to the extent that ADV has alleged any injury at all (its loss of 30 anime titles), that is not an injury of the type that the antitrust laws were intended to remedy.

The *Jefferson Hospital* case supports FUNimation's position. It explains the antitrust injury requirement as "ensur[ing] that the plaintiff's demand for relief ultimately serves the purposes of antitrust law to increase consumer choice, lower prices and assist competition, not competitors. Because the lure of treble damage recovery for otherwise ordinary tort and contract actions has inspired 'antitrust' lawsuits that do not fulfill these goals, the standing test is often a useful filter at an early stage of litigation."[18] ADV's claims do not meet these goals; they seek only to vindicate ADV's own commercial loss.

This case is similar to *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*[19] the iconic Supreme Court case that helped to define the antitrust injury requirement. In that case, the defendant bowling equipment manufacturer foreclosed on loans to failing bowling centers, purchased their

---

[16]    *Nicsand, Inc. v. 3M Co.,* 507 F.3d 442, 451 (6th Cir. 2007) (quotations omitted; alteration in original).

[17]    123 F.3d 301 (5th Cir. 1997).

[18]    *Id.* at 306. Ultimately, the *Jefferson Hospital* case did not decide the case on antitrust injury grounds. It upheld summary judgment for the defendant because of its failure to define a relevant geographic market. Had the case been decided after *Twombly* and *Iqbal*, one queries whether it might have been disposed of at the 12(b)(6) stage.

[19]    429 U.S. 477 (1977).

assets, and began operating the centers itself.  Several bowling alleys sued, claiming that the manufacturer's acquisition of these bowling alleys threatened or constituted monopolization. The Supreme Court held that whatever injury the plaintiff bowling alleys suffered was the result of increased competition, not decreased competition.  It held that they lacked antitrust injury and hence lacked standing.  There was no question that the manufacturer's acquisition of the defaulting bowling centers harmed the plaintiffs.  The problem was that it did not harm competition.[20]

This case is also similar to *Jebaco, Inc. v. Harrah's Operating Co., Inc.*, [21] cited in FUNimation's opening brief.  In that case, plaintiff Jebaco leased berths on Lake Charles to a third party (Players) to operate riverboat casinos.  Jebaco was compensated via "per patron" fees. Players assigned its rights to Harrahs, which then sold them to another third party, Pinnacle. These sales had the effect of depriving Jebaco of its per-patron fees.  Jebaco sued under Sections 1 and 2 of the Sherman Act, alleging that Harrahs' sale to Pinnacle was collusive and that together they monopolized/attempted to monopolize/conspired to monopolize the market for gambling licenses.  The Court of Appeals (applying *Twombly*) upheld dismissal on the ground that Jebaco had not plausibly alleged antitrust injury.  The court held that Jebaco's loss of its fees might have been an injury to its "competitive position," but it was not an injury to competition.[22] The court also reasoned that the substitution by Harrah's of one firm for another did not constitute antitrust injury.[23]  The same reasoning applies to ARM's substitution of FUNimation for ADV as the counterparty on the anime licenses.

---

[20]   *Id.* at 489 n.14.

[21]   587 F.3d 314 (5th Cir. 2009).

[22]   *Id.* at 320.

[23]   *Id.* at 320-21.

ADV argues in its brief that FUNimation's acts *could* raise prices for consumers, but it does not allege that this has occurred, nor would such an allegation be plausible given that the Counter Complaint is completely devoid of any allegations concerning how anime is produced, marketed, distributed or consumed.  Information about the anime market is in the public domain. ADV shows contempt for the Court's and the parties' resources by failing to provide even the most cursory information about pricing or distribution trends.

ADV's failure to allege antitrust injury is fatal.  *See Norris v. Hearst Trust*, 500 F. 3d 454, 463 (5th Cir. 2007) (holding that plaintiff newspaper distributors failed adequately to allege antitrust injury because they alleged only harm to themselves; "[t]here is no allegation of any harm – or increased price or cost to – subscribers (or readers).").

> b.  *Illegal Exclusionary Conduct.*

Antitrust is a tort.  It requires proof of more than injury.  It requires proof of a wrongful act that caused that injury.  Every antitrust cause of action that is before this Court requires proof of exclusionary conduct (also known as "predatory" or "anti-competitive" conduct).  In order to survive this Motion to Dismiss, the Counter Complaint would have to include plausible factual allegations of exclusionary conduct.

"Exclusionary conduct" has a very specific meaning.  It refers to collusive or exclusive practices that *alter the marketplace* by, for example, restricting firms' output across the market, raising rivals' costs, forcing rivals to raises prices, or causing rivals to exit the market.[24]  There are a number of different tests that courts use to identify exclusionary conduct.  It is not necessary to define the precise test here, for ADV's allegations would fail any of them.  The

---

[24]    Steven Salop, "Exclusionary Conduct, Effect on Consumers, and the Flawed Profit-Sacrifice Standard," 73 ANTITRUST L. J. 311 (2006).

Fifth Circuit generally applies the "no economic sense" test.[25]  As this Court defined it in the *Rio Grande Royalty* case, "[p]redatory or anticompetitive conduct is conduct that tends to impair the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way."[26]

What exclusionary conduct is *not* is conduct that – however improper or venal it might be – has a valid business justification.  "Even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws; those laws do not create a federal law of unfair competition or purport to afford remedies for all torts committed by or against persons engaged in interstate commerce."[27]

In *Taylor Publishing Co. v. Jostens, Inc.*,[28] the Court of Appeals for the Fifth Circuit held that the following acts did *not* constitute exclusionary conduct under the antitrust laws:

- Misappropriating plaintiff's confidential information;
- Approaching and hiring the plaintiff's employees in an effort to obtain the plaintiff's confidential business information;
- Deceiving customers into transferring business from plaintiff to defendant by providing them with misleading pricing information;
- Interfering with plaintiff's contracts with its customers; and
- Offering below-cost pricing (this was insufficient because it applied to a small minority of defendant's products).

The *Taylor Publishing* case is particularly relevant here because it rejected the idea that

---

[25]    *Stearns Airport Equip Co., Inc. v. FMC Corp.*, 170 F.3d 518, 522 (5th Cir. 1999) ("The key factor courts have analyzed in order to determine whether challenged conduct is or is not competition on the merits is the proffered business justification for the act. If the conduct has no rational business purpose other than its adverse effects on competitors, an inference that it is exclusionary is supported.").

[26]    *Rio Grande Royalty Co. v. Energy Transfer Partners*, 786 F. Supp.2d 1190, 1196 (S.D. Tex. 2009) (Ellison, J.) (holding that plaintiff failed to state a claim for monopolization because it failed to identify exclusionary conduct). The exact test is subject to scholarly debate, but in any form it requires that the defendant have acted in a manner contrary to its own economic interests.  *See Verizon Commc'n, Inc. v. Law Offices of Curtis Trinko, L.L.P.*, 540 U.S. 398 (2004); *United States v. Microsoft Corp.*, 87 F.Supp.2d 30, 44 (D.D.C. 2000); 73 Antitrust L.J. at 312.

[27]    *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225 (1993).

[28]    216 F.3d 465, 476-84 (5th Cir. 2000).

misappropriating confidential information, tortiously interfering with contracts, or inducing parties to breach their noncompetition agreements is exclusionary conduct.[29]  These are many of the same allegations on which ADV relies.  The *Taylor Publishing* court observed that even if those claims were true, the conduct harmed only a competitor and not competition.[30]  In observing that tortious interference with a contract is not exclusionary conduct, the court quoted the leading scholars on antitrust law, Philip Areeda and Herbert Hovenkamp, as saying:

> [W]hile it may be a tort for a defendant to induce another to deal in violation of its contract with the defendant's rival, it should not be an exclusionary practice . . . . Th[e] competitive effect is neither increased nor decreased when the resource owner or customer is or is not contractually bound against making that transfer. If there is a tort, so be it. But antitrust law should not make liability depend on the existence or nonexistence of contracts that do not affect the competitive results.[31]

In attempting to demonstrate that it has pleaded exclusionary conduct, ADV's brief refers the Court to the following four allegations: that FUNimation acquired the foreclosed anime titles; that FUNimation engaged in "independently tortious conduct"; that FUNimation was "seeking to gain control of ADV based on FUNimation's claim that it had acquired debt allegedly owed by ADV"; and "filing the current lawsuit."  (Response, dkt. no. 34, at p.21.)  Taken together or separately, these allegations do not state an antitrust claim:

- FUNimation's acquisition of the anime titles is not exclusionary conduct.  ADV concedes that it made business sense for FUNimation to purchase them.

- Even if the Counter Complaint adequately pled "independently tortious conduct," it would not state an antitrust claim.  The Counter Complaint pleads misappropriation, fraud, and tortious interference.  As *Taylor Publishing* makes abundantly clear *as a matter of law*, none of these causes of action can support an antitrust claim.

- "Seeking to gain control" of a competitor – unsuccessfully – is not exclusionary conduct.  Moreover, ADV alleges that this statement was made as an offer of settlement.  As such, it is not admissible under FED. R. EVID. 408.  No claim can be premised on this allegation.

---

[29]   *Id.*

[30]   *Id.* at 483.

[31]   *Id.* at 484 (quoting 3A Areeda & Hovenkamp ¶ 782m, at 269).

- The filing of this lawsuit is clearly protected under *Noerr-Pennington*. The notion that FUNimation filed this case to harass ADV is utterly implausible. FUNimation filed this lawsuit in the hopes of obtaining the millions of dollars that ADV indisputably owes (although ADV disputes that it owes it to FUNimation). If FUNimation wanted to use the assignment to destroy its competitor rather than in a legitimate effort to obtain relief, it would have filed the case as soon as the assignment was made – and before ADV fraudulently transferred substantially all of its assets to third parties! ADV's fraudulent transfer makes this case much more complicated – and seemingly would have eliminated any motive for FUNimation to sue ADV on the debt! This is a case motivated by principle: to vindicate a clear wrong and to recover a receivable for which FUNimation gave value. The Counter Complaint is a side show plainly motivated to try to gain settlement leverage.

ADV's brief cites two cases that it claims premised antitrust violations on "independent torts." (Response, dkt. no. 34, at pp.21-22.) ADV's reliance on these cases is baffling. *Conwood Co, LP v. United States Tobacco Co.*,[32] held that "[i]solated tortious activity alone *does not constitute exclusionary conduct for purposes of a § 2 violation*, absent a *significant and more than a temporary effect on competition*, and not merely on a competitor or customer."[33] The court stated that "[b]usiness torts will be violative of § 2 only in 'rare gross cases.'"[34] *Conwood* did find exclusionary conduct on the ground that the defendant snuff manufacturer effectively prevented its competitor from displaying and/or selling its snuff at approximately 300,000 retail outlets. That is not remotely comparable to the facts alleged here. In any event, *Conwood* is a Sixth Circuit case that predated *Twombly*.

ADV also cites *Dooley v. Crab Boat Owners Ass'n*,[35] an opinion from the Northern District of California, for the proposition that torts such as cutting crab lines and beating up crew members may constitute exclusionary conduct. (Response, dkt. no. 34, at p.22.) *Dooley* is (WOW) *not even an antitrust case*. *Dooley* presented claims under *California's state predatory*

---

[32]   290 F.3d 768 (6th Cir. 2002).

[33]   *Id.* at 783 (emphasis added).

[34]   *Id.* at 784 (quoting 3A Areeda & Turner, ANTITRUST LAW ¶ 782(a), at 272 (2002)).

[35]   271 F.Supp.2d 1207 (N.D. Cal. 2003).

*pricing statute*.

Finally, ADV argues that the acquisition or control of a competitor may raise antitrust concerns. (dkt. no. 34 at p.21.) It may, but that is not what occurred here. FUNimation did not acquire ADV. It acquired a small amount of property formerly belonging to ADV.

ADV's reliance on inapposite cases is unfortunate. Ultimately what matters is that ADV has failed to allege that FUNimation engaged in any conduct that was against its own economic self-interest or that harmed competition. Which means that ADV has failed to allege exclusionary conduct. Which means that all of ADV's antitrust claims must be dismissed.

c.    *Harm to Competition within a Relevant Market.*

This is really three things. A claimant must plead a relevant product market and a relevant geographic market, and it must establish that competition (not just a competitor) has been harmed within that market, e.g. through raised prices or restricted output.

ADV argues falsely that the question of whether it has defined a relevant market may only be one of fact. That is not remotely true. *PSKS, Inc. v. Leegin Creative Leather Products*, [36] affirmed 12(b)(6) dismissal of an antitrust claim and held that in order to state an antitrust claim, the "complaint must plausibly define the relevant product and geographic markets."

For its incorrect and contrary proposition, ADV relies upon *Seidenstein, M.D. v. Nat'l Medical Enterprises, Inc.* [37] This case directly contradicts ADV's position. *Seidenstein*, decided more than two decades before *Twombly*, stated in *dictum* that while the question of whether a defendant has market power in a relevant market is "usually one of fact for the jury . . . [i]n some instances, however, the relevant market may be determined as a matter of law."[38] That is the

---

[36]    615 F.3d 412, 417 (5th Cir. 2010).

[37]    769 F.2d 1100 (5th Cir. 1985).

[38]    *Id.* at 1106.

only way in which the case is instructive here (that is, in supporting FUNimation).   The *Seidenstein* trial court directed a defense verdict that the court of appeals affirmed.  One basis for affirmance was that, as a matter of law, the plaintiff did not properly define the relevant market.[39]

More instructive is *Apani Southwest v. Coca-Cola Enterprises* [40] which upheld 12(b)(6) dismissal because the plaintiff did not adequately plead a relevant market. The court reached this decision despite the fact that it concluded (in clear contravention of the later *Twombly* holding) that it would be improper to hold the plaintiff to a heightened pleading standard.[41]   The court nonetheless held that "[w]here the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, **the relevant market is legally insufficient, and a motion to dismiss may be granted**."[42]

ADV also argues, inaccurately, that an alleged product market may be rejected *only* if it is too narrow and not if it is too broad.  There *are* several cases that have rejected market definitions as too narrow.  The opposite situation (a too-broad definition) rarely occurs because few litigants are unwise enough to define their markets broadly.  The broader the market, the more difficult it is to establish harm to competition within that market.  There is absolutely no rule that market definition may be challenged solely on the basis that it is too narrow.

ADV's problem is that it has not defined a relevant market at all.  The Counter Complaint

---

[39]   *Id.*

[40]   300 F.3d 620 (5th Cir. 2002).

[41]   *Id.* at 633.

[42]   *Id.* at 628 (emphasis added).

alleges that FUNimation's antitrust violations have occurred in "various downstream markets for Japanese anime."  This is a meaningless phrase, and it is all that ADV offers.  "Anime" is the shorthand term for any animation of a certain recognizable style.  It may refer to television series, full-length feature films, short films, videos, video games, commercials, and/or internet-based releases, as well as several genres of fiction.  It may be distributed worldwide through an enormous number of different technological and economic arrangements.  There is enormous variation in the distribution methods for anime and a perhaps infinite number of ways one could define different markets.  Without a baseline market definition, it is impossible to know whether competition in that market has been harmed or whether a defendant has market power.  ADV's failure to identify the specific market in which it purportedly alleges that FUNimation engaged in monopolization (or attempted monopolization) is fatal.

As a significant aside, video distribution swiftly has evolved over the past four years.  The Counter Complaint pays no attention to economic or technological realities in light of the emergence of video outlets such as Youtube, Itunes and Hulu, all of which postdate the events giving rise to this case.  Were ADV to state an antitrust claim, it would be required to identify a market that takes account of these shifting dynamics.  It falls woefully short of that task.

Next, if ADV were able to define a relevant market, it would have to plead competitive harm within that market.  As discussed above, ADV has described only harm to itself.  This is yet another basis to dismiss all the antitrust claims.

> d.    *For a Sherman Act Section 1 claim, proof of a conspiracy.*

Each of the foregoing discussions identifies defects that – if the Court agrees – requires dismissal of all antitrust claims.  This discussion focuses on ADV's attempt to state a claim under Section 1 of the Sherman Act.  Section 1 condemns conspiracies that restrain trade.  In its

Motion to Dismiss, FUNimation argued that the Counter Defendants cannot, as a matter of law, be held liable under Section 1 because members of a single economic enterprise cannot, as a matter of law, conspire.

ADV does not appear to disagree with Counter Defendants' point but argues that FUNimation conspired not with itself but with third party ARM.  The Court should reject this attempt to salvage the Section 1 claims.  The Counter Complaint does not contain any plausible allegation of conspiracy.  This is *Twombly qua Twombly*.  Except that it is a worse case than *Twombly*.

In *Bell Atlantic Corp. v. Twombly*,[43] the Supreme Court upheld 12(b)(6) dismissal of a claim that telephone exchange carriers had conspired to restrain competition in the provision of long distance telephone services.  On its face, *Twombly* would have been a stronger case than ADV's because it was brought by consumers challenging alleged collusion in their provider market.  The Supreme Court held that the plaintiffs failed to state a claim because the conspiracy that they alleged among providers was as consistent with competitive behavior as with anticompetitive behavior.  That is certainly true of alleged discussions between a single licensor and a single licensee – who are *not* competitors – regarding a single proposed sale and assignment.  This is a manifestly defective allegation of conspiracy.

    e. *For a Sherman Act Section 2 Monopolization claim, a plausible allegation that the defendant has monopoly power.*

To plead monopolization, a plaintiff must plead that the defendant possesses monopoly power AND that the defendant acquired or maintained its monopoly power willfully.[44]  It is true that, as ADV urges, monopoly power is not synonymous with market share.  It means more than

---

[43] 550 U.S. 544, 562-63 (2007).

[44] *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966).

that.  Monopoly power is the power to restrict output and to raise prices.  FUNimation's opening brief discusses the pleading requirements for Section 2 claims extensively; FUNimation will not repeat it all here.  It does want to respond to one misleading argument in ADV's brief.

ADV's brief claims that it is not necessary for a plaintiff to plead any particular market share to state a claim for monopolization.  This is inexplicable.  The very case that ADV cites, *Dimmitt Agri Indus., Inc. v. CPC Int'l, Inc*[45] repeats the clear and uncontestable rule that the Fifth Circuit requires a market share of well in excess of 50% as a predicate for showing monopoly power.  A market share of more than 50% is not sufficient to establish market power, but it is *necessary* to show market power.[46]  Failure to plead this is a basis for 12(b)(6) dismissal.[47]

It is true that the cause of action for *attempted monopolization* relaxes the requirement to plead and to prove market share, but it requires that the plaintiff adequately and plausibly plead that the defendant has a dangerous probability of success in achieving a monopoly.[48]  Given that ADV has not presented *any* allegations that go to FUNimation's alleged market power, it has not pled at all (much less adequately or plausibly) a basis to hold that FUNimation is dangerously close to having monopoly power.

## CONCLUSION

With respect to all issues not addressed herein, FUNimation relies upon the authorities and arguments in its Motion to Dismiss (dkt. no. 13).  FUNimation appreciates the opportunity to respond to the Court's questions.

---

[45]   679 F.2d 516 (5th Cir. 1982).

[46]   *Id.* at 528-31.

[47]   *Apani Sw., Inc. v. Coca-Cola Enter's, Inc.,* 300 F.3d 620, 632-33 (5th Cir. 2002).

[48]   *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).

Respectfully submitted,

By:    */s/ Lauren J. Harrison*
       LAUREN J. HARRISON
       Attorney-in-Charge
       Fed. Id. No. 30232
       State Bar No. 24025840
       1001 Fannin, Suite 2450
       Houston, Texas  77046
       Telephone: 713/437-1800
       Facsimile: 713/437-1810
       Email: lharrison@joneswalker.com

**OF COUNSEL:**
JONES WALKER LLP

*Attorneys For Plaintiff,*
*Funimation Entertainment And Third-Party*
*Defendants Funimation Productions, Ltd.,*
*Animeonline, Ltd., Funimation GP, LLC,*
*Funimation LP, LLC, Funimation Holdings, LLC,*
*Anime Holdings, LLC, And Gen Fukunaga*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was forwarded to all known counsel of record listed below via CM/ECF in accordance with the Federal Rules of Civil Procedure on this the 19th day of April, 2013.

Mr. Kyle C. Herbert
Mr. Shane A. McClelland
SIMON, HERBERT, MCCLELLAND
  & STILES, LLP
3411 Richmond Avenue, Suite 400
Houston, Texas  77046

*Attorneys for Defendants*
*Aesir Holdings, L.L.C.,*
*Sxion 23, L.L.C.,*
*Valkyrie Media Partners, L.L.C.,*
*Seraphim Studios, L.L.C., Sentai Filmworks,*
*L.L.C., and Unio Mystica Holdings, L.L.C.*
*f/k/a UnioMystica, L.L.C. d/b/a*
*Switchblade Pictures*

Mr. Chris Lacy
Ms. Jamie Aycock
Ms. Lauren Reeder
AHMAD, ZAVITSANOS, ANAIPAKOS, ALAVI
  & MENSING, P.C.
1221 McKinney, Suite 3460
Houston, Texas 77010

*Attorneys for Defendant/Third-Party*
*Plaintiff A.D. Vision, Inc. and*
*Defendant John Robert Ledford II*

       /s/ Lauren J. Harrison
       LAUREN J. HARRISON